UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

FEDERAL TRADE COMMISSION,                    :     Index No.: 08 CV 1819 (PAC)

                    Plaintiff,       :

        - against -                          :

BLUEHIPPO FUNDING, LLC, et al.,              :

               Defendants.       :

-------------------------------------------------------------X

## BLUEHIPPO DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR SANCTIONS AND TO MODIFY CONSENT ORDER

K&L Gates LLP
Douglas F. Broder
Alyssa B. Cohen
599 Lexington Avenue
New York, New York 10022
(212) 536-3900
(212) 536-3901

*Counsel for BlueHippo Funding, LLC and
BlueHippo Capital, LLC*

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ........................................................................1

II.  FACTUAL BACKGROUND.........................................................................3

    A.   BLUEHIPPO'S BUSINESS MODEL ....................................................4

    B.   BLUEHIPPO'S DISCLOSURES TO CUSTOMERS ........................................6

    C.   THE FTC'S DRAFT COMPLAINT AND THE SETTLEMENT
        NEGOTIATIONS ....................................................................9

    D.   THE COMPLAINT AND CONSENT ORDER..................................................10

    E.   BLUEHIPPO'S COMPLIANCE WITH THE CONSENT ORDER....................12

    F.   THE FTC'S REQUESTS AND BLUEHIPPO'S PRODUCTION OF
        COMPLIANCE DATA AND INFORMATION.....................................................12

    G.   THE FTC'S CURRENT MOTIONS ........................................................13

    H.   BLUEHIPPO'S BANKRUPTCY FILING..........................................................18

III. ARGUMENT ....................................................................19

    A.   THE FTC HAS THE BURDEN OF PROVING BY CLEAR AND
        CONVINCING EVIDENCE THAT BLUEHIPPO FAILED TO
        COMPLY WITH THE CONSENT ORDER AND THAT IT
        FAILED TO MAKE DILIGENT EFFORTS TO DO SO IN A
        REASONABLE MANNER....................................................................19

    B.   THE FTC HAS NOT PROVED THAT BLUEHIPPO MADE
        ANY MATERIAL MISREPRESENTATION REGARDING
        THE FINANCING OR DELIVERY OF COMPUTERS ......................................20

        1.   The FTC's Analysis of BlueHippo's Spreadsheets Is
            Replete with Errors: In Fact BlueHippo Ordered
            Hundreds of Computers for Customers on Credit During
            the Year Following Entry of the Consent Order ........................................20

        2.   BlueHippo's Statements Concerning Financing Did Not
            Mislead Consumers....................................................................22

3.     The FTC Fails to Establish that BlueHippo's Statements
Concerning Financing Are Material to Consumers ...................................25

B.     BLUEHIPPO DISCLOSED ALL MATERIAL TERMS
CONCERING ITS REFUND AND STORE CREDIT POLICY ..........................25

C.     BLUEHIPPO HAS NOT BEEN CONDITIONING CREDIT ON
PREAUTHORIZED TRANSFERS.......................................................................27

D.     THE FTC'S SANCTION DEMANDS ARE UNLAWFUL,
EXCESSIVE, AND WITHOUT FACTUAL BASIS............................................29

IV.     CONCLUSION.........................................................................................................33

# TABLE OF AUTHORITIES

## CASES

*American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160 (S.D.N.Y. 1978) ............23

*Avis Rent a Car System Inc. v. Hertz Corp.*, 782 F.2d 381 (2d Cir. 1986) ...................................22

*In re Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984) ................................................................25

*Federal Trade Commission  v. Trudeau*, 579 F.3d 754 (7th Cir. 2009) ......................................30

*Hi-Tech Pharmacal Co., Inc. v. Hi-Tech Pharmaceuticals, Inc.*, No. 05-CV-2674
   (ARR)(SMG) 2007 WL 1988737 (E.D.N.Y. July 5, 2007)...................................................23

*King v. Allied Vision, Ltd.*, 65 F.3d 1051 (2d Cir. 1995) ..............................................................20

*Kraft, Inc. v. Federal Trade Commission*, 970 F.2d 311 (7th Cir. 1992) .....................................25

*Latino Officers v. The City of New York*, 558 F.3d 159 (2d Cir. 2009) ........................................20

*Paramedics Electromedicina Comercial Ltda. v. GE Medical Systems Information
   Technologies, Inc.*, 369 F.3d 645 (2d Cir. 2004) ................................................................19

*Perez v. Danbury Hospital.*, 347 F.3d 419 (2d Cir. 2003)...........................................................20

*Thompson Medical Co., Inc. v. Ciba-Geigy Corp.*, 643 F. Supp. 1190 (S.D.N.Y. 1986) .............22

## STATUTES

12 C.F.R. § 205.10(e)(1) ...............................................................................................................28

12 C.F.R. § 226.2 (2006) ..............................................................................................................28

16 C.F.R. Part 435.........................................................................................................................9

15 U.S.C. § 45 ..............................................................................................................................9

15 U.S.C. §§ 1601-1666j ..............................................................................................................9

15 U.S.C. § 1602(e) ......................................................................................................................28

15 U.S.C. §§ 1693-1693r ..............................................................................................................9

15 U.S.C. § 1693a(9) ....................................................................................................................28

Defendants, BlueHippo Funding, LLC and BlueHippo Capital, LLC (collectively "BlueHippo"), by and through BlueHippo's attorneys, K&L Gates LLP, submit this memorandum in opposition to plaintiff the Federal Trade Commission's motions for contempt and concomitant sanctions and to modify the April 9, 2008 Stipulated Final Judgment and Order for a Permanent Injunction ("Consent Order" or "Order").

## I. PRELIMINARY STATEMENT

There is no factual or legal basis for the FTC's motions. BlueHippo has made a reasonable and diligent effort to comply with the Order. The FTC has not produced clear and convincing evidence to the contrary.

The FTC's primary allegation is that BlueHippo made false representations regarding the fact that it "finances" computers and about when and on what conditions it ships computers. This allegation is based entirely on an FTC employee's misreading of data produced by BlueHippo to the FTC's specifications. The FTC failed to ask for data essential to its behind-the-scenes analysis, and its employee applied false and biased assumptions that render inaccurate his conclusions about the number of computers financed, which customers were entitled to computers and when. In fact, from the date of the Consent Order through the end of March, 2009, BlueHippo ordered computers on credit for 840 customers. The FTC's badly flawed analysis cannot supply the clear and convincing evidence it must produce to prevail.

Nor did the FTC provide any evidentiary basis for its assumption that consumers were misled by BlueHippo's use of the term "financing" in its ads. Not only did BlueHippo provide computers on credit, its sales scripts made crystal clear the terms under which it would extend credit. The FTC was thoroughly aware of BlueHippo's financing practices before entry of the Consent Order and did not demand that they be changed; it merely required that BlueHippo

disclose them.  BlueHippo has done that.  Indeed, the Consent Order itself reflects that the only BlueHippo business practice the FTC found unacceptable was one that BlueHippo had discontinued in March 2006.

The FTC's allegation that BlueHippo violated the Order by failing to disclose that store credit could not be applied toward shipping and handling is equally meritless.  The FTC provides no evidence to support its assertion that the undisclosed details were material, let alone that any consumer was misled.  In fact, as the FTC has long been aware, BlueHippo carefully disclosed all material terms of these policies to customers several times before the customers made any commitments, and BlueHippo accepted no order unless the customer verbally acknowledged his understanding in a recorded verification.  Moreover, the FTC has been aware of BlueHippo's allegedly deceptive non-disclosure for at least several months.  Yet it allowed BlueHippo to continue the practice, saying nothing to BlueHippo about it until now.  Had it done so earlier, BlueHippo could easily have added the requested disclosure to its sales scripts.

Nor is there any basis for the FTC's charge that BlueHippo conditioned credit on automatic debiting of customer bank accounts.  BlueHippo required *layaway* customers to agree to preauthorized automatic electronic fund transfers – a practice that began well before the Consent Order and is entirely consistent with governing law, as interpreted by the FTC itself.  BlueHippo permits layaway customers to pay by paper check after they have made ten consecutive payments, and after customers obtain credit they may pay by other means, including remote check, paper check, and money order.  Proof lies in the fact that hundreds of customers have done so.

Finally, the relief sought by the FTC in its two motions is neither properly substantiated nor reasonably calculated to provide relief to BlueHippo's customers.  The FTC does not provide

-2-

a reasoned basis for calculating the restitutionary payments it demands. Rather, it seeks

exorbitant restitution that has no relationship to its allegations, even if they could be supported.

     The unfortunate irony is that the FTC's relentless pursuit of BlueHippo has harmed rather

than benefited consumers, thus accomplishing precisely the opposite of the FTC's mandate.

Simultaneously with its filing of these motions, the FTC trumpeted its ill-conceived accusations

in a press release that was the lead item on its website (*see* Cohen Dec.[1], Exhibit 1, Press

Release), accompanied by a video of the FTC's Chairman excoriating BlueHippo as "a company

with a business model based on deceit." (the transcript of the Chairman's statement is attached

as Exhibit 2 to the Cohen Dec.; a dvd of the video preserved from the FTC's website is attached

as Exhibit 3 to the Cohen Dec.).

     The FTC's publicity campaign has had predictable results. BlueHippo's payment

processor's bank, based solely on the press release and without notice to BlueHippo, froze more

than $800,000 of funds it had collected from BlueHippo customers. Without access to its funds,

BlueHippo had no alternative but to file bankruptcy on November 23, 2009. BlueHippo has now

stopped taking orders and is winding down its operations. By convicting BlueHippo in the press

before this Court heard its motion, the FTC accomplished the primary relief it sought: it put

BlueHippo out of business. The biggest losers will be BlueHippo customers, for whom

BlueHippo cannot now supply computers.

## II.  FACTUAL BACKGROUND

     The following description of BlueHippo's business model contains information taken

from a White Paper (attached to the Cohen Dec., without exhibits, as Ex. 4) that BlueHippo

provided to the FTC during the negotiations that led to their settlement and entry of the Consent

---

[1] All references to the Cohen Dec. refer to the Declaration of Alyssa B. Cohen, sworn to on December 7, 2009.

Order.  It is supplemented as necessary with information established by affidavit, deposition testimony and other exhibits.

## A.    <u>BLUEHIPPO'S BUSINESS MODEL</u>

From BlueHippo's inception in 2003, its business practices evolved based on its experience, customer feedback, and other factors.  The Company developed three different business models in succession.  The first, in use until March 2006, and the second, in use from March 2006 through the end of 2006, are described in the White Paper, (*see* Cohen Dec., Ex. 4 at 5-9), but were discarded long before the Consent Order and are relevant only in understanding certain provisions of the Consent Order.  We therefore describe here the third business model, which, in its overall structure, has been in continuous use since the beginning of 2007, more than a year before entry of the Consent Order.

That business model combines aspects of layaway financing and installment credit financing to allow consumers with poor or non-existent credit to purchase personal computers on time.  Customers placing orders agree to purchase products using traditional layaway financing – paying BlueHippo a down payment and a fixed sum weekly or bi-weekly for a year by automatic debit from their bank accounts (ACH transfer) until they have covered the full purchase price.  At that point, upon receiving address verification from the customer, BlueHippo, which does not produce or inventory products, orders the product shipped to the customer from one of its vendors.  The computers BlueHippo sells are not cheap knock-offs, but high quality merchandise.  Throughout the period at issue, BlueHippo's primary supplier was Dell.  *See*, Cohen Dec., Ex. 4, p. 9-10; Rensin Tr.[2] at p. 108-09.

---

[2] Excerpts of the deposition transcript of Mr. Rensin are attached as Exhibit 5 to the Cohen Dec.

BlueHippo offers customers who establish a good layaway payment history the option of qualifying for credit. If a customer makes the initial down payment followed by a specified number of consecutive payments disclosed at the time of the customer's order (e.g., 13 weeks), without any missed payments, and returns a properly filled-out installment credit agreement and supporting documents, and if the customer's address remains current and is verified, BlueHippo will order the product before the individual has paid the product's full purchase price. *See* FTC Ex.[3] 41 at 00017 and Ex. 42 at 00021.

Most of BlueHippo's customers have poor credit histories and are suspicious of credit offers. Many who sign up in the hope of qualifying for credit do not meet the qualifying conditions, because they miss one or more of the required consecutive payments or never complete the required paperwork. Others move without giving notice, leaving BlueHippo to do its best to find them when they are entitled to shipment of their computers. Some who meet the qualifications choose not to seek credit, preferring instead to continue with layaway financing. Some cancel their orders, even after qualifying for credit, before their computers are shipped. Some miss payments during the three to four weeks after qualifying for credit required for processing – as disclosed to customers before they place their orders. *See* Rensin Dec. ¶ 9.[4]

Customers who do not qualify for credit may continue to make payments until they have paid in full, at which time their computers are ordered. Customers often miss multiple payments and take longer, sometimes much longer, than a year to complete their payments. Some never make the required payments, and therefore never receive computers. *See* Cohen

---

[3] All references to "FTC Ex." refer to the exhibits attached to the FTC's opening brief.

[4] BlueHippo incorporates in its opposition the declaration of Joseph Rensin, submitted with Mr. Rensin's Opposition and cited as "Rensin Dec."

Dec., Ex. 4 at p. 13.

BlueHippo offers a full cash refund to any customer wishing one who cancels within 7 days of placing an order. Thereafter, customers who cancel are entitled to use their payment balances as "store credits" to purchase goods from BlueHippo's Online Store. BlueHippo is not an online merchant, and goods in its online store, priced at only 10% above its cost, are only available for purchase with store credits. It does not permit customers to apply their payment balances to taxes, shipping and handling, but instead requires that customers pre-pay these costs by money order – a requirement since the inception of the Online Store. *See* Rensin Dec. ¶ 11.

## B.     **BLUEHIPPO'S DISCLOSURES TO CUSTOMERS**

BlueHippo attracts customers by advertising on television, on the radio, and in print and other media. Its ads focus on the sale of computers. In its ads, BlueHippo states that it has financed thousands of computers for customers with poor credit histories and that it does not require a credit check, merely that the customer have an active bank account. The ads do not promise to provide credit; they do promise consumers with credit problems a way to purchase computers without having their credit checked, provided that they have checking accounts. They encourage customers to call a toll-free number to learn more. *See* Cohen Dec., Ex. 6, BlueHippo Advertisements.

A customer who calls the toll-free number is connected to a sales representative, who walks the customer through a sales script. FTC Ex. 40.[5] At the outset, the representative obtains basic information such as the customer's name and telephone number and whether he has an active bank account. FTC Ex. 40 at BH00004 – 05. Next the representative determines what

---

[5] The FTC submitted two scripts in support of its motion, FTC Exhibits 39 and 40. The first was in use in 2007, before the Consent Order (*see* FTC Ex. 39 at BH0-000024), and should be disregarded.

product the customer wants to purchase, reconfirms the buyer's personal information including email address and cell phone number, and determines when payments will be made. *Id.* at BH 00006 – 015. The representative also explains that payment is set up using ACH, but the customer has the option to change to paper checks after 10 weeks of consecutive payments. *Id.* at BH00009.

The representative then explains the cancellation and refund policy, stating that there are no cash refunds after seven days but that thereafter BlueHippo will provide store credit for use towards products at BlueHippo.com. The representative also tells the customer that BlueHippo will be sending out a welcome package which will include everything discussed on the phone and "a couple of important forms that you need to sign and send back to us as soon as possible, ok?" *Id.* at BH 00016. The representative then obtains bank information from the customer. *Id.* at BH 00018 – 025.

At the end of the call, the representative asks the customer to confirm verbally that he understands and agrees to the details of the sale, including the precise payment schedule and total price to be paid, during a recorded verification. If the customer stops the representative to ask a question, the representative answers the question but then repeats the entire verification to make sure the customer understands and authorizes the agreement and its terms. *Id.* at BH 00026 – 033.

During the verification, the representative informs the customer that he or she will be purchasing according to a layaway plan, but that "you understand to get your purchase out of layaway before you pay in full you will need to show that you are credit worthy by paying as agreed." *Id.* at BH 00030. He explains that after the customer has made his initial payment and a specified minimum number of consecutive layaway payments, BlueHippo will send him an

offer to provide credit to finance the remaining balance due. The representative continues: "Once you've made these payments and sent back both sets of documents and we've verified the information, please allow another 3 – 4 weeks for shipping and handling – of course you can always continue on the layaway plan if you prefer." *Id.* at BH00029. The representative repeats the cancellation, refund, and store credit policies. *Id.* at BH 00030.

After the call is completed and the customer has authorized the sale, BlueHippo sends the customer by mail and by email a set of documents consisting of a layaway agreement, a sales order, and a cover letter. FTC Ex. 41. The customer is required to return the layaway agreement and sales Order, which lists the customer's shipping address and other contact information and summarizes the purchase. *Id.* at BH-00014. The layaway agreement states, consistent with the script:

> I understand to get my purchase out of layaway before I pay in full I will need to show that I am credit worthy by paying as agreed. After I've paid my Activation payment and a minimum of 13 consecutive weeks worth of payments have been posted to my account and I've sent the signed Sales Order, a voided check or savings deposit slip, and this Layaway Agreement back, BlueHippo will offer to finance my balance.

*Id.* at BH-00017.

When the customer returns the signed layaway documents or makes the number of consecutive payments required to qualify for credit, BlueHippo mails the customer a package offering to finance the remaining balance of the layaway purchase through an installment credit arrangement "provided you continue to make all of your pre-shipment payments," together with an installment contract (the "Installment Contract") and address verification form. FTC Ex. 42. The Installment Contract contains all terms and conditions governing the credit arrangement. If the customer decides to finance the remaining balance, he or she must fill out the verification form and sign and return to BlueHippo both the verification form and the installment contract. If

the customer does not wish to finance the balance, the customer may continue to pay under the layaway plan or suspend payment and receive store credit for payments already made.  FTC Ex. 41 at BH00017; FTC Ex. 42 at BH00018.

**C.**      **THE FTC'S DRAFT COMPLAINT AND THE SETTLEMENT NEGOTIATIONS**

In 2006, the FTC informed counsel for BlueHippo and Joseph Rensin that it intended to file a complaint against BlueHippo and Rensin and provided a draft complaint (the "Draft Complaint").  *See* Rensin Dec., Ex. 1, Draft Complaint.  The Draft Complaint alleged that BlueHippo and Rensin had violated the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, by falsely representing that they would ship computers and televisions to consumers within promised times, and by failing to disclose that payments were non-refundable.  The Draft Complaint also alleged that BlueHippo violated the Mail Order Rule, 16 C.F.R. Part 435; the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1666j; and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r.

During the period of discussions and negotiations that followed, counsel for BlueHippo and Rensin provided detailed information to the FTC concerning the business practices described above, as well as the company's earlier business practices.  In particular, counsel prepared and presented to the FTC the White Paper, dated January 12, 2007, and attached exhibits including scripts and financing documents then in use.  The FTC was well aware of BlueHippo's successive business models, and its abandonment of the no refund policy in March, 2006.  As a result, the FTC was fully familiar with BlueHippo's current business model featuring a combination of layaway and installment financing, cash refunds for customers who cancel within seven days following the customer's order, and credits for use in the online store for customers

who cancel thereafter.  *See generally* Cohen Dec., Ex. 4.  Counsel also argued at length that it was inappropriate to impose liability on Rensin individually.  *Id.* at 19-22.

The negotiations were protracted, and the parties exchanged numerous drafts of what ultimately became the Consent Order.  The FTC's initial drafts included Rensin as a defendant and party to the consent order.  *See* Rensin Dec., Ex. 2, Draft Consent Order.  The parties consummated the settlement when the FTC agreed not to name Rensin as a defendant or make him a party to the Consent Order.

**D.**     **THE COMPLAINT AND CONSENT ORDER**

On February 22, 2008, the FTC filed the Complaint in this action (the "Complaint").  The Complaint did not name Rensin as a defendant, contained no factual allegations concerning him, and did not even mention his name.  The Complaint also corrected the FTC's earlier mistaken belief that the Company still did not allow refunds of any kind, alleging:

> *Before March 2006*, defendants had a strict policy of not refunding any payments to consumers who ceased to make payments, regardless of how much the consumer had paid to [BlueHippo Funding], regardless of whether [BlueHippo Funding] or the consumer was the breaching party, and regardless of whether or not [BlueHippo Funding] had ordered the merchandise from a third-party vendor.

FTC Ex. 23 ¶ 17 (emphasis added).

On April 9, 2008, this Court entered the Stipulated Final Judgment and Order for a Permanent Injunction.  FTC Ex. 20.  Rensin was no longer a party, and his name was not mentioned.  The Consent Order included both injunctive and monetary relief.  The injunctive provisions each prohibited BlueHippo from violating the law in specific respects.  The three provision that the FTC now claims BlueHippo has violated enjoin BlueHippo from:

- making "any express or implied misrepresentation of material fact that is false or misleading in any manner, orally or in writing, to any consumer or entity, including but not limited to, misrepresenting that purchasers of Covered Products who make the

-10-

required periodic payments would receive the Covered Products purchased within the times stated by Defendants;" [Section I.A];

- making any representation regarding any refund, cancellation, exchange or repurchase policy without disclosing clearly and conspicuously, prior to receiving any payment from customers[,] all material terms and conditions of any refund, cancellation, exchange, or repurchase policy, or if there is a policy of not making any refunds, cancellations, exchanges, or purchases whatsoever, a statement informing the customer of such policy, prior to receiving any payment from customers" [Section I.B]; and

- "conditioning the extension of credit on mandatory preauthorized transfers in violation of the EFTA and its implementing Regulation E." [Section IV.]

The Consent Order also contained a monetary judgment in the amount of $3.5 million for use to fund a consumer redress program detailed in the Consent Order.[6] Redress was available only to "Eligible Purchasers," defined in the Consent Order as consumers who "made any payment to Defendants . . . *on or before February 28, 2006*, related to the purchase of a computer, and who has not received the computer, nor a full refund of or restitution for such payments pursuant. . . ." [Definition 6.] The Consent Order, read together with the Complaint, thus made clear that the only consumers eligible for redress were those who had purchased from BlueHippo during the period before March, 2006, when it had a "a strict policy of not refunding any payments to consumers who ceased to make payments," and failed adequately to disclose that policy. See FTC Ex. ¶¶ 17, 18.[7]

The FTC did not seek redress on behalf of consumers who ordered computers from BlueHippo after its policy was changed to permit cash refunds. BlueHippo, through its counsel, disclosed to the FTC in its detailed White Paper and elsewhere the current business model, which

---

[6] Under the Order, the amount of the monetary judgment could be increased to as much as $5 million if necessary to fund the consumer redress program. BlueHippo timely paid the $3.5 million, and no further payments were required.

[7] The Consent Order also included provisions that allowed the FTC to monitor BlueHippo's compliance. BlueHippo acknowledges that, at the outset, its attention to those provisions was inexcusably deficient and that it was appropriately sanctioned by the Court as a result. BlueHippo corrected those deficiencies and its compliance with those provisions is not before the Court on these motions.

had been in effect since the beginning of 2007. The Consent Order nowhere suggested that this model, or the business practices through which it was implemented, violated the FTC Act or any other statute or regulation.

**E.    BLUEHIPPO'S COMPLIANCE WITH THE CONSENT ORDER**

After entry of the Order, BlueHippo continued to conduct its business as before, as it had disclosed to the FTC, and in accordance with the requirements of the Order. In its advertising, BlueHippo continued to state, accurately, that it financed computers for consumers with credit problems. In its scripts and follow-up paperwork it continued to disclose to its customers the terms upon which it would do business exactly as described above.

As it had in the past, BlueHippo periodically modified the offers and promotions available to customers, and made corresponding changes to scripts and to the variable terms in the transaction documents, such as the product description and the payment amount. These changes in the product offerings, as well as the frequency of payments and the number of consecutive payments required to qualify for installment credit, did not change the material terms and conditions of the underlying transactions, and the disclosures of those terms in the scripts thus remained the same. FTC Ex. 43 at 2-3.

BlueHippo charged its General Counsel with monitoring and ensuring compliance with the Order. Rensin Dec. ¶ 20-22. Counsel's approval of each variant of the script was required before the script was used. Rensin Dec. ¶ 23. Similarly, all ads were reviewed by counsel before authorized for use. Rensin Tr. 56-57, 6; Ford Tr., at 21-22.[8]

**F.    THE FTC'S REQUESTS AND BLUEHIPPO'S PRODUCTION OF COMPLIANCE DATA AND INFORMATION**

---

[8] Excerpts of the deposition transcript of John Ford, BlueHippo's Chief Operating Officer, are attached as Exhibit 7 to the Cohen Dec.

After the entry of the Order, the FTC made numerous requests for additional information from BlueHippo pursuant to the Order's compliance monitoring provisions. After overcoming early failures to meet its obligations under the Order's compliance reporting provisions, BlueHippo compiled spreadsheets in response to the FTC's requests, produced documents, and provided several thousand audio and video recordings.

The FTC's requests for reports were very precise; each identified specific data the FTC sought, sometimes listing as many as a dozen separate requests, with subparts, for tens of thousands of consumers. *See, e.g.,* FTC Ex. 22.A, request no. 3. The FTC was rigorous in insisting that the spreadsheets it received from BlueHippo contain exactly the information requested, in exactly the form the FTC required, down to the column headings.

As the FTC acknowledges, BlueHippo compiled this information in spreadsheets some of which were massive. Two spreadsheets responding to FTC Request Nos. 3 and 6, first produced on May 1, 2009, then updated on May 28 and July 27, 2009, contained more than 45 data fields for each of more than 75,000 customer orders. FTC Ex. 21 at ¶ 7; FTC Ex. 22.D; Cohen Dec., Ex. 8, May 1, 2009 Letter. BlueHippo also produced a spreadsheet, at the FTC's request, that included a list of over 6,000 customers who made payments to BlueHippo by money order, remote check, or paper check. *See* Cohen Dec., Ex. 9, July 2, 2009 Letter; *see also* Demchick Dec.[9] ¶ 33 (analyzing data of customers who were extended credit and paid by means other than ACH).

## G.    THE FTC'S CURRENT MOTIONS

On November 12, 2009, the FTC filed its motions seeking to have BlueHippo held in civil contempt for violations of the Order, demanding both coercive and monetary sanctions, and

---

[9] All references to "Demchick Dec." refer to the declaration of Neil H. Demchick, sworn to on December 7, 2009.

asking the Court to modify the Order to prohibit BlueHippo from financing any goods or services and from selling consumer electronics.

The FTC's primary factual claim was that BlueHippo had been falsely representing to consumers that it "finances" computers as well as the "conditions precedent to and timing for receiving merchandise."  These claims are based on a forty-four paragraph declaration submitted by a recently hired FTC economist, Erez Yoeli, Ph.D, in which Dr. Yoeli states certain assumptions, analyzes the two massive July 27, 2009 spreadsheets responding to FTC Requests 3 and 6 based on those assumptions, and makes factual assertions that he contends "summarize" the information in the spreadsheets.  In addition, the FTC relies on carefully selected BlueHippo advertisements in which BlueHippo makes the unremarkable statements that it "finances" computers or has "financed thousands of computers."

Neither Dr. Yoeli nor anyone else at the FTC contacted BlueHippo or its counsel to determine whether his underlying assumptions or conclusions were correct.  In fact, as shown in the attached affidavit of Neil Demchick, an independent CPA retained to analyze Dr. Yoeli's declaration and certain of the FTC's allegations, many of his assumptions were faulty.  As a result, many of his conclusions, including those at the heart of the FTC's motions, are wrong. The FTC never asked for, and therefore never received, sufficient data from which to determine the facts it asserts with such confidence.   The flaws in the FTC's analysis, detailed in Mr. Demchick's affidavit, are summarized here.

**Fundamental Error.**  To begin with Dr. Yoeli limits his analysis to customers who placed orders after April 10, 2008 (Yoeli Declaration ¶¶ 13, 19), excluding the thousands of customers who placed orders before April 10, 2008 and made payments after April 10, 2008 – although the FTC requested and received information about those customers as well.

**Errors in the Analysis of Refunds.**  Dr. Yoeli states in paragraphs 14 through 16 that customers who placed orders between April 10 and December 10, 2008 paid BlueHippo a total of $21,749,501.74 and BlueHippo provided them cash refunds of $277,947.77.  This refund analysis is based on a number of assumptions, stated in paragraph 12 of the Declaration, that are incorrect, and as a result, the numbers are incorrect.

The FTC determined the amount of cash refunds that BlueHippo paid to customers who placed orders from April 10 until December 10, 2008, by adding the amounts listed in the "Paid" column in spreadsheet no. 3 for customers who received refunds.  Demchick Dec.¶ 21.  The fallacy in this approach is clear on the face of the spreadsheet.  Of the customers listed as having received cash refunds, the amount listed in the "Paid" column for 452 customers is $0.00.  *Id.* ¶ 22.a.  Of course, if a customer received a cash refund, the amount paid by the customer cannot be 0.  The amount in the "Paid" column is *net of cash refunds*, not the gross amount paid before refunds, (*id.* ¶ 22.c.), and adding the amount in the Paid column for customers who received refunds provides no information at all about refunds.  The Declaration's assertion concerning the amount of refunds received is incorrect.  *Id.* ¶ 22.d.

 In fact, the FTC's carefully tailored requests produced a spreadsheet from which it is impossible to determine the total amount refunded to the customers in this group from the spreadsheet. The FTC specifically asked in Request No. 3 that BlueHippo provide, for each customer who requested a refund, the date the request was made, the date a refund was made, and the type of refund; it did not ask for the amount of these refunds, and the spreadsheets do not contain this information.  FTC Ex. 22.A; Demchick Dec. ¶ 24.

**Errors in the FTC's Analysis of Financing.**  The FTC's assertion, in paragraph 25 of the Declaration, that 2,477 of the customers who placed orders between April 10 and December

10, 2008 qualified for financing by March 11, 2009 is also incorrect. Again, the FTC did not ask for sufficient information to determine when customers qualified for shipment of computers on credit, and did not interpret correctly that data that it did request.

According to paragraph 12 of the Yoeli Declaration, the FTC assumed that a customer qualified for credit after making 13 consecutive payments and providing a fully completed Installment Contract. In fact, customers who make 13 consecutive payments and provide fully completed Installment Contract documents do not always qualify for credit for a number of reasons, including the following:

a. Customers who made the required number of payments for extension of credit and early shipment lost their qualification for credit if they missed payments between the time they did so and the time of shipment – a disclosure plainly stated in the layaway documents. FTC Ex. 41 at 00017; 42 at 00018. Thus, if a customer who made 13 consecutive payments then missed a payment before shipment (which customers were told would take three to four weeks), that customer was no longer qualified for credit.

b. The FTC's assumption does not consider *when* the customer returned the Installment Contract. If a customer made 13 consecutive payments but did not return the Installment Contract until a month after the 13th payment, the customer qualified for credit only then and only if he had not defaulted by missing a payment by the time the Installment Contract was provided. The dates when customers returned their Installment Contracts are included in the spreadsheet, and some returned them well after the thirteenth payment. Demchick Dec. ¶ 17.b.

c. Some customers make 13 or more payments and then contact BlueHippo and cancel their orders. Rensin Dec. ¶ 9. The FTC did not ask for data concerning cancellations, and its assumption would have led it to count customers who canceled after making 13 or more payments but before receiving their computers as customers who qualified for financing but did not receive computers. Demchick Dec. ¶ 27.e.1.

d. BlueHippo could not order computers for customers who made the necessary payments and returned the required documents but changed their addresses before doing so, or provided bad address information in the first instance. The FTC did not ask for information concerning orders delayed by address problems, and its analysis did not take them into consideration. Demchick Dec. ¶ 27.e.2.

For all of these reasons, and for others described in Mr. Demchick's affidavit, the FTC did not request and therefore did not have sufficient information to determine how many of the

customers who placed orders between April 10 and December 10, 2008 qualified for financing and were entitled to shipment of computers on credit by March 11, 2009, and its assertion that there were 2,477 such customers has no basis.

What the spreadsheets do show, however, is that from April 10, 2008 through March 31, 2009 – the one-year period following entry of the Order – BlueHippo ordered hundreds of computers for its customers on credit. Mr. Demchick identified 883 customer orders filled by BlueHippo during this period for which the customer made at least one payment after BlueHippo ordered the merchandise from its vendor, or the spreadsheet reflects an outstanding balance due. In each of these cases, BlueHippo provided credit. Demchick Dec. ¶ 32.a.

Finally, the FTC asserts that one customer, no. 4856807, did not qualify for financing but BlueHippo mistakenly ordered a computer for him. FTC Ex. 21 ¶ 27. Mr. Demchick reviewed the data for that customer, and the facts are quite different. After the customer made two payments, on June 5, 2008, he made a lump sum payment for the outstanding balance of $2,329.68 by ACH. BlueHippo therefore ordered a computer for him, not by mistake but because he had paid in full. After the computer was ordered, however, the $2,329.68 payment was returned for insufficient funds. BlueHippo thus ended up ordering and paying for the customer's computer and receiving only $185.32 of the $2,329.68 purchase price. See Demchick Dec. ¶ 28.

**Errors in the FTC's Analysis of Shipping Delays**. The FTC asserts, in paragraphs 34-37 of the Yoeli Declaration, that by July 24, 2009, BlueHippo had ordered 1,462 of the 2,477 computers for customer orders that qualified for financing; that all of these orders were placed more than four weeks after the customer qualified for financing, and that the average delay from the date customers qualified for financing and the date BlueHippo ordered their computers was

26.2 weeks. According to the FTC, one customer's computer was ordered almost a year after he qualified for financing. All of these assertions are incorrect.

As explained above, the FTC did not request, and therefore BlueHippo did not provide, data that is essential to determine when customers qualify for financing. Because the FTC could not determine when customers qualified for financing, it could not determine how long afterward their computers were ordered. The FTC's statements concerning delays in shipping have no basis. Demchick Dec. ¶ 30.

**Errors in the FTC's Analysis of Store Credits.** The FTC states its conclusions concerning the number of customers who placed orders using store credit between April 10, 2008 and July 24, 2009, the funds they paid in connection with those orders, and the number of store credit orders for which BlueHippo had placed orders as of July 24, 2009. Yet again, the FTC did not request sufficient information to make these determinations. As the FTC itself points out, store credits cannot be applied to pay shipping and taxes, and online store orders are not shipped until those minimal charges are paid. The FTC did not ask for information concerning amounts paid for shipping and taxes, and the spreadsheet concerning store credits therefore did not include that information. It is impossible to determine from the spreadsheet whether any customers fully paid for online store merchandise and shipping and taxes but did not receive the merchandise ordered. Demchick Dec. ¶ 31.

## H.     BLUEHIPPO'S BANKRUPTCY FILING

The FTC broadcast its November 12 filing of the motions now before the Court in a widely disseminated press release that was featured at the top of its website. *See* Cohen Dec., Ex. 1. The very next day, having seen the FTC announcement, BlueHippo's payment processor, Checkgateway, suspended payment processing for BlueHippo. It notified BlueHippo on

November 16 that its bank had frozen accounts containing $800,000 collected from BlueHippo

customers. Three days later, Checkgateway gave written notice to BlueHippo of termination of

the parties' contract based on the FTC's allegations, and asserted the right to hold funds in

BlueHippo's client account for two years. *See* Cohen Dec., Ex. 10, November 19, 2009 Letter.

During the days that followed, BlueHippo desperately sought to obtain the voluntary

return of these funds. Those efforts were unsuccessful, the company exhausted its cash on hand,

and it was unable to fill consumer orders or take new ones. It had no alternative but to file

bankruptcy on November 23, 2009. BlueHippo stopped taking orders and is quickly winding

down its operations. It now has a skeleton staff of a few employees, all of whom will be gone in

a week. Rensin Dec. ¶ 32.

## III.    ARGUMENT

The FTC's motions should be denied. The FTC has not and cannot establish by any

standard either that BlueHippo has violated the Order in any material respect or that BlueHippo

has not diligently attempted to comply with the Order. Nor has the FTC provided a reasonable

factual or mathematical basis for the monetary sanctions it seeks.

**A.    THE FTC HAS THE BURDEN OF PROVING BY CLEAR AND CONVINCING EVIDENCE THAT BLUEHIPPO FAILED TO COMPLY WITH THE CONSENT ORDER AND THAT IT FAILED TO MAKE DILIGENT EFFORTS TO DO SO IN A REASONABLE MANNER.**

A party may be held in civil contempt for failure to comply with a court order only if all

three of the following conditions are met: "'(1) the order the contemnor failed to comply with is

clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the

contemnor has not diligently attempted to comply in a reasonable manner.'" *Paramedics*

*Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir.

2004) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)); *see also Perez v. Danbury Hosp.*, 347 F.3d 419, 423-24 (2d Cir. 2003) (same) (quoting *King*, 65 F.3d at 1058).

As the moving party here, the FTC bears the burden of proving each element of contempt. *See, e.g., King*, 65 F.3d at 1058 ("A contempt order is warranted only where *the moving party* establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict.") (emphasis added); *see also Latino Officers v. The City of New York*, 558 F.3d 159 (2d Cir. 2009) (affirming denial of contempt motion on ground that movants failed to prove each element required for contempt finding).

## B.  THE FTC HAS NOT PROVED THAT BLUEHIPPO MADE ANY MATERIAL MISREPRESENTATION REGARDING THE FINANCING OR DELIVERY OF COMPUTERS

The FTC's lead argument – that BlueHippo misrepresented that it was financing computers – rests entirely upon an unsupportable analysis of data and an equally flawed understanding of the English language. BlueHippo's use of the term "financing" in its advertising to describe its business model was neither deceptive nor misleading. To the contrary, there was nothing false about it.

### 1.  The FTC's Analysis of BlueHippo's Spreadsheets Is Replete with Errors: In Fact BlueHippo Ordered Hundreds of Computers for Customers on Credit During the Year Following Entry of the Consent Order

Assuming, as the FTC does, that "financing" is synonymous with credit, the FTC's argument that BlueHippo misrepresented that it financed computers rests on its assertion that BlueHippo did not finance a single computer during the year following entry of the Order. In its attempt to prove that false premise, the FTC has devoted months of effort, enlisted a Ph.D. economist, and spent untold taxpayer dollars manipulating the data in BlueHippo's spreadsheets until it developed a methodology that conveyed that false impression. The errors in the FTC's

assumptions are so numerous and fundamental that they undermine the credibility of every assertion the FTC makes.

First, although the FTC requested and BlueHippo provided data concerning "each customer who [] paid the Defendants any amount of money for any product since April 10, 2008," *see, e.g.*, FTC Ex. 22.A, and although the Consent Order applied to BlueHippo's dealings with all customers, the FTC's expert "only included customers orders placed with Defendants between April 10, 2008 and December 10, 2008." FTC Ex. 21 at ¶ 19. By limiting its review to customers who placed orders after April 10, 2008, the FTC excluded customers who placed orders before April 10, although those customers were *most* likely to qualify for credit within the period for which data was reviewed. Thus the FTC's analysis was pre-biased to show an artificially depressed number of customers who qualified for and received computers on credit.

After imposing this arbitrary limit on the customers analyzed, the FTC's economist made the many erroneous assumptions and omitted many important factors summarized above and described in greater detail in Mr. Demchick's report. These flaws rendered its entire analysis invalid and its conclusions meaningless. The FTC failed to consider whether customers who made the minimum number of monthly payments continued to make payments as required during the three to four weeks allowed for processing and shipment, and for the sometimes much longer periods before they returned the required installment loan documents. It did not account for customer cancellations or customers who moved without notifying BlueHippo, preventing it from placing orders. It made no provision for customers who qualified for credit but chose to stay on layaway, as the documents and scripts clearly permitted.

It is impossible to draw any conclusions based on the FTC's analysis regarding whether any customer qualified for credit and was not shipped a computer. Indeed, the FTC's custom-

-21-

designed spreadsheets did not contain sufficient information to determine whether any customers qualified for credit but did not receive their computers. But they did contain sufficient information for BlueHippo's expert to determine, without regard to *qualification* for credit, that at least 883 customers *received* credit during the year following entry of the Order.

Because the FTC's determinations as to when customers were entitled to computers on credit had no basis, its contentions about shipping delays are equally baseless. Establishing that shipment of a customer's computer was delayed requires first establishing when the customer was entitled to shipment, as the FTC recognizes. But the FTC's analysis of that issue is so thoroughly permeated with defects that it is impossible to conclude when any customer's computer should have been shipped, and therefore whether it was delayed at all, much less to what extent.

In short, had the FTC taken the time to understand BlueHippo's business and requested the right data, or had it shared its analysis before charging into court, these problems could have been solved, the FTC could have completed a meaningful analysis, and it would never have filed these motions.

### 2.    BlueHippo's Statements Concerning Financing Did Not Mislead Consumers

Deciding whether a statement or advertisement is deceptive or misleading is a fact-intensive undertaking that requires the court to view the statements in context. *See, e.g., Avis Rent a Car Sys. Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986) (holding that a car rental ad was not misleading when viewed in its entirety and taking into account the surrounding circumstances and business model of the company). In *Thompson Medical Co., Inc. v. Ciba-Geigy Corp.*, 643 F. Supp. 1190 (S.D.N.Y. 1986), the court applied an "average consumer of reasonable intelligence" standard to determine whether advertising was misleading or deceptive.

*Id.* at 1200. The Court found that the phrase "lose weight fast" was not misleading, notwithstanding evidence that the public might misinterpret this statement, and refused to enjoin its use. *Id.*

The truth or falsity of an advertisement is measured by public perception. *See Am. Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (S.D.N.Y. 1978); *see also Hi-Tech Pharmacal Co., Inc. v. Hi-Tech Pharms., Inc.*, No. 05-CV-2674 (ARR)(SMG), 2007 WL 1988737, at *7 (E.D.N.Y. July 5, 2007) ("A mark's common usage and understanding by the relevant public may be discerned from any competent source including consumer surveys, testimony of consumers or trade professionals, dictionary definitions, uncontested usage of the mark by competitors to describe their products, generic usage in newspaper and magazine articles . . . .").[10]

The FTC's entire claim rests on the false premise that consumers equate "financing" to "credit," and that its ads mislead consumers to believe that BlueHippo is promising to sell them computers on credit. But the FTC provided no evidence to back up its premise. And the facts contradict it. Nowhere do the ads promise credit. Rather, read fairly, they tell consumers who have credit problems that BlueHippo offers them a way to buy computers even if they have credit problems, and it will not check their credit.

Of course, BlueHippo does give credit to many consumers, but its layaway sales are also consistent with its ads. The largest retailers in the country, the most reputable national media outlets, and scores of mainstream websites routinely refer to layaway sales as financing. Here, for example, are two of the countless references to "layaway financing" in the media, on-line, and in advertising:

---

[10] A copy of the *Hi-Tech Pharmacal Co.* decision is annexed to this Memorandum as Tab A.

National Public Radio recently reported that "On Dec. 8, Wal-Mart will stop
offering *layaway financing*." Nancy Mullane, Wal-Mart Ends Layaway
Financing, http://www.npr.org/templates/story/story.php?storyId=6533682 (last
visited Dec. 4, 2009) (emphasis added).

"Layaway programs are *financing agreements* in which retailers – without
charging interest – hold merchandise for customers until they have finished
paying in installments." Mae Anderson, Toys 'R Us Adds Layaway For Big-
Ticket Items, http://www.usatoday.com/money/industries/retail/2009-10-19-toys-
r-us_N.htm (last visited Dec. 4, 2009)(emphasis added.)[11]

BlueHippo's ads were no more intended to mislead consumers than NPR's and USA

Today's new reports. They plainly meant to convey that BlueHippo offered a way to buy

computers for people with bad credit who could neither pay the full purchase price in a lump

sum nor qualify for credit. BlueHippo did exactly that, in two ways: by selling computers on

layaway– often referred to in the vernacular as layaway financing – and by offering credit to

consumers who make sufficient layaway payments as agreed and meet other requirements. Even

the FTC does not dispute that BlueHippo has sold thousands of computers pursuant to its

layaway business model.

Finally, the clearest evidence that BlueHippo did not intend its ads to mislead consumers,

and that no consumer could have been misled, is the clarity of the disclosure to consumers who

call BlueHippo based on the ads. Before any consumer spent a dollar with BlueHippo, he or she

was taken through a script by a BlueHippo sales representative that makes crystal clear the terms

on which BlueHippo sells computers. The representatives explained over and over that

consumers were signing up for a layaway plan, and that they would be eligible for credit only if

they met specific conditions.

---

[11] *See, also, e.g.*, HuffingtonPost.com, Sears' Layaway Program to Stay,
http://www.huffingtonpost.com/2009/01/16/sears-layaway-program-to-_n_158452.html ("Layaway programs are
financing agreements in which retailers – without charging interest – hold merchandise for customers until they have
finished paying for the items in installments.") (last visited Dec. 4, 2009); http://www.doityourself.com/stry/pricing-
resin-patio-chairs; http://ezinearticles.com/ezinepublisher/?id=2134525;
http://www.ehow.com/about_5523449_credit-check-laptop-financing.html.

**3.    The FTC Fails to Establish that BlueHippo's Statements Concerning Financing Are Material to Consumers**

The FTC must also prove the materiality of any alleged misrepresentation.  A representation is material under the FTC Act if it "'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product.'" *Kraft, Inc. v. Fed. Trade Comm'n*, 970 F.2d 311, 322 (7th Cir. 1992) (citing *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165, 175, 182 (1984)).

The FTC contends only that BlueHippo's use of the term "financing" is material because "if consumers knew that [BlueHippo was] lying when they said that they finance computers, they would not have signed up with and started throwing money at BlueHippo with the hope of receiving a financed computer."  FTC Memorandum ("FTC Mem.") at 18 – 19.  Here again, the FTC provided no evidence.  And here again the facts belie its claim.  BlueHippo does not permit a consumer to "sign up and start throwing money" at it without making clear exactly what it means by financing and what the consumer has to do to obtain credit.  Put another way, even if a consumer was somehow misled by BlueHippo's advertising, the consumer's confusion would be cleared up and rendered immaterial by the sales representative and the script.

**B.    BLUEHIPPO DISCLOSED ALL MATERIAL TERMS CONCERING ITS REFUND AND STORE CREDIT POLICY**

The FTC complains that BlueHippo has violated the Order by failing to clearly and conspicuously disclose "material terms and conditions" of its refund policy.  Specifically, the FTC claims that BlueHippo fails to disclose that: (1) consumers may not apply their store credit to shipping, handling, and taxes; (2) consumers must prepay those charges before BlueHippo will order their merchandise; and (3) consumers may only redeem their store credit for one item

at a time. While the FTC accurately describes BlueHippo's store credit policies, once again it paints a misleading picture.

To begin with, the scripts do not contain any false or misleading statements. They accurately state that no refunds are available after seven days and that thereafter the customer may use his payments as store credits at BlueHippo.com. This is precisely the refund plan and structure the FTC did not object to at the time of settlement.

Nothing in the scripts suggests that the customer will not have to pay taxes, shipping and handling in advance or that store credits can be used to pay those charges. Indeed, the actual language of the scripts speaks only to the *products*, not the ancillary costs associated with those products.[12] More important, the FTC has again failed to provide any evidence to support its conclusory assertion that this information is material.

BlueHippo did not disclose *details* of its Online Store policy in the scripts, but nothing in the Order requires the disclosure of immaterial details. What was not specifically disclosed was that store credits policies required consumers to pay costs amounting to a mere fraction of the total purchase price. The policy did not diminish consumers' ability to apply the entirety of the payments made to BlueHippo towards the purchase of computers, gaming systems, televisions, and a variety of other electronic goods.

The immateriality of the requirement to pay taxes and shipping is illustrated by the manner in which the online store operated. BlueHippo set prices at only 10 percent above its cost. BlueHippo could well have set prices at 50% or more above cost, requiring many customers to make greater additional payments to obtain items that the actual policy allowed

---

[12] "[Y]ou can cancel your order at any time prior to shipment – and while we don't give cash refunds after 7 days – we will give you store credit *that you can use on over a thousand desktops, laptops, monitors, TV's [sic]* and more at BlueHippo.com." FTC's Ex. 40 at BH00016 (emphasis added).

them to obtain by paying only the modest cost of shipping and taxes.  The combination of low

prices and requiring payment of shipping and taxes is likely more favorable to consumers, and

there is no justification for requiring greater disclosures.

Finally, the FTC never suggested to BlueHippo before filing its motions that it viewed

the disclosures concerning the store as deficient, much less a violation of the Order.  The FTC

was plainly aware of those policies before May of this year, when it asked BlueHippo for a

report describing "policies regarding redeeming store credits and any limitations on using store

credits to pay for products or costs associated with such products, *including taxes, and shipping

and handling.*"  FTC Ex. 22.E at 4.  In BlueHippo's July 2 response, it detailed the shipping and

taxes policy in clear and unambiguous terms.[13]  Yet the FTC never complained about the practice

until now.  Had BlueHippo known the FTC believed additional disclosure was required, it would

have inserted in the script the familiar refrain, "shipping and taxes not included."

## C.    BLUEHIPPO HAS NOT BEEN CONDITIONING CREDIT ON PREAUTHORIZED TRANSFERS

Finally, the FTC complains that BlueHippo has violated the Order by "conditioning the

extension of credit on mandatory preauthorized transfers, in violation of the [Electronic Funds

Transfer Act ("EFTA")] and its implementing Regulation E."  This is simply false.

---

[13] The letter described the availability of store credits and the way the store operated and stated:

> Store credit cannot be used for taxes or shipping and handling (store credit amount is principal paid, so store credits can only be used for principal). Instructions are displayed on the screen (and can be printed out) with how and where to send the balance of their order using a certified check, cashier's check, or money order.

FTC Ex. 22F at 5-6.

EFTA prohibits sellers from extending credit only on the condition that debtors agree to automatic preauthorized electronic transfers from their bank accounts. EFTA does not prohibit the use of such transfers in credit-based transactions, but rather simply prohibits lenders from *requiring* the use of such transfers as a precondition to the extension of credit. *See* 12 C.F.R. § 205.10(e)(1) ("No financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers, except for [two scenarios not relevant here.]").

EFTA defines "preauthorized electronic transfers" as "electronic fund transfer[s] authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(9). 15 U.S.C. § 1602(e) defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e).

The Federal Reserve's Official Staff Commentary to its Regulation Z provides that layaway plans like that here are not considered "credit": "The following situations are not considered credit for purposes of the regulation: Layaway plans, unless the consumer is contractually obligated to continue making payments." Regulation Z, 12 C.F.R. § 226.2 (2006), Supp. I, § 2(a)(14)(1) (official staff interpretation of "credit") This rule reflects the fact that layaway customers incur no debt, and thus receive no credit. Accordingly, there is no prohibition on conditioning layaway programs on preauthorized electronic transfers.

BlueHippo freely admits conditioning its layaway plans on the ability to electronically debit consumers' bank accounts, at least through the first round of payments. *See, e.g.* FTC Ex. 40 at 6. Such a practice is legitimate and the FTC does not challenge it here. 15 U.S.C. § 1602(e).

As the FTC knows, BlueHippo has not conditioned the extension of credit on the use of preauthorized electronic transfers, and is thus not in contempt of this Court's Order. BlueHippo extends credit only to those customers who qualify by meeting its clearly spelled out pre-conditions. Once those conditions are met, BlueHippo offers to extend credit by sending the customer an installment credit agreement. That credit agreement allows customers to provide their bank name, routing number, account number, and type of account for the purpose of using electronic debiting services. *See* FTC Ex. 42 at 4. But BlueHippo *does not require* the use of electronic debiting services as a condition to credit.

The best evidence of this fact is that many customers who were extended credit made payments after April 10, 2008 by means other than preauthorized electronic transfers, including remote checks, paper checks, and money orders. *See* Demchick Dec. ¶ 33; *see also* Cohen Dec., Ex. 9, July 2, 2009 Letter.

That alternative payment types are permitted under the credit agreement is also evident from the face of the agreement itself. *See* FTC Ex. 42 at 4 (providing that consumer agrees to pay fees arising from "any *check or other instrument* you give us that is unpaid for any reason;" stating, "If you are a Maryland resident, you agree to pay the fee if a *check you give us* is unpaid after the *second presentment*;" and explaining that customers should make "payments *at our business address* shown at the top of the first page or at such other address as we may give to you") (emphasis added).

## D.    THE FTC'S SANCTION DEMANDS ARE UNLAWFUL, EXCESSIVE, AND WITHOUT FACTUAL BASIS.

Because the FTC has not met its burden to show contempt by clear and convincing evidence, its demand for coercive and monetary sanctions should be denied. Moreover, the monetary sanctions the FTC seeks are not authorized by law and not reasonably related to the

wrongs alleged. Put simply, the FTC has not carried its burden of putting forth "a reasonable approximation of losses, gains, or some other measure the court finds appropriate." *Fed. Trade Comm'n v. Trudeau,* 579 F.3d 754, 773 (7th Cir. 2009).

The FTC's request for monetary sanctions comes in three parts. The FTC first asks for "more than $15 million" in restitution: "more than 35,000 consumers who placed orders with BlueHippo in the year after the Order and failed to receive either a computer or merchandise purchased using store credit should receive a refund of all monies paid to BlueHippo." FTC Mem. at 23-24.

This summary request for $15 million in sanctions ignores the fact that the large majority of consumers who placed orders with BlueHippo in the period in question were not entitled – under the explicit terms of the transactions to which the customers agreed in recorded phone conversations and in signed documents – to receive computers, merchandise, or cash refunds, and the FTC does not contend otherwise. Some consumers failed to make the requisite consecutive payments or to return the required installment loan documents, did not qualify for credit, and subsequently did not meet, or have not yet met, their layaway obligations; some made nary a single payment after the down-payment, or a few sporadic payments; some qualified for credit and cancelled their orders; and some simply proceeded with a layaway plan and never paid the full purchase price, or have not yet paid the full price, a prerequisite for receipt of merchandise. All of these consumers knew they were not entitled to cash refunds. To grant them full cash refunds would be a curious result and one not reasonably related to the harms alleged by the FTC in this contempt motion.

The FTC attempts to avoid its logical fallacy by arguing: "Each of these consumers placed orders with BlueHippo after being told by Contempt Defendants that BlueHippo was in

the business of financing computers. As discussed above, had BlueHippo not misrepresented the
nature of its business in widespread nationwide advertising, these consumers would not have
paid hundreds, if not thousands, of dollars to BlueHippo." FTC Mem. at 23-24. Putting aside
the fact that BlueHippo's use of the term "financing" was not a material misrepresentation, it is
absurd to contend that customers agreed to the terms later clearly explained to them because of
having seen or heard this magic word in BlueHippo's ads. Customers signed up with BlueHippo
because they had no or poor credit and no other opportunity to gain access to the technologies so
pervasive and important in today's society.[14]

The FTC next even more broadly requests "over $21 million," the amount it contends
was paid by "all consumers who have placed orders with BlueHippo since entry of the order"
because every consumer who placed an order was "harmed by Contempt Defendants' failure to
disclose fully the onerous terms and conditions of the refund policy." FTC Mem. at 24.

This request too should be rejected. To begin with, it involves unfair double-counting. It
includes all of the $15 million previously requested. And it is not even remotely proportional to
the alleged harm. The FTC seeks full refunds for: (a) *customers who never placed a single
order or request with the Online Store*, as is true of the vast majority of the 61,878 customers on
whose behalf the FTC makes this request;[15] and (b) omissions that, at most, cost the customers a

---

[14] The fact that BlueHippo is now in bankruptcy, and will possibly liquidate and thus ship no more computers, plays
no role in this contempt analysis. Whether consumers who were not entitled to receive merchandise but paid some
monies to BlueHippo might have claims in bankruptcy is an issue committed to the bankruptcy court. BlueHippo
sincerely regrets all consumer losses occasioned by its bankruptcy but those losses will not have been caused by the
conduct the FTC alleges was contumacious.

[15] According to the FTC's own expert, customers placed 8,088 orders for merchandise using store credits between
April 10, 2008 and July 24, 2009. FTC Ex. 21 at ¶ 39. That comes to barely 13% of the 61,878 customers the FTC
claims are entitled to recover every penny they paid to BlueHippo because of the online store. Moreover, the FTC's
expert asserts that these customers paid $163,047.54 in additional money in connection with their online store
orders. *Id.* Some portion of those payments was for the difference between the product price and the amount of the
customer's credit; the portion allocable to shipping and taxes is smaller, likely much smaller. That is the FTC's
justification for its request for more than $21 million in restitution.

small fraction of the purchase price of the merchandise in the Online Store. In short, the relief sought would be grossly out of balance with the alleged harm.

Third and finally, the FTC seeks relief even for customers who received the bargained-for merchandise, because they "were forced to wait longer than the promised three to four weeks after qualifying, were injured by BlueHippo's misrepresentations regarding delivery, and, accordingly should be compensated for the injury suffered as a result of that delay." FTC's Mem. at 25. For all of the reasons discussed *supra*, BlueHippo maintains that it should not be held in contempt for the shipping delays. Moreover, the FTC's failure to name a number in this request s BlueHippo suggests that the FTC recognizes the minimal nature of any harm arising from shipping delays.

Finally, because BlueHippo has discontinued sales and is winding down its operations, the FTC's request for coercive relief is now moot. So too is the FTC' motion to modify the Consent Order. The FTC has accomplished its goal.

## IV.    CONCLUSION

For each of the foregoing reasons, defendants BlueHippo Funding, LLC, and BlueHippo

Capital, LLC respectfully urge this Court to deny the FTC's Motions for Sanctions and to

Modify the Order of Permanent Injunction.


Dated:  December 7, 2009                          Respectfully Submitted,

                                                  K&L GATES LLP


                                  By:    _Douglas F Broder_ /s/ ABC
                                         Douglas F. Broder (DB-8406)
                                         Alyssa B. Cohen (AC-2323)
                                         599 Lexington Avenue
                                         New York, New York 10022
                                         T:  (212) 536-3900
                                         F:  (212) 536-3901

                                         *Counsel for BlueHippo Funding, LLC and*
                                         *BlueHippo Capital, LLC*

# Tab A

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
**(Cite as: 2007 WL 1988737 (E.D.N.Y.))**

COnly the Westlaw citation is currently available.

United States District Court,
E.D. New York.
HI-TECH PHARMACAL CO., INC., Plaintiff,
v.
HI-TECH PHARMACEUTICALS, INC., Defendant.
**No. 05-CV-2674 (ARR)(SMG).**

July 5, 2007.

Michael F. Sarney, Samson Helfgott, Katten
Munchin Rosenman LLP, New York, NY, for Plain-
tiffs.

David C. Berg, Law Offices of David C. Berg, Mi-
chael J. Levin, Barger & Wolen, LLP, New York,
NY, for Defendants.

### MEMORANDUM and ORDER

### I. Introduction

GOLD, S., United States Magistrate Judge.

*1 Plaintiff, Hi-Tech Pharmacal, a manufacturer of
generic and branded drugs and dietary supplements,
brings this action for trademark infringement, unfair
competition, and false designation of origin under
Section 43(a) of the Lanham Act, codified at 15
U.S.C. § 1125(a). Compl. ¶ 13. Plaintiff alleges that
defendant, a manufacturer primarily of dietary sup-
plements, infringes its trademark. Plaintiff contends
that defendant's mark, "Hi-Tech Pharmaceuticals," is
so similar to plaintiff's mark that it causes confusion
and mistake, and leads customers to believe that
plaintiff is the source of defendant's products. Plain-
tiff also brings various claims under New York State
law.

Plaintiff and defendant now cross-move for summary
judgment on the federal claim, and defendant moves
for summary judgment on plaintiff's state law claims.
By stipulation dated November 14, 2006, the parties
consented to have me decide their respective mo-
tions. Docket Entry 32. I held oral argument on May
10, 2007. For the following reasons, the parties'
cross-motions for summary judgment on plaintiff's
Lanham Act claim are denied; defendant's motion for
summary judgment on plaintiff's state law claim for
dilution is denied; and defendant's motion for sum-
mary judgment on plaintiff's claims for unfair compe-
tition, misappropriation, and unfair and deceptive
trade practices is granted.

### II. Facts

#### A. Hi-Tech Pharmacal

Hi-Tech Pharmacal ("Hi-Tech") makes and sells pre-
scription pharmaceuticals, over-the-counter health
and medical products, and vitamins and mineral sup-
plements. Declaration of David Seltzer ("D. Seltzer
Decl.") ¶ 2. Vitamins and minerals are defined as
dietary supplements by the Food and Drug Admini-
stration ("FDA"). Declaration of Michael F. Sarney
("Sarney Decl."), Ex. 1. Hi-Tech's products include
both generic and branded dietary supplements and
prescription and over-the-counter drugs, as well as
contract and private label products. Deposition of
David Seltzer ("D. Seltzer Dep.") at 46; D. Seltzer
Decl. ¶¶ 2-3, Exs. 2-3.

Hi-Tech's generic products make the most prominent
use of the company's trade name. The packaging for
Hi-Tech's generic products, which include eye drops,
vitamin drops, and cough syrup, features the "Hi-
Tech Pharmacal" company logo but no drug-specific
"brand" name. D. Seltzer Decl., Ex. 7. The branded
products, which include products such as a sugar-free
cough syrup marketed under the name Diabetic Tus-
sin and a prescription analgesic sold under the name
Naprelan, do not have the "Hi-Tech Pharmacal" logo
on their label. Rather, these products are marketed
under a name specific to each item, but the packaging
does indicate that they are made and distributed by
Hi-Tech. D. Seltzer Decl. ¶ 10.

Hi-Tech has employed the "Hi-Tech Pharmacal" mark
since 1983. Id. ¶ 2. It has marketed over-the-counter
health products, vitamins, and minerals under that
name since 1983, and pharmaceutical products under
it since 1984. Id. In addition to its inclusion on prod-
uct packaging and labels, the name "Hi-Tech Phar-

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
(Cite as: 2007 WL 1988737 (E.D.N.Y.))

macal" also appears on product catalogs, order forms, price lists, invoices, annual reports, and advertisements.[FN1] *Id.* ¶¶ 10-22 *and accompanying exhibits.* The typical display of the name seems to be the word "Hi-Tech" in large white lettering in a rectangle against a teal colored background, with the word "Pharmacal" appearing in smaller, more simple black lettering          below.          *See* http://www.hitechpharm.com/prod.htm (last visited June 13, 2007). This mark appears in the upper left-hand corner of many of plaintiff's generic products. *Id.* Although plaintiff has registered other names, it has not registered the "Hi-Tech Pharmacal" mark with the United States Patent and Trademark Office ("PTO"). D. Seltzer Decl. ¶ 4.

> FN1. Defendant lists what it describes as "multiple" inconsistent names, logos, and domain names that the plaintiff has employed on product labels, in company materials, and otherwise in the course of its business, including: "Hi-Tech Pharmacal," "Hi-Tech," "H-T," "hitechpharm.com," "hit-keb@bellsouth.net," "R$_x$ Choice," "Steri-Med," "R$_x$ Steri-Med," and "Health Care Products." Def.'s 56.1 Statement at 3-4, Def.'s Resp. 2. For purposes of this motion, only the continuous use of the claimed mark, "Hi-Tech Pharmacal," and its distinctiveness and origin-indicating qualities, are relevant.

**\*2** In 2005, Hi-Tech's net sales were approximately $68 million. *Id.* ¶ 6. This amount constitutes less than 1% of industry revenues. Def.'s 56.1 Statement at 10, Def.'s Resp. 14. Hi-Tech's generic product business accounted, very roughly, for 80-85% of this figure, including some contract manufacturing products. D. Seltzer Dep. at 49, ll. 3-19. Hi-Tech does not sell its generic products directly to end users or consumers, but only to major distributors, wholesalers, and chains throughout the United States, such as Rite Aid, CVS, Wal-Mart, Walgreen's, Eckerd, Safeway, and Albertsons. Deposition of Edwin A. Berrios ("Berrios Dep.") at 45, ll. 20-22; Declaration of Edwin A. Berrios ("Berrios Decl.") ¶¶ 2, 4-5; Def.'s 56.1 Statement at 10, Def.'s Resp. 12; Pl.'s 56.1 Statement ¶ 12.

Hi-Tech advertises its products in trade journals, such as the U.S. Pharmacist and Drug Store News, promotes its products at various trade shows, and solicits

business by direct customer contact, such as phone calls or emails. Berrios Decl. ¶ 6; Berrios Dep. at 112, ll. 7-12. Between 1997 and 2006, Hi-Tech spent $5-6 million to promote its branded products and approximately $3 million to promote its generic products. D. Seltzer Decl. ¶ 9.

*B. Hi-Tech Pharmaceuticals*

Defendant Hi-Tech Pharmaceuticals ("HTP") makes and sells vitamins and other dietary supplements. Declaration of Jeffrey A. Jones ("Jones Decl.") ¶¶ 3-6, Ex. 3. Ninety percent of HTP's products are sexual stimulants and body building and weight loss products; its vitamin sales account for less than 1% of its business. *Id.* ¶¶ 9-10. HTP's products are sold primarily in tablet form, *id.* ¶ 6, whereas many of Hi-Tech's products, including its dietary supplements, are sold in liquid form. D. Seltzer Dep. at 36, ll. 3-23, 38-39, ll. 24-5.

HTP has been using the name "Hi-Tech Pharmaceuticals" or "HTP" and its accompanying logo on products and in advertising since 1990 or 1991. Jones Decl. ¶ 3. At least in recent years, HTP's usual logo has included the words "Hi-Tech Pharmaceutical" and "its initials 'HTP' imprinted on a circle with a stylized helical design running diagonally through the diameter of the circle ." [FN2] *Id.* ¶ 18.

> FN2. In a few of the advertisements presented to the court, the words "Hi-Tech Pharmaceuticals" are presented in a different format. *See* Jones Decl., Exs. 7, 12.

HTP sells its products directly to consumers over the Internet and, like Hi-Tech, in major stores such as Wal-Mart, CVS, and Rite-Aid. Def.'s 56.1 Statement at 12, Def.'s Resp. 19; Pl.'s 56.1 Statement ¶ 19. HTP promotes its products by sponsoring car races and beauty pageants, advertising on television, radio and in print, producing its own magazine, and participating at trade shows. Sarney Decl. ¶¶ 17-25. Over the past five years, HTP has spent approximately $15 million on advertising, and its annual sales have grown from $4.8 million to $33.8 million. Jones Decl. ¶ 16-17.

HTP has been the subject of a number of regulatory actions and is named as a defendant in a pending criminal prosecution. In 2003, the Food and Drug

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
(Cite as: 2007 WL 1988737 (E.D.N.Y.))

Administration ("FDA") began investigating whether certain representations made in HTP's labels and marketing material suggested that its products were drugs rather than dietary supplements. Declaration of Edmund J. Novotny ("Novotny Decl.") ¶ 8. The FDA also investigated whether defendant's products contained the chemical compound Taldalafil, which was not approved for sale in the United States at the time. *Id.* ¶ 9. The investigation led to a lawsuit filed by the United States against HTP. Sarney Decl., Ex. 12. In response, HTP voluntarily recalled the products in issue and agreed to enter into a consent decree. Novotny Decl. ¶¶ 10-11. HTP's products have remained in commerce continuously, however, and the FDA has not sought judicial enforcement of the decree. *Id.* ¶¶ 11-13.

*3 On or about January 13, 2004, the FDA issued a letter advising HTP that, because Taldalafil was "again found" in four of its products, those products "may not be legally marketed in the United States." Sarney Decl., Ex. 14. In addition, on November 10, 2004, the Federal Trade Commission ("FTC") filed charges against HTP and other companies, alleging that HTP had misrepresented facts regarding a weight loss product known as Lipodrene. Novotny Decl. ¶ 16. That litigation is still pending. *Id.* Defendant asserts that it did not manufacture Lipodrene at the time of the allegations giving rise to the FTC's complaint. *Id.*

In April of 2004, the FDA quarantined some of the defendant's dietary supplements containing <u>ephedrine</u> alkaloids. *Id.* ¶ 17. The status of the FDA rule banning <u>ephedrine</u> alkaloids is presently in litigation. *Id.* ¶ 18.

Finally, in or about September of 2006, the Department of Justice filed an indictment against HTP and its officers, alleging that they conspired to import pharmaceutical drugs from Belize illegally. *Id.* ¶ 20. In a statement reported in the press, the prosecutor on the case contended that:

The indictment's allegations are disturbing because customers thought they were getting legitimate and safe prescription drugs over the Internet from Canada at cheaper prices, when in reality they received adulterated fakes that were crudely made in an unsanitary house in Belize.

Berrios Decl., Ex. 9. Defendant asserts that the government has confused HTP with a Belizean entity of the same name. Novotny Decl. ¶ 20. The criminal charges are pending. *Id.*

*C. This litigation*

Hi-Tech first became aware of HTP in or about 2001, when it began receiving phone calls asking about HTP's products. Declaration of Anne Siebert ("Siebert Decl.") ¶ 3. In 2002, one of plaintiff's customers mistakenly forwarded to plaintiff a warning letter issued by the FDA regarding HTP. D. Seltzer Decl. ¶ 23. The customer apparently believed that plaintiff was the subject of the letter. Subsequently, in April of 2002, Hi-Tech issued two cease and desist letters to HTP, demanding that it refrain from using Hi-Tech's name. *Id.* ¶ 24, Ex. 20. Plaintiff sent another such letter in March of 2003. *Id.* It is unclear what response-if any-HTP made to these letters, but it clearly did not stop using the "Hi-Tech Pharmaceuticals" name. Transcript of Oral Argument ("Tr .") at 5, ll. 12-15. The record is also unclear as to why plaintiff did not file its lawsuit until June of 2005, more than two years after the last letter. Tr. at 46-47. The record does, however, reveal the following information about the period from 2001 to 2005.

In her declaration, Anne Siebert, executive assistant to the president of Hi-Tech, states that in or about 2001, she began to receive "a couple of ... calls a day" asking about purchasing defendant's product, Stamina-Rx. Siebert Decl. ¶ 3. She also received phone calls about at least one of the defendant's other products, Lipodrene. *Id.* Although the calls were not always logged, plaintiff has submitted a log of some of the calls it received inquiring about defendant or defendant's products as of March 2006. *Id.* ¶ 4. Ten such calls were logged between November 29, 2005 and March 28, 2006. *Id.,* Ex. A. Siebert also asserts that Hi-Tech received emails about defendant's products, including a message from one of plaintiff's customers, asking whether it should return some of defendant's product, StaminaRx, to plaintiff. *Id.* ¶ 5, Ex. C. One of plaintiff's customers also sent plaintiff a "Returned Goods Invoice" for defendant's products. Supplemental Declaration of Anne Siebert ("Siebert Supp. Decl.") ¶ 2, Ex. 1. Another vendor sent a letter to plaintiff regarding a dispute over an outstanding invoice for defendant's product. *Id.* ¶ 3. In another instance, one of defendant's suppliers, Atlantic

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
(Cite as: 2007 WL 1988737 (E.D.N.Y.))

Sweetener, Co., billed plaintiff for products that were purchased and shipped to defendant. D. Seltzer Decl. ¶ 26. In the course of just a few days at one particular trade show, between twenty and thirty pharmacists approached Hi-Tech's vice president of sales and marketing to ask whether Hi-Tech Pharmacal and Hi-Tech Pharmaceuticals are the same company, or whether the Hi-Tech Pharmaceuticals' booth was part of plaintiff's exhibition. Berrios Decl. ¶ 15.

*4 Plaintiff has also submitted printouts from a website, www.PriceGrabber.com, that lists "Hi-Tech Pharmacal" as the manufacturer of Lipodrene and other fat-burning and weight loss pills that appear to be HTP's products and are not even made or sold by plaintiff. Sarney Decl., Ex. 18. A printout from www.shopping.msn.com lists both Hi-Tech Pharmacal and Hi-Tech Pharmaceuticals as the manufacturer of HTP's Stamina-Rx, a sexual stimulant. *Id.,* Ex. 19.

As noted above, the FDA placed some of HTP's products under quarantine. In February of 2006, Bloomberg News mistakenly reported that it was plaintiff and not defendant whose products were quarantined by the FDA. D. Seltzer Decl. ¶ 25. As a result of the mistake, plaintiff saw its share price drop from $25.95 to $23.81 in ten minutes. *See* "Stock Plunges After Case of Mistaken Identity," Newsday, (Mar. 1, 2006); D. Seltzer Decl., Ex. 21. Although Bloomberg News ultimately issued a correction, plaintiff's shareholders and investors inquired about the incident, and plaintiff was forced to respond by issuing a press release stating that its products were not the subject of the FDA seizure. *Id.* ¶ 25, Ex. 22.

The criminal prosecution of HTP caused further confusion. As a result of the indictment, plaintiff received inquiries from two of its customers about its involvement. Berrios Decl. ¶ 16. Plaintiff asserts that a buyer for one of these customers, Cardinal Health Care, told plaintiff that Cardinal, upon learning of the criminal charges, began removing plaintiff's products from its system. *Id.* ¶ 17.

### III. Discussion

#### A. Plaintiff's Lanham Act Claim

Plaintiff and defendant cross-move for summary judgment on plaintiff's federal claim of trademark

infringement under Section 1125(a) of the Lanham Act. Summary judgment is appropriate where the pleadings, evidence obtained through discovery, and affidavits establish that there is no genuine issue of material fact and that the undisputed facts entitle the movant to judgment as a matter of law. *Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 580 (2d Cir.1991), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 868 (2d Cir.1986). In making this determination, a court must determine whether a reasonable jury could return a verdict for the nonmoving party, and, in doing so, the court will "resolve all ambiguities and draw all inferences against the moving party." *Lang,* 949 F.2d at 580.

"A trademark is any word, name, or symbol, or any combination thereof, used by a person to identify and distinguish his or her goods ... from those manufactured or sold by others and to indicate the source of the goods." *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997), *quoting* 15 U.S.C. § 1127 (internal quotation marks omitted). A trade name, or a name used to identify a business, also serves to indicate origin and is entitled to protection under the Act.[FN3] 15 U.S.C. § 1127. The section of the Lanham Act relevant in this case provides in part:

> FN3. "Hi-Tech Pharmacal"-whether a company name (trade name) or a mark of origin (trade mark)-is treated the same in all contexts for purposes of this motion. In both the trade name and mark contexts, the words "Hi-Tech Pharmacal" are an indicator of source and origin.

*5 (a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
**(Cite as: 2007 WL 1988737 (E.D.N.Y.))**

to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

A plaintiff establishes liability under Section 1125(a) "if it can show [1] that it has a valid trademark entitled to protection and [2] that the defendant's use of it is likely to cause confusion." *Genesee*, 124 F.3d at 142, quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995) (internal quotation marks omitted). *See also Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir.1985). Whether a mark is entitled to protection depends on its classification as to its degree of distinctiveness or whether it has acquired secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2757-2758, 120 L.Ed.2d 615 (1992). Whether there is a likelihood of confusion is determined according to the eight-factor ("*Polaroid* Factors") test originally set forth in *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir.1961).

For purposes of these motions, it is undisputed that plaintiff has been using the mark "Hi-Tech Pharmacal" continuously for a longer period than the defendant has used "Hi-Tech Pharmaceuticals." Plaintiff is therefore the senior user and entitled to priority if it can establish the two elements of liability listed above. *See Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F.Supp. 1339, 1347 (E.D.N.Y.1994).

The Second Circuit has held that summary judgment "may be appropriate in certain trademark actions." *Lang*, 949 F.2d at 580 (citing cases). It is also well-settled, however, that the classification of the distinctiveness of a mark is a question of fact. *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344-345 (2d Cir.1999); *Bristol-Myers*

*Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039-1040 (2d Cir.1992). Similarly, the resolution of each of the *Polaroid* factors underlying the determination of likelihood of confusion poses a question of fact, although the ultimate balancing of those factors is a question of law. *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir.2005); *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir.2004) ("Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law.").

*i.) Classification of Plaintiff's Mark*

**\*6** Infringement actions under the Lanham Act encompass both registered and unregistered trademarks. *Virgin Enter. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir.2003). Unregistered marks may be protected if they are distinctive.

Some marks enjoy protection because they are inherently distinctive. *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757-2758. A mark that is not inherently distinctive may still enjoy protection if plaintiff establishes evidence that the mark has developed special significance in the marketplace or "secondary meaning." *Id.*

When determining distinctiveness, courts consider where a mark falls along a spectrum comprised of five categories: "(1) generic, (2) descriptive, (3) suggestive, (4) arbitrary or (5) fanciful." *Two Pesos*, 505 U.S. at 768, 112 S.Ct. at 2757.[FN4] Generic terms, or terms that "refer to the genus or class of which the product is a species," are never protected. *PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 561 (2d Cir.1990). *See also Genesee*, 124 F.3d at 143. Descriptive terms, or terms that "convey an immediate idea of some characteristic or attribute of the product," while also not inherently distinctive, are entitled to protection, but only if the plaintiff offers proof that the term has acquired "secondary meaning," or "proof that the public has come to associate the term with a particular source." *Papercutter*, 900 F.2d at 562. Suggestive terms-occupying a middle ground-are terms that "require some imagination on the part of the consumer to ascertain the nature of the product" and are entitled to protection even absent any additional showing. *Id.* Finally, arbitrary and fanciful terms are "so distinctive and indicative of a product's *source*" that they are entitled to protection

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
**(Cite as: 2007 WL 1988737 (E.D.N.Y.))**

"without the need of debating whether they are merely descriptive." *Id.* (emphasis added and internal quotes omitted).

> FN4. Some courts collapse arbitrary and fanciful marks into a single fourth category. *See, e.g., Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976); *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.,* 478 F.Supp.2d 340, 343 (E.D.N.Y.2007).

Plaintiff contends that its mark is arbitrary or suggestive, while defendant argues that plaintiff's mark is not entitled to protection because it is an unregistered, descriptive mark with no secondary meaning. Pl.'s Mem. at 10-11; Def.'s Mem. at 8-14. In determining whether a mark crosses the fine line from suggestive to descriptive, the question is whether the words-taken together-convey "an *immediate* idea of the ingredients, qualities, or characteristics of the goods." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 (2d Cir.1976) (emphasis added). *See also* MCCARTHY § 11:67 ("If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness.").

As previously stated, where a mark fits along the spectrum from generic to fanciful is a question of fact. More specifically,

[t]he factual issue presented is how the purchasing public views the mark. The fact-finder is not the designated representative of the purchasing public, and the fact-finder's own perception of the mark is not the object of the inquiry. Rather, the fact-finder's function is to determine, based on the evidence before it, what the perception of the purchasing public is.

**\*7** *Lane Capital Mgmt.,* 192 F.3d at 344. Thus, a court may classify a mark for purposes of a summary judgment motion only if the evidence would lead a reasonable fact-finder to only one conclusion about the purchasing public's perception of the mark's distinctiveness. *Id.* at 348 (reasoning that "if the only evidence is the mark and the product, then the view of the purchasing public may be divined only if the purchasing public could have only one view, or if one competing view is dominant enough to permit a rea-

sonable conclusion by the preponderance standard"). The Supreme Court has cautioned that courts making this determination should not dissect a mark into its component words for purposes of determining distinctiveness. "The commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety [.]" *Estate of P.D. Beckwith, Inc., v. Comm'r of Patents,* 252 U.S. 538, 545-46, 40 S.Ct. 414, 417, 64 L.Ed. 705 (1920); MCCARTHY ON TRADEMARKS § 11:27 (2006).

The public's perception of a mark may be discerned from various types of evidence.

> A mark's common usage and understanding by the relevant public may be discerned from any competent source, including consumer surveys, testimony of consumers or trade professionals, dictionary definitions, uncontested usage of the mark by competitors to describe their products, generic usage in newspaper and magazine articles, and generic usage by the proponent of the trademark.

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.,* 478 F.Supp.2d 340, 360 (E.D.N.Y.2007) (citing cases) (internal quotations and citations omitted). No one source is dispositive of the issue. *Id.*

Plaintiff has offered very little evidence of public perception of its mark, relying instead primarily upon a common sense interpretation of the words it uses. Plaintiff contends that its mark is inherently distinctive because it combines "a common term, Hi-Tech" with "the fanciful term, pharmacal, and thereby uses the mark as a whole in an arbitrary way to form a distinctive composite." Pl.'s Mem. Supp. Mot at 12.[FN5] *See also* Pl.'s Reply Mem. at 3-6. Defendant counters that plaintiff's mark is descriptive because it merely describes the plaintiff's products: pharmaceuticals (i.e., pharmacal), made with or embodying high technology (i.e., hi-tech). Def.'s Mem at 10. Defendant offers some evidence in support of this contention, including dictionary definitions of both words and the results of searches on www.google.com, purportedly indicating that both words are commonly used. Declaration of Michael J. Powell ("Powell Decl."), Exs. 1-4, 7-10. Defendant also shows that other similar companies, including some that sell medical, dental, or nutritional products, have used the

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
(Cite as: 2007 WL 1988737 (E.D.N.Y.))

words "Hi-Tech" and "pharmacal" in their trade names. *Id.,* Exs. 12-14, 17-32. Finally, defendant presents some evidence that the word "hi-tech" has been used in news articles and on the Internet to describe pharmaceuticals, pharmaceutical companies, and other aspects of the pharmaceutical industry. *Id.,* Exs. 33-38.

> FN5. This rationale actually comes from plaintiff's argument as to strength of its mark, although it is applicable here. Plaintiff's argument as to the protectibility of its mark is almost entirely conclusory in nature. *See* Pl.'s Mem. Supp. Mot at 10 ("The use of HI-TECH PHARMACAL in connection with the manufacture and sale of pharmaceuticals and nutritional supplements is neither generic nor descriptive. Accordingly, it is entitled to protection under the Lanham Act without evidence of secondary meaning.").

**\*8** Neither plaintiff nor defendant has presented evidence sufficient to show that a reasonable fact-finder could come to only one conclusion about the distinctiveness of plaintiff's mark. Plaintiff has presented no consumer surveys, no testimony of typical consumers or professional buyers for the chain stores that purchase its products, and no dictionary definitions or other examples of how the words are used independently or as a composite in other contexts. Plaintiff has, therefore, not met its burden of showing that a reasonable fact-finder could only conclude that its mark is suggestive.

Defendant has similarly failed to demonstrate the absence of a genuine issue of material fact in this respect. Although the defendant offers dictionary definitions of the words "Hi-Tech" and "Pharmacal," dictionary definitions are not dispositive. *Jewish Sephardic,* 478 F.Supp.2d at 360. *See also Courtenay Commc'ns Corp. v. Hall,* 334 F.3d 210, 215-216 (2d Cir.2003) (noting the importance of taking into account not just the language, but the whole mark, including any "distinctive lettering, coloring, or other design elements," in determining the protectibility of otherwise generic words). Moreover, although "pharmacal" may be similar enough to pharmaceutical to call the idea of drugs or health-related products to mind, it is not found in all dictionaries, and it is certainly not a commonly used word. *Compare* Ox-

ford American Dictionary, p. 745 (1999) (containing only pharmaceutical); Random House Dictionary of the English Language, p. 1451 (2d ed.1987) (same); Webster's II: New Riverside University Dictionary, pp. 880-881 (1980) (same) *with* Webster's Third New International Dictionary, pp. 1694-95 (2000) (including both words). The only dictionary defendant points to that includes the word "pharmacal" is a medical dictionary. *See Merriam-Webster Med. Dict.,* http://dictionary.reference.com/browse/pharmacal (last visited June 12, 2007). Similarly, a search for the word "pharmacal" on www.google.com turns up 537,000 results, whereas a search for the word "pharmaceutical" produces over 80 million results. *See also* Powell Decl., Exs. 4-5 (showing similarly disparate results for pharmacal and pharmaceutical). Thus, the rarely used term "pharmacal" may not immediately conjure up an image of pharmaceuticals at all for the ordinary consumer. *See Collyrium v. John Wyeth & Bro.,* 167 Misc. 231, 3 N.Y.S.2d 42, 45 (N.Y.Sup.Ct.1938) (finding that the fact that the word "collyrium"-meaning eye lotion or eye salve-was not in common use among the general public bolstered its distinctiveness). Indeed, the term "pharmacal" might also reasonably be understood by those unfamiliar with its meaning as referring to a chain of drug stores in California or drugs designed to help reduce caloric intake.

Defendant's google searches and evidence of third-party use of the word "hi-tech" also do little to help its position. Extensive third-party use of the word hi-tech may speak to the dilution of the "strength" of the origin-indicating qualities of plaintiff's mark in the marketplace, but it does not necessarily speak to the public's perception of plaintiff's entire mark as conceptually suggestive or descriptive. *Dana Braun, Inc. v. SML Sport Ltd.,* 2003 WL 22832265, \*9 (S.D.N.Y. Nov.25, 2003); *Oxford Indus., Inc. v. JBJ Fabrics, Inc.,* 1988 WL 9959, \*4, 6 U.S.P.Q.2d 1756, 1760 (S.D.N.Y. Feb.2, 1988) ("A mark can be conceptually strong (by being arbitrary or fanciful) and at the same time be commercially weak if the mark lacks significance in the market place for identifying the origin of goods.").

**\*9** Because the parties here have filed cross-motions for summary judgment, it might seem that they agree that this case does not involve questions of fact. Indeed, in some cases, a mark may be categorized based upon little evidence other than the mark itself

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
**(Cite as: 2007 WL 1988737 (E.D.N.Y.))**

and the nature of the product to which it applies. *Lane Capital Mgmt.,* 192 F.3d at 348. *But see, e.g., Courtenay Comm'c'n,* 334 F.3d at 215 (reversing the district court's dismissal on the basis that the mark "iMarketing News" could not be found to be generic on the basis of the pleadings alone). Other marks, however, require "[r]azor-thin judgment calls," *Thompson Med.,* 753 F.2d at 212, and summary judgment may not be appropriate on a record as sparse as the one presented here.

Plaintiff's mark does not so clearly require imagination that it can be determined to be suggestive on summary judgment based on little more than the mark itself and the nature of the products plaintiff sells. Courts finding trademarks to be suggestive on such limited proof have typically been addressing less descriptive marks. *See, e.g., Playtex Prods.,* 390 F.3d at 164 (affirming a grant of summary judgment finding "Wet Ones" to be a suggestive mark because, while the product it describes is wet and dispensed one-at-a-time, the name "Wet Ones" "without more, does not itself conjure up the image of a towelette."); *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 75 (2d Cir.1988) (reversing the denial of a preliminary injunction and finding, based on little more than the mark and the nature of the product, that the unregistered mark GUNG-HO as applied to a marine action figure was suggestive because "[i]t takes some imagination even for a child to intuit a swamp-crawling, leech-sucked, bug-bitten marine Sergeant from the term 'GUNG-HO.' "); *Lemme v. Nat'l Broad. Co., Inc.,* 472 F.Supp.2d 433, 444 (E.D.N.Y.2007) (holding for purposes of summary judgment that the registered mark "American Dream" was suggestive when applied to a talk show based primarily on the reasoning that "a consumer would not immediately connect American Dream with a Talk Show about People, their Heritage, Goals, Struggles and Dreams."); *Citigroup Inc. v. City Holding Co.,* 171 F.Supp.2d 333, 345-346 (S.D.N.Y.2001) (holding, in the context of summary judgment, that "Citicorp," "Citibank," and a whole family of "Citi" marks are suggestive because "Citi" is a coined term and "does not describe banking or financial services, or any features or qualities of financial services and the term CITI is not in any way geographically descriptive because the business of Citicorp is national and international in scope.").

However, plaintiff's mark also does not fit comforta-

bly among other marks that courts have found to be purely descriptive by relying primarily on the meaning of the words in the mark and mark holder's products themselves. *See, e.g., Bernard v. Commerce Drug Co.,* 964 F.2d 1338, 1341 (2d Cir.1992) (holding that the term arthriticare was descriptive because it indicated the general use (care) of a product for a specific condition (arthritis)); *PaperCutter,* 900 F.2d at 563-564 (holding that the plaintiff's trade name, "Papercutter," was descriptive and required proof of secondary meaning because it conveyed information about plaintiff's products, which were artistic paper designs and cutouts, rather than information about the entity with which those products were associated); *Thompson Med.,* 753 F.2d at 216 (holding that the mark "Sportscreme" was descriptive because "[n]o exercise of the imagination is necessary for the public to understand that the product is a cream useful in connection with sports."); *Ideal World Mktg., Inc. v. Duracell, Inc.,* 15 F.Supp.2d 239, 244 (E.D.N.Y.1998) (holding that the unregistered name "Powercheck" used in connection with rechargeable camcorder battery packs was descriptive because "[n]o exercise of the imagination is necessary to perceive that PowerCheck enables a consumer to check, or verify, the power in the battery."); *Sizes Unlimited, Inc. v. Sizes To Fit, Inc.,* 871 F.Supp. 1558, 1563 (E.D.N.Y.1994) (holding that the names "sizes woman," "sizes unlimited," and "smart size" were descriptive marks because the word "sizes" was used in "the most direct and unimaginative fashion possible"-i.e., to "immediately alert[ ] the potential customer to what its sponsor deems the most important feature of the product at issue.").

*10 On the record submitted in connection with the pending motions, I conclude that a jury might reasonably find the plaintiff's mark to be either suggestive or descriptive. The evidence presented by the parties is simply insufficient to preclude a reasonable fact-finder from reaching one decision or the other. Therefore, to the extent the parties' motions rely on a finding that plaintiff's mark fits in one of these categories, summary judgment must be denied because the parties' submissions raise a genuine issue of material fact as to the public's perception of the mark.

*ii.) Secondary Meaning of Plaintiff's Mark*

This conclusion, however does not end the analysis. Plaintiff's mark may be entitled to protection even if

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
(Cite as: 2007 WL 1988737 (E.D.N.Y.))

it is merely descriptive, provided that the mark has acquired "secondary meaning." A showing of secondary meaning establishes that, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Bristol-Myers Squibb,* 973 F.2d at 1041, *quoting Inwood Labs. v. Ives Labs.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982). "Secondary meaning is an essentially factual determination, proof of which 'entails vigorous evidentiary requirements.' " *Id., quoting Thompson Med.,* 753 F.2d at 217 (internal quotations and citations omitted). The burden of establishing secondary meaning rests with the party asserting rights in the mark; here that burden lies with the plaintiff. *Id.* Moreover, plaintiff's burden is to establish that its mark acquired secondary meaning *before* defendant began using its allegedly infringing mark. *Jewish Sephardic,* 478 F.Supp.2d at 344, *citing PaperCutter,* 900 F.2d at 564.

A plaintiff may prove secondary meaning through a variety of different types of evidence, including consumer surveys, advertising efforts, sales volume, media coverage, and length and exclusivity of the use of the mark. *Jewish Sephardic,* 478 F.Supp.2d at 344-345 (citing cases). Here, plaintiff has provided almost no evidence of secondary meaning. Plaintiff has put forth no consumer surveys indicating that relevant consumers associate plaintiff's products with its trade name. With regard to advertising expenditures, plaintiff asserts that it has spent $3 million on advertising in connection with the Hi-Tech Pharmacal mark from 1997 to the present. D. Seltzer Decl. ¶ 9; Pl.'s Mem. at 13. The size of this figure aside, plaintiff has not shown that any significant advertising took place to establish secondary meaning before the defendant began using its allegedly infringing mark in 1990 or 1991. Similarly, the growth in plaintiff's sales from 1989 to 2005, ultimately reaching $68 million annually, fails to establish that the mark acquired secondary meaning *before* the defendant began using it. Plaintiff has also not shown that it received any sort of meaningful unsolicited media coverage or that the length and exclusivity of its use of the "Hi-Tech Pharmacal" mark enhanced the origin-indicating quality of its mark in the eyes of the relevant purchasing group. For all of these reasons, I find that plaintiff has failed to meet its burden to show that its mark has acquired secondary meaning during the relevant period of time.

*11 Because I find that a genuine issue of material fact exists with regard to the distinctiveness of plaintiff's mark and with regard to whether plaintiff's mark has acquired secondary meaning, I do not reach the issue of whether there was a likelihood of confusion based on the eight *Polaroid* factors.[FN6] *See Thompson Med.,* 753 F.2d at 213 ("The classification of a particular term represents merely a threshold determination. After a mark has been duly catalogued and its eligibility for protection has been determined, we must then examine a litany of factors to evaluate whether consumers are likely to be confused as to the source of the product."). For the reasons stated above, plaintiff's and defendant's cross-motions for summary judgment on the Section 1125(a) Lanham Act claim are denied.

> FN6. I do note, however, that plaintiff has made a strong showing that there was not just a *likelihood* of confusion, but rather that relevant consumers were actually confused. *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 141-42 (2d Cir.1999) ("Evidence that confusion has actually occurred is of course convincing evidence that confusion is likely to occur."). Websites have mislabeled defendant's products as plaintiff's products. Customers returned defendant's goods to plaintiff. Potential customers phoned or emailed plaintiff wishing to buy defendant's products.
>
> Plaintiff has also shown that the defendant's alleged misconduct-when coupled with the confusion as to the source of defendant's goods-has had a damaging and negative impact on plaintiff's reputation and dealings with its customers. *Lang,* 949 F.2d at 582-83. Here, one of the plaintiff's customers forwarded a warning letter from the FDA regarding the defendant, apparently in the mistaken belief that the letter concerned plaintiff's activities. The Bloomberg News report erroneously stating that plaintiff's, rather than defendant's, products were seized caused plaintiff's stock to drop and customers and investors to question plaintiff's involvement. Perhaps most importantly, when the defendant was indicted, one of plaintiff's

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
**(Cite as: 2007 WL 1988737 (E.D.N.Y.))**

customers mistakenly believed that plaintiff had been charged and even began to remove plaintiff's products from its system.

*B. Plaintiff's State Law Claims*

Defendant has moved for summary judgment on each of plaintiff's state law claims. I address each aspect of defendant's motion in turn below.

*i.) Common Law Trademark-related Unfair Competition & Misappropriation*

Plaintiff's complaint asserts claims for common law trademark-related unfair competition and common law misappropriation. Plaintiff's complaint appears to allege that defendant has engaged in unfair competition by virtue of its alleged infringement of plaintiff's mark. Compl. ¶¶ 18-22. To establish such a claim under New York law, a plaintiff must show (1) defendant's bad faith and (2) actual confusion or a likelihood of confusion. *Deere & Co. v. MTD Holdings Inc.,* 2004 WL 324890, *18 (S.D.N.Y. Feb.19, 2004), *citing Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34-35 (2d Cir.1995). *See also Genesee Brewing Co.,* 124 F.3d at 149 ("[Plaintiff's] *state law* claim of unfair competition is not viable without a showing of bad faith."); *Girl Scouts of U.S. of Am. v. Bantam Doubleday Dell Pub. Group, Inc.,* 808 F.Supp. 1112, 1131 (S.D.N.Y.1992) ("Under New York law, common law unfair competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent."). The same showing of bad faith must be made for a claim of common law misappropriation. *See Jeffrey Milstein,* 58 F.3d at 34 ("The essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.' "), *quoting Rosenfeld v. W.B. Saunders, A Div. of Harcourt Brace Jovanovich, Inc.,* 728 F.Supp. 236, 249-50 (S.D.N.Y.1990); *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980).

Defendant denies having acted in bad faith. It asserts that it was unaware of Hi-Tech Pharmacal when it began using the mark Hi-Tech Pharmaceuticals, and that it never intended to benefit from Hi-Tech Phar-

macal's advertising or trade off of its reputation. Jones Decl. ¶¶ 27-29. In response, plaintiff has been unable to produce any evidence of defendant's bad faith. Plaintiff conceded at oral argument that it had no evidence of bad faith on the part of the defendant in its adoption of its mark. Tr. at 5, ll. 1-8. For example, there is no evidence that defendant intentionally copied its mark from plaintiff. *Cf. Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 753-754 (2d Cir.1996). Nor is there any evidence that defendant conducted an incomplete trademark search or ignored the advice of counsel in adopting its mark; in fact, as noted above, plaintiff never registered "Hi-Tech Pharmacal." *See id.* at 754. Moreover, defendant's continued use of its mark after the cease and desist letters cannot by itself constitute evidence of bad faith. *Something Old, Something New, Inc. v. QVC, Inc.,* 1999 WL 1125063, *7 (S.D.N.Y. Dec.8, 1999) ("Defendant's failure to completely abandon the use after receiving a cease and desist letter is insufficient to support an allegation of bad faith."), *citing Wonder Labs, Inc. v. Procter & Gamble, Co.,* 728 F.Supp. 1058, 1064 (S.D.N.Y.1990). Finally, plaintiff has presented no evidence that defendant's persistence in the use of its mark during the course of this litigation represents anything but a good faith belief that it is entitled to do so because plaintiff's mark is not protectible-an argument that I have already found to be at least colorable, as indicated above. *Cf. Int'l Star Class Yacht Racing Ass'n,* 80 F.3d at 754 (holding that persistence in using a mark during litigation that defendant had intentionally copied, and after a search had revealed the mark's registration, was evidence of bad faith). In the absence of any showing of bad faith by the plaintiff, defendant's motion for summary judgment on the unfair competition and misappropriation claims is granted, and those claims are hereby dismissed.

*ii.) Unfair and Deceptive Trade Practices*

**\*12** Defendant also seeks summary judgment on plaintiff's claim under Section 349 of the N.Y. General Business Law, prohibiting "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y.Gen.Bus.Law § 349 (McKinney 2007). To establish liability under this section, a plaintiff must show: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *U-Neek, Inc. v. Wal-Mart*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
**(Cite as: 2007 WL 1988737 (E.D.N.Y.))**

*Stores, Inc.,* 147 F.Supp.2d 158, 176 (S.D.N.Y.2001), citing *Maurizio v. Goldsmith,* 230 F.3d 518, 521 (2d Cir.2000).

Because the purpose of the statute is consumer protection, "the gravamen of the complaint must be consumer injury or harm to the public interest." *Something Old, Something New,* 1999 WL 1125063, at *11, quoting *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir.1995). *Compare Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.,* 292 F.Supp.2d 535, 552 (S.D.N.Y.2003) (dismissing a Section 349 claim in a trade dress infringement action-where the defendant made a type of pants highly similar to plaintiff's-because the core of the claim was harm to the business and not the consumer), *with Vitabiotics, Ltd. v. Krupka,* 606 F.Supp. 779, 785 (E.D.N.Y.1984) (granting summary judgment to a plaintiff on a Section 349 claim where the evidence showed that defendant, after ending its relationship as plaintiff's distributor, deliberately marketed vitamins under the same name as plaintiff's brand and that defendant's vitamins contained illegal substances). Thus, to proceed on a Section 349 claim in the context of a trademark dispute, a plaintiff is required to show that the defendant's behavior was "the sort of offense to the public interest which would trigger" an FTC investigation under 15 U.S.C. § 45. *Something Old, Something New,* 1999 WL 1125063, at *11.

The record before the court includes several allegations of wrongful conduct by the defendant for violating laws and regulations administered by the FTC and FDA. This type of alleged conduct, if it occurred, is surely consumer-oriented and a significant threat to the public's interest in safe, clearly labeled drugs and dietary supplements. However, these allegations do not form the core of the plaintiff's claim for trademark infringement here. *See* Compl. ¶¶ 23-26. The FTC action cited by plaintiff is only tangentially related to some of the specific instances of actual confusion alleged in plaintiff's motion papers. Accordingly, defendant's motion for summary judgment on plaintiff's Section 349 claim is granted.

### iii.) Dilution

Defendant seeks summary judgment on plaintiff's claim under New York's anti-dilution statute. N.Y. Gen.Bus.Law. § 360-l (McKinney 2007). That sec-

tion provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

*13 N.Y.Gen.Bus.Law § 360-l.[FN7] To prevail on a claim under this statute, a plaintiff must demonstrate (1) a mark of truly distinctive quality or with secondary meaning and (2) a likelihood of dilution. *Deere & Co. v. MTD Prod., Inc.,* 41 F.3d 39, 42 (2d Cir.1994); *Le Book Pub., Inc. v. Black Book Photography, Inc.,* 418 F.Supp.2d 305, 313 (S.D.N.Y.2005). In its interpretations of this Section, the Second Circuit has held that it "protects only extremely strong marks." *Bristol-Myers Squibb,* 973 F.2d at 1049, quoting *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983). *See also Strange Music, Inc. v. Strange Music, Inc.,* 326 F.Supp.2d 481, 496 (S.D.N.Y.2004) ("While this does not mean that the mark must be famous, weak marks will not be subject to a dilution claim under this statute.").

> FN7. This section was previously codified at 368-d. Because the text has remained identical, it is appropriate to examine case law prior to the re-codification when analyzing this claim.

As established above, I conclude that there is a genuine issue of material fact regarding whether plaintiff's mark is inherently distinctive or has acquired secondary meaning. Accordingly, I do not reach the "likelihood of dilution" prong of the test. *Strange Music,* 326 F.Supp.2d at 496. Summary judgment on plaintiff's dilution claim would be inappropriate on the record before the court. Defendant's motion as to the state law dilution claim is denied.

### IV. Conclusion

For the foregoing reasons, the parties' respective cross-motions for summary judgment on plaintiff's Lanham Act claim and defendant's motion for summary judgment on plaintiff's dilution claim are denied. Defendant's motion for summary judgment on

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)
 **(Cite as: 2007 WL 1988737 (E.D.N.Y.))**

plaintiff's unfair competition, misappropriation, and <u>Section 349</u> unfair and deceptive trade practices claims is granted. The court will schedule a conference to address the further progress of this litigation by separate order.

**SO ORDERED.**

E.D.N.Y.,2007.
Hi-Tech Pharmacal Co., Inc. v. Hi-Tech Pharmaceuticals, Inc.
Not Reported in F.Supp.2d, 2007 WL 1988737 (E.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.