**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| vs. | * | Case No. 08-cv-1819 (PAC) |
| | * | |
| BLUEHIPPO FUNDING, LLC *et al.*, | * | *Electronically Filed* |
| | * | |
| Defendants. | * | |

**JOSEPH RENSIN'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CONTEMPT**

# TABLE OF CONTENTS

Page

I.   Introduction ...................................................................................................1

II.  Facts ...............................................................................................................3

   A. Background ...............................................................................................3

   B. Mr. Rensin's Investment in BlueHippo...................................................4

   C. The FTC's Agreement to Omit Mr. Rensin from the Consent Order and
      Complaint..................................................................................................4

   D. The FTC's Unexplained Change of Heart ...............................................6

III. Legal Standard ...............................................................................................7

IV.  Argument ........................................................................................................9

   A. Mr. Rensin Should Not Be Held in Contempt and Found Personally Liable
      For BlueHippo's Conduct. .......................................................................9

      1. Mr. Rensin Diligently and Reasonably Attempted to Comply With
         The Order. ...........................................................................................9

      2. The Equities Counsel Against Contempt and Personal Liability.......15

   B. Even If Mr. Rensin is Held Personally Liable, Second Circuit Authority
      Requires That the Extent of His Liability Be Limited Because He Has
      Received Few Benefits From BlueHippo, and Holds Little, If Any, of
      Consumers' Monies. ...............................................................................17

V.   Conclusion ....................................................................................................22

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alemite Mfg. Corp. v. Staff, 42 F.2d 832 (2d Cir. 1930) ................................................... 8

Aspira of NY v. Bd. of Educ. of NY, 423 F. Supp. 647 (S.D.N.Y. 1976) ............................ 10, 11

California Artificial Stone Paving Co. v. Molitor, 113 U.S. 609 (1885)..................................... 16

DePace v. Matsushita Elec. Corp. of Am., 257 F. Supp. 2d 543 (E.D.N.Y. 2003) ..................... 22

Donsco, Inc. v. Casper Corp., 587 F.2d 602 (3d Cir. 1978) ..................................................... 9

FTC v. Garvey, 383 F.3d 891 (9th Cir. 2004) ....................................................................... 8

FTC v. Kennedy, 574 F. Supp. 2d 714 (S.D. Tex. 2008) ........................................................ 19

FTC v. Medlab, Inc., 615 F. Supp. 2d 1068 (N.D. Ca. 2009)..................................................... 19

FTC v. Stefanchik, 559 F.3d 924 (9th Cir. 2009) .................................................................... 19

FTC v. Verity International, Ltd., 443 F.3d 48 (2d Cir. 2006)........................................... 18, 21, 22

Gemveto Jewelry Co., Inc. v. Jeff Cooper, Inc., 613 F. Supp. 1052 (S.D.N.Y. 1985)................ 15

Gemveto Jewelry Co., Inc. v. Jeff Cooper, Inc., 800 F.2d 256 (Fed. Cir. 1986)......................... 15

Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002) ........................... 18, 19, 20

King v. Allied Vision, Ltd., 65 F. 3d. 1051 (2d Cir. 1995)………………………………………... 8

International Longshoremen's Ass'n v. Phila. Marine Trade Ass'n, 389 U.S. 64 (1967) ............. 16

Jolly v. Pittore, 170 B.R. 793 (S.D.N.Y. 1994) ...................................................................... 2, 8

Latino Officers v. The City of New York, 558 F.3d 159 (2d Cir. 2009)…………………………...8

Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Tech., Inc., 369 F.3d 645,
    655 (2d Cir. 2004)......................................................................................................... 7

Pereira v. Farace, 413 F.3d 330 (2d Cir. 2005)..................................................................... 22

Perez v. Danbury Hosp., 347 F.3d 419 (2d Cir. 2003) ........................................................ 7, 9

## FEDERAL STATUTES

15 U.S.C. § 45......................................................................................................................... 5

15 U.S.C. §§ 1601-1666j ........................................................................................................... 5

15 U.S.C. §§ 1693-1693r ................................................................................ 5, 6, 7

## FEDERAL RULES

Fed. R. Civ. P. 65(d)(2) ..................................................................................... 8

## FEDERAL REGULATIONS

16 C.F.R. Part 435 ............................................................................................ 5

## OTHER AUTHORITIES

Robert W. Hamilton & Jonathan R. Macey, Corporations, at 565 (10th ed. 2007) ..................... 12

Joseph Rensin, by and through his undersigned attorneys, submits this memorandum in opposition to the Federal Trade Commission's Motion for Order to Show Cause Why Defendants Should Not Be Held In Contempt (the "Contempt Motion").

## I.    **<u>INTRODUCTION</u>**

Joseph Rensin is the former Chief Executive Officer and sole member of BlueHippo Funding, LLC (collectively with its subsidiary BlueHippo Capital, LLC, "BlueHippo"). Mr. Rensin is not a party to the underlying case, was never named as a defendant, and was not a party to the settlement that led to this Court's entry of the April 9, 2008 Consent Order (the "Consent Order," or the "Order"). Indeed, before filing the Complaint in this action, which names only the two BlueHippo entities as defendants, the FTC furnished to counsel for BlueHippo and Mr. Rensin a draft complaint that included prospective claims against Mr. Rensin as well as BlueHippo. During protracted settlement negotiations, which began with the Federal Trade Commission ("FTC") insisting that Mr. Rensin be a named defendant and party to the Complaint and Consent Order, the FTC agreed to a settlement pursuant to which it abandoned the claims it had proposed to assert against Mr. Rensin and removed him from the Consent Order. Yet now, a year and a half later, without so much as suggesting that Mr. Rensin's responsibilities at Blue Hippo increased or his role at the company changed, the FTC asks this Court to find Mr. Rensin *individually* in contempt and to impose on him *in his personal capacity* millions of dollars of liability – based entirely on the alleged contumacious conduct of BlueHippo.

The FTC does not contend that BlueHippo failed to observe corporate formalities, nor could it. It does not claim that Mr. Rensin derived any personal benefit from BlueHippo's supposed contempt, nor could it. BlueHippo is no sham pass-through entity or fly-by-night alter ego of the sort the FTC typically seeks to disregard. Until the FTC finally succeeded in

shuttering BlueHippo by filing this motion, the company did business from its Baltimore offices for six and a half years under the oversight of a Board of Directors consisting of two independent directors and Mr. Rensin; a senior management team (most of whom had public company experience) overseeing a workforce that at its peak approached 200 employees; and a legal department responsible for compliance that included an in-house General Counsel and a second corporate counsel.  Far from milking the company, Mr. Rensin has put more into it than he has taken out.  His annual salary has never exceeded $200,000, and he receives no special benefits or fancy perks.  He invested substantial personal funds to start the company, loaned it additional funds last year, and has never received a distribution, dividend, or even a bonus of any kind.  In fact, during the six and a half years of the business, he was never even given a holiday bonus although every other employee received one.

Despite these facts – and facts they are – the FTC has reversed course since 2008 and now seeks to hold Mr. Rensin personally and individually liable for the alleged contempt of BlueHippo.  To be sure, as an officer of the company (until he gave up his CEO position for unrelated health reasons on July 20, 2009) with knowledge of this Court's Order, he is bound by it.  But that is **not** enough.  The FTC must do more than overcome the arguments advanced by BlueHippo that there is no basis to find it in contempt – which it cannot do.  Mr. Rensin, like any corporate officer, should be liable for BlueHippo's alleged contempt only if *he* "acted with a *deliberate purpose to disobey* and frustrate the order of th[e] Court."  *Jolly v. Pittore*, 170 B.R. 793, 796-98 (S.D.N.Y. 1994) (Martin, J.) (emphasis added).  Far from attempting to frustrate the Order, Mr. Rensin diligently attempted to comply with it.  If the FTC's determination to omit him from the Complaint it filed in this action and from the Consent Order to which it agreed are to have any meaning, this Court must be especially vigilant in requiring of the FTC a showing by

2

clear and convincing evidence not only that BlueHippo is in contempt, but that Mr. Rensin himself violated the Court's Order.  The FTC offers no basis at all for finding Mr. Rensin individually in contempt.

For the reasons set forth below, as well as those advanced in BlueHippo's Opposition (the "BlueHippo Opposition"), which Mr. Rensin adopts in full, this Court should deny the FTC's Contempt Motion as to Mr. Rensin.  In addition, even if the Court were to find some basis to hold Mr. Rensin in contempt, binding Second Circuit authority limits the extent of monetary relief to the amount of his financial benefit from any contumacious conduct, which cannot be more than the salary Mr. Rensin received during since entry of the Order.

## II.    <u>FACTS</u>

### A.    <u>Background</u>

Joseph Rensin has been a Baltimore businessman since 1985.  He co-founded and for 10 years was Chairman of the Board of Creditrust Corporation, a NASDAQ 500 company with over 1,500 employees and $400 million in debt and equity offerings.  In 2003, Mr. Rensin founded BlueHippo Funding, LLC.  He is its sole member and was its Chief Executive Officer until July 20, 2009, when he relinquished that position.

Since its inception, BlueHippo has scrupulously observed corporate formalities.  It has a Board of Directors comprised of Mr. Rensin, its chair, and two outside directors who have substantial public company and other varied business experience.  BlueHippo's Board of Directors has regularly scheduled quarterly meetings supplemented by additional meetings when required by businesses developments, maintains minutes of its meetings as well as other organizational documents, and is involved in most major corporate decisions.  Ex. A, Rensin Decl. ¶ 4.

**B.**    <u>Mr. Rensin's Investment in BlueHippo</u>

Mr. Rensin's sole compensation from Blue Hippo, or any affiliated entities, has been his salary, which has been far from extravagant.  During the period since entry of the Order he has been paid at an annual rate of $200,000.  His compensation from April 8, 2008, the date the Order was entered, through November 20, 2009 totaled $316,923.17.  *See* Ex. B (document produced to the FTC on Nov. 20, 2009, listing Mr. Rensin's compensation).  Mr. Rensin has *never* received any dividends or distributions, or received any other pecuniary benefit from the company, aside from his salary and related health benefits.

In fact, the monies Mr. Rensin has received from BlueHippo are far outpaced by the monies that BlueHippo has received from Mr. Rensin:  Mr. Rensin put in the initial start-up capital contribution of $751,000.00, Ex. C, Rensin Dep. at 168:9-12, and, following the FTC settlement, loaned BlueHippo an additional $500,000.00, *id.* at 162:19-21.  Not a penny of these funds – totaling over $1.25 million – has ever been recovered by Mr. Rensin.  *Id.* at 168:16-19 ("But that capital remains invested in this business and has never been withdrawn, despite the company's ability to do so over a long period of time, and the $500,000 [loan] remains unpaid.").  Although, as the sole member of the LLC, Mr. Rensin has always had the authority to cause it to distribute funds, he has never done so.

**C.**    <u>The FTC's Agreement to Omit Mr. Rensin from the Consent Order and Complaint</u>

In 2006, the FTC informed counsel for BlueHippo and Mr. Rensin that it intended to file a complaint against BlueHippo and Mr. Rensin and provided a draft complaint (the "Draft Complaint").  *See* Ex. A, Rensin Decl., Ex. 1.  The Draft Complaint named both BlueHippo *and Mr. Rensin*, and alleged violations of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.

4

§ 45, the Mail Order Rule, 16 C.F.R. Part 435; the Truth in Lending Act, 15 U.S.C. §§ 1601-1666j; and the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693-1693r.

During the period of discussions and negotiations that followed, counsel for BlueHippo and Rensin provided detailed information and negotiated in earnest. A critical subject of negotiation, which threatened to derail a settlement, was the FTC's intention to name Mr. Rensin as a defendant, and Mr. Rensin's refusal to agree to a settlement to which he was a party.

A White Paper prepared by counsel for BlueHippo and Mr. Rensin, dated January 12, 2007, argued that there was no basis for the FTC's proposed claim against Mr. Rensin individually, and that it was especially inappropriate to seek restitution from him. *See* Ex. 4 to BlueHippo Opp. at 19-22. As negotiations progressed, the FTC produced a proposed Consent Order, and the parties exchanged numerous drafts. The FTC's initial drafts included Rensin as a defendant and party to the consent order. *See* Ex. A, Rensin Decl., Ex. 2. Mr. Rensin was clear in his position: he had not violated the law, and he was unwilling to consent to any settlement to which he was a party. The FTC could have insisted on pursuing its claims against Mr. Rensin; instead, the Commission agreed to a Settlement that named, and required restitution from, only BlueHippo.

The FTC filed its Complaint in this action on February 22, 2008. Unlike its predecessor, the Complaint as filed did not name Mr. Rensin as a defendant. The factual allegations concerning Mr. Rensin were excised; his name was not even mentioned. Similarly, Mr. Rensin was removed from the Consent Order, entered by this Court on April 9, 2008; it too did not mention his name. Section VII of the Consent Order, titled "Right to Reopen," specified two circumstances in which the FTC would be permitted "to reopen this matter both to add additional parties and claims . . . and to demonstrate to the Court that additional relief, including additional

equitable monetary relief, should be entered by the Court against any or all current or future

defendants." FTC Ex. 20 at § VII. Only if certain written representations made by BlueHippo's

counsel were false or if BlueHippo defaulted in its payment and other obligations related to the

consumer redress program did the FTC have the right to reopen. *Id.* Neither occurred.

**D.     The FTC's Unexplained Change of Heart**

In January of this year, the FTC began requesting from BlueHippo documents and reports

pursuant to its right to monitor compliance with the Order. The FTC propounded 24 separate

requests, for reports and data concerning hundreds of thousands of transactions, recordings of

customer verifications, copies of BlueHippo ads, and other materials concerning BlueHippo's

business practices. Only three of the FTC's requests related to Mr. Rensin:

- Request 11 asked for a copy of BlueHippo's organization chart. FTC Ex. 22(E). BlueHippo had no current formal organization chart, and its counsel therefore responded that a list of officers and directors and their titles had previously been provided and updated. FTC Ex. 22(F).

- Request 12 asked for a report identifying BlueHippo's officers, directors, principals, owners and shareholders, and other entities in which each had an interest. FTC Ex. 22(E). BlueHippo produced information identifying entities owned by or affiliated with BlueHippo, two of which were owned by Mr. Rensin. *See* Ex. D (Oct. 8, 2009 production of BlueHippo to FTC); Ex. E (Oct. 28, 2009 Letter of D. Broder to L. Kapin); Ex. F (spreadsheet of corporate entities appended to Oct. 28, 2009 Letter of D. Broder to L. Kapin). The FTC had known for years that Mr. Rensin was the CEO and sole owner of BlueHippo, and had alleged those facts in its draft Complaint in early 2006.

- Request 13 asked for a report that described the positions, titles and responsibilities of the six members of BlueHippo's senior management team, including Mr. Rensin. FTC Ex. 22(E). BlueHippo's counsel provided the requested information by letter dated July 27, 2009. FTC Ex. 22(G). Concerning Mr. Rensin, the letter stated:

  > Joseph Rensin – Chief Executive Officer of Defendant from April 10, 2008 to July 20, 2009. Mr. Rensin's primary responsibilities included overseeing the senior management team in formulating strategy.

*Id.* This information too had long been known to the FTC.

Thus, none of these responses provided the FTC with material information concerning Mr. Rensin or his role at BlueHippo of which it was unaware in early 2008, when it filed the Consent Order, settling the underlying action without asserting any claims against Mr. Rensin or making him a party to the Order.  The FTC issued subpoenas to take the depositions of Mr. Rensin and John Ford, Chief Operating Officer, in their corporate capacities, and the parties eventually scheduled the depositions for November 24, 2009.  But on November 12, before those depositions had taken place, the FTC filed the current motions.  The FTC had no information concerning Mr. Rensin's role at BlueHippo, or otherwise bearing on his personal liability, that it did not have when it settled the underlying matter with BlueHippo, agreeing not to assert claims against Mr. Rensin.  It nevertheless asked the Court to hold not just BlueHippo in contempt, but also Mr. Rensin, and to seek to recover millions of dollars from him.

### III.    <u>LEGAL STANDARD</u>

A party seeking a finding of civil contempt faces a high legal and evidentiary burden. Specifically, "[a] party may be held in civil contempt for failure to comply with a court order if: '(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.'"  *Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)); *see also Perez v. Danbury Hosp.*, 347 F.3d 419, 423-24 (2d Cir. 2003) (same) (quoting *King*, 65 F.3d at 1058).

The burden of proving each element of contempt rests squarely on the shoulders of the moving party.  *See, e.g.*, *King*, 65 F.3d at 1058 ("A contempt order is warranted only where *the moving party* establishes by clear and convincing evidence that the alleged contemnor violated

7

the district court's edict.") (emphasis added); *see also Latino Officers v. The City of New York*, 558 F.3d 159, 164-65 (2d Cir. 2009) (affirming denial of contempt motion on ground that movants failed to prove each element required for contempt finding).

A person not party to the underlying proceeding may be held in contempt only upon a threshold showing that the non-party was bound by the Order in question. Pursuant to Fed. R. Civ. P. 65(d)(2), an order binds only those who receive actual notice of it and are "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with [those listed in (A) and (B)]." Fed. R. Civ. P. 65(d)(2).

But the mere fact that a non-party, such as a corporate officer, is bound by an order merely begins the inquiry. Courts do not willy-nilly hold every corporate officer, agent, servant, employee, owner, or other person involved with a defendant-company in contempt of court whenever it is determined that a company fails to live up to its court-ordered obligations. A person may be held in contempt only upon a showing that the person knew of the allegedly contumacious conduct, and participated in, directed, or controlled that conduct. *See, e.g.*, *FTC v. Garvey*, 383 F.3d 891, 900 (9th Cir. 2004) ("[T]o hold an individual liable for restitution, the FTC must also show that the individual had actual knowledge of the material misrepresentations, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth."); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (Hand, J.) ("We agree that a person who *knowingly assists* a defendant in violating an injunction subjects himself to civil as well as criminal proceedings for contempt.") (emphasis added); *Jolly*, 170 B.R. at 796-98 (analyzing evidence of whether individual defendants "acted with a *deliberate purpose to disobey* and frustrate the order

8

of th[e] Court") (emphasis added); *cf. Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) ("A corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an *actual participant* in the tort.") (emphasis added). This common-sense approach allows courts to consider the facts relevant to each individual and determine whether the evidence establishes the three prerequisites to a contempt finding as to that individual.

## IV.   ARGUMENT

### A.   Mr. Rensin Should Not Be Held In Contempt and Found Personally Liable For BlueHippo's Conduct.

The FTC's attempt to establish Mr. Rensin's contempt rests on its contempt allegations against BlueHippo; if it has not met its burden as to BlueHippo, it cannot possibly do so as to Mr. Rensin. For the many reasons set forth at length in BlueHippo's Opposition, the FTC's allegations concerning BlueHippo fall far short, and its motion against Mr. Rensin thus does not even reach the starting line. But wholly apart from the deficiencies in its underlying showing, the FTC fails to establish that Mr. Rensin individually should be held in contempt.

### 1.   Mr. Rensin Diligently and Reasonably Attempted to Comply With The Order.

As outlined above, the FTC has the burden to establish the three elements of contempt: "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Perez*, 347 F.3d at 423-24 (quoting *King*, 65 F.3d at 1058). The FTC offers no evidence that Mr. Rensin did not diligently and reasonably try to comply with the Order, and to bring BlueHippo into compliance. The skeletal allegations concerning Mr. Rensin found within the FTC's papers are patently inadequate to show a lack of diligence.

Indeed, while Mr. Rensin has no burden, the evidence shows that he acted diligently, reasonably, and in good faith, all the time believing that he was complying with the order.

The relevant question here is "whether defendant[] ha[s] been reasonably diligent and energetic in attempting to accomplish what was ordered." *Aspira of NY v. Bd. of Educ. of NY*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976) (Frankel, J).  As the FTC itself acknowledged at the time, the Order here was a generalized injunction not to break the law.  *See, e.g.*, Ex. G (August 22, 2007 e-mail from FTC attorney Frank Gorman to former BlueHippo counsel Linda Goldstein describing the "follow-the-law injunction we're proposing").  Specifically, the Order prohibited:

- False or misleading factual representations, in violation of the FTC Act, Order at 4;

- Failure to disclose material terms and conditions of refund policies, *id.*;

- Violation of the "Mail Order Rule," *id.* at 4-5;

- Violation of the Truth in Lending Act and Regulation Z, *id.* at 5-8; and

- Violation of the Electronic Fund Transfer Act and Regulation E, *id.* at 8.

An analysis of whether an individual acted in contempt of a court's order must begin with the nature and terms of the injunction.  The Order here prohibits the company from violating various statutes and legal rules.  The Order did not require specific policy or operational changes; the sole business practice for which the Order required redress, a no-refund policy in place prior to March 2006, had been long since abandoned.  *See* BlueHippo Opp. at 9-11; *see also* Ex. 4 to BlueHippo Opp.  Moreover, the Order was the product of more than a year of negotiations between BlueHippo, through its outside counsel, and the FTC, during which there were extensive disclosures concerning the Company's business practices.  *See* BlueHippo Opp. at 9-10.  During that process, insofar as the FTC had indicated it believed particular business practices did not comply with the statutes and regulations it enforces, the company had made whatever changes

10

were required to address the FTC's concerns. Ex. A, Rensin Decl. ¶ 19. In short, the absence of any requirement in the Order that BlueHippo change its then-existing business practices, and the process that led to the Order, gave Mr. Rensin every reason to believe that the company's business model and practices as of the date the Order was entered were fully compliant with the law, and that was (and remains) his belief. *Id.*

Thus, the company's task was to ensure that its conduct remained compliant with the law and the Order. Mr. Rensin was BlueHippo's CEO; he had broad managerial responsibilities rather than detailed involvement in day-to-day marketing and sales. *See* Ex. C, Rensin Dep. at 13. Five members of his senior management team, each responsible for their own departments, reported directly to him. *Id.* Delegation of responsibility to these direct subordinates, and active supervision of them, was the best way for Mr. Rensin to preserve the company's compliance: he was not the person overseeing call centers and telemarketers; he was not answering customer service calls; and he was not administering the company's IT systems and software to ensure their proper functioning. Rather, he was overseeing the general operational management and direction of the business, and involving himself in details of the company's operations only when necessary and to the extent time permitted. That role was consistent with his position as CEO:

> The CEO has responsibility for the management team that directs the enterprise. . . . Of course, the CEO, as the head of a large bureaucratic organization, cannot hope to run details of the business operations; if he is to be effective, authority over details must be delegated to subordinates, and the CEO must concentrate on the broadest issues relating to the corporation.

Robert W. Hamilton & Jonathan R. Macey, Corporations, at 565 (10th ed. 2007) (quoting Robert W. Hamilton, *Reliance and Liability Standards for Outside Directors*, 24 Wake Forest L. Rev. 5, 9-12 (1989)).

Because the Order compelled compliance with highly technical statutory and regulatory requirements, ensuring compliance required and demanded legal judgment.  Mr. Rensin, who is not an attorney, therefore delegated to his in-house legal team of two attorneys substantial responsibility for maintaining the company's compliance.  Ex. A, Rensin Decl. ¶ 20; *id.* ¶ 22. Mr. Rensin instructed the General Counsel to ensure that each of his managers understood the Order's requirements and conducted the company's business activities in full compliance with the law and the Order.[1]  *Id.* ¶ 22

In addition, the Order's core provisions concerned the company's representations and disclosures to consumers.  In the course of BlueHippo's business, such representations and disclosures occurred when consumers saw or heard BlueHippo's ads, when they called in response to the ads, and, for those who placed orders, when they received the company's two mailings, one containing the layaway agreement and supporting documents and the second containing the installment contract and supporting documents.  With respect to those communications with consumers, Mr. Rensin did the following:

- ▪ **Scripts:**  The scripts used in conjunction with BlueHippo sales efforts had been in place since long before entry of the Order.  During the year-long negotiation of the Consent Order, they were provided to the FTC and reviewed by outside and in-house counsel.  Mr. Rensin understood that any concerns expressed by the FTC with the scripts (or with any other business practice) had been addressed before entry of the Order.  The only changes to the scripts after entry of the Order were to variables such as the purchase price, the specifications of the computer, and the features of particular offers and promotions available to consumers at a given time (e.g., changes to the number or frequency of consecutive payments required to qualify for credit, or the duration of payments under the layaway plan), none of which affected the scripts' legal disclosures.  *See* Ex. C, Rensin Dep. at 69-72; Ex. H, Ford Dep. at 49-50.  Well before entry of the Order, Mr. Rensin had

---

[1]      The Order required the Company to furnish a copy to each of its officers and managerial employees.  Mr. Rensin believed that the General Counsel, when he reviewed the terms of the Order with senior management, furnished copies of the Order as required.  He is aware of the deposition testimony of BlueHippo COO John Ford, that Ford did not receive a copy of the Order until April 2009.  Ex. H, Ford Dep. at 54:7-9.  This is not Mr. Rensin's recollection, and it would certainly be inconsistent with his instructions.  Ex. A, Rensin Decl. ¶ 22.  Regardless, however, the overall import of Ford's testimony is that BlueHippo counsel "communicated with [him] regarding the subject matter of the FTC Order."  Ex. H, Ford Dep. at 58:22-24.

imposed a requirement that his legal department approve every variant of the company's scripts before their use to ensure that all scripts were in full compliance with the law, and he continued that requirement after the Order. Ex. A, Rensin Decl. ¶ 24. In addition, on numerous occasions, Mr. Rensin reminded management and others that scripts must be reviewed and approved by the legal department. When scripts were revised to reflect the current promotions and offers, they were circulated to a number of members of management, including the general counsel, the COO, Mr. Rensin, and others. Mr. Rensin reviewed some of them, and occasionally had brief discussions with others who received them, including the General Counsel. From comments made during these conversations about legal review of the scripts, Mr. Rensin was confident that scripts were being reviewed by the legal department as required. Mr. Rensin was familiar with the company's basic script and believed it to be accurate and to disclose all terms important to prospective purchasers. *Id.* ¶ 25.

- **Ads:** Similarly, Mr. Rensin imposed a requirement that the legal department review and approve every ad before its publication, and he communicated that requirement to the General Counsel, the COO, and senior members of the marketing department. From conversations with others at the company in which advertising was discussed, Mr. Rensin was confident that all ads were reviewed by the legal department as required. He did not see every ad the company ran after the date of the Order, but he saw some, and he believed those he saw to be accurate. Ex. A, Rensin Decl. ¶ 26.

- **Contractual documents**: The layaway agreement, installment contract, and supporting documents were legal documents drafted by the legal department, with the exception of the cover letters that accompanied each, which were reviewed and approved by the legal department. These documents predated entry of the Order, and like the scripts, the FTC had copies of them before entry of the Order. Mr. Rensin understood that if the FTC had any objections to them, the objections had been addressed as of the date the Order was entered. Only the legal department was authorized to modify the documents (apart from filling in variables for each transaction, such as the purchase price, the specifications of the computer, and the frequency and amount of payments). Mr. Rensin understood that they complied with the law as of the date the Order was entered, and that there were no subsequent changes that had any legal significance. Ex. A, Rensin Decl. ¶ 27-28.

Finally, aside from the active delegation and supervision of compliance tasks to his operational and legal subordinates, Mr. Rensin had always instructed his management team to bring to his attention operational and other problems that were significant or that they could not resolve. *Id.* ¶ 29. When such matters were brought to his attention, he gave direction to

13

management concerning their resolution, and occasionally, if the problem was sufficiently significant to require his personal attention, he involved himself in resolving it. Such problems were not frequent, and when they arose, they did not typically relate to compliance with the Order. *Id.*

At least one such problem did affect compliance with the Order. In the Spring of 2009, Dell had a major layoff that was widely reported in the press. Mr. Rensin learned in discussions with a number of employees that a substantial number of orders placed with Dell had not been processed due to an error at Dell, and because of Dell's layoffs, there was a delay before Dell brought the matter to BlueHippo's attention. From his discussions with numerous others at BlueHippo, it was clear that they had been aggressively working on a solution to the problem, and when it reached his attention, the problem either had been resolved or was on the verge of resolution. The orders that had not been processed were placed a second time and properly filled, but only after a delay during which BlueHippo was unaware of the problem. Because BlueHippo's personnel were addressing the problem aggressively and appropriately and a solution was imminent, or had already been accomplished, Mr. Rensin did not have to take further action. *See* Ex. A, Rensin Decl. ¶ 30.

Mr. Rensin thus did precisely what a CEO of a company subject to a "comply-with-the-law" injunction should do: instruct his lawyers to ensure full compliance while overseeing their work; instruct others involved in matters that implicated the subject of the Order that counsel's approval was required; and, to the extent problems arose that were not legal in nature and affected compliance with the Order, take appropriate steps to ensure that they are resolved. Those bound by injunctions and orders must be reasonably diligent and active in ensuring that they are in compliance with such injunctions and orders; they cannot be expected, much less

required, to have the knowledge and expertise of legal professionals. To the contrary, it is only reasonable to leave the legal niceties to the lawyers.

For these reasons, even if this Court were to find BlueHippo in contempt of its obligations under the Order, Mr. Rensin himself made reasonable and diligent efforts to comply with the Order. Thus, the Contempt Motion should be denied as to him regardless of the ultimate outcome with respect to BlueHippo. *See Gemveto Jewelry Co., Inc. v. Jeff Cooper, Inc.*, 613 F. Supp. 1052, 1056-57 (S.D.N.Y. 1985) (declining to hold trademarks defendants in contempt partially because, in a reasonably diligent attempt to comply with the order, defendants removed four items from their catalog and petitioned the court for further clarification of the order vis-à-vis the remaining items in question), *rev'd on other grounds by Gemveto Jewelry Co., Inc. v. Jeff Cooper, Inc.*, 800 F.2d 256 (Fed. Cir. 1986).

For the foregoing reasons, this Court should not find that Mr. Rensin failed to reasonably and diligently attempt to comply with the Order. Thus, the Court should deny the Contempt Motion.

**2.     The Equities Counsel Against Contempt and Personal Liability.**

Additionally, the equities here counsel strongly against holding Mr. Rensin individually in contempt, and imposing on him liability for BlueHippo's allegedly contumacious conduct.

> In analyzing a contempt order, we recognize that such an order is a 'potent weapon,' *International Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967), to which courts should not resort 'where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct,' *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885).

*King*, 65 F.3d at 1058.

The "potent weapon" of contempt has no place under the present circumstances. *Id.* Mr. Rensin was not a party to the underlying proceeding or the Order, and he believed that he and

BlueHippo were in compliance with the Order.  BlueHippo is a duly-formed LLC that throughout the period at issue had a fully independent and functioning Board of Directors, a management team that reported to Mr. Rensin, and a two-person in-house legal department.  Mr. Rensin was not siphoning off corporate profits and pocketing them for his personal use; to the contrary, Rensin invested $751,000 to start the company, and loaned an additional $500,000 in order to assist the company.  In return, he received only a reasonable salary during his tenure as CEO; in fact, Mr. Rensin was paid less than several other executives.  The company's demise will, separate and apart from the resolution of this action, cost him dearly.

Moreover, in early 2008, after more than a year of difficult negotiations, the FTC had to choose between settling the underlying dispute without naming Mr. Rensin as a party to the Consent Order and filing a Complaint asserting claims against both BlueHippo and Mr. Rensin.  The FTC surely believed the distinction was significant; it pressed for Mr. Rensin's inclusion throughout the course of negotiations.  In the end, it agreed to a settlement with BlueHippo alone, apparently persuaded that Mr. Rensin's position had merit – or at least that it had sufficient merit to warrant omitting him from the settlement.  As a result, Mr. Rensin is neither a defendant in the FTC's Complaint nor a party to the Consent Order.  Yet now, through its contempt motion, the FTC seeks to hold him individually liable for the entirety of the relief sought, to the same extent as if he were a party to the settlement.  And it does so without a shred of evidence that Mr. Rensin's role at BlueHippo was different after entry of the Order than before, or that any other change has occurred that would warrant recasting the parties' agreement.  To the contrary, Mr. Rensin's role diminished when he gave up the CEO position in July, and now, with the company shuttered, there is no role for him to have.  This Court should not tolerate such procedural gamesmanship.

16

The FTC should not be permitted to do now what it agreed not to do when the full panoply of issues was on the table. The Order entered into by the FTC and BlueHippo, and executed by this Court, essentially dictates that BlueHippo not break the law. To hold a non-party corporate officer who took the steps described above personally liable for the violation of an Order that broadly requires a company to comply with the laws would be draconian indeed. To do so against the background of this settlement would be far worse. For these reasons, too, the Court should deny the FTC's Contempt Motion.

**B.**    **Even If Mr. Rensin Is Held Personally Liable, Second Circuit Authority Requires That the Extent of His Liability Be Limited Because He Has Received Few Benefits From BlueHippo, and Holds Little, If Any, of Consumers' Monies.**

Even if this Court were to hold Mr. Rensin in contempt, and hold him personally liable for that contempt, the FTC's Contempt Motion wildly overreaches in seeking tens of millions of dollars in relief. Mr. Rensin is not the party who received the consumers' monies here; rather, he has drawn only a reasonable salary from BlueHippo in exchange for his service as CEO. Under any circumstances, that amount is the upper limit on the relief available from him.

In *FTC v. Verity International, Ltd.*, 443 F.3d 48 (2d Cir. 2006), the Second Circuit was faced with the task of determining the scope of relief available under § 13(b) of the FTC Act – the same provision invoked in the FTC's Complaint here. In *Verity*, the FTC alleged, *inter alia,* that various defendants who sold internet pornography using a billing system that charged consumers through AT&T and Sprint, so that charges appeared on their telephone bills, engaged in deceptive practices by making false representations. *Id.* at 55. After affirming the district court's decision in the FTC's favor on the merits, the Second Circuit addressed the relief available under the FTC Act. The FTC sought to recover the entire amount paid by consumers, but defendants contended that, because AT&T and Sprint had retained as fees a substantial

portion of consumers' payments, the FTC's recovery should be limited to the portion of consumers' payments that the defendants received.  The court agreed with the defendants, holding that the FTC's monetary relief was limited to "equitable restitution."  *Id.* at 66. Equitable restitution "allow[s] the plaintiff to recover money or property *in the defendant's possession* that could 'clearly be traced' to money or property 'identified as belonging in good conscience to the plaintiff.'"  *Id.* at 66-67 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)) (emphasis added).  This limited form of relief is contrasted with "legal restitution," which is "awarded [even] when the plaintiff could not assert title to or the right to possession of particular property but nevertheless had some basis for recovering for some benefit that the defendant wrongly received from the plaintiff."  *Id.* (citing *Great-West*, 534 U.S. at 212).

Limiting the FTC's recovery to equitable restitution, the Second Circuit explained, prohibits courts from measuring relief in FTC cases by looking to the "full amount lost by consumers."  *Id.* at 67.  Indeed, *Verity* vacated the district court's calculation of damages, stating unambiguously that merely "[l]abeling the remedy 'consumer redress' or 'disgorgement,' each a restitutionary remedy, does not alter the basic principle that *restitution is measured by the defendant's gain*."  *Id.* (emphasis added).  The court noted that, in some cases, the defendant's gain will be the same as the consumer's loss, and thus the benchmark for relief will be the same. In *Verity*, however, a middleman – the phone companies – received a portion of the pursued funds, and thus the amount gained by defendant was significantly less than the amount lost by consumers.

Like the defendant in *Verity*, Mr. Rensin did not receive the full amount of the alleged consumer loss here; indeed, he received, if any, a tiny and minute fraction of such funds.  The

most aggressive measure of the amount Mr. Rensin received that came from consumers is his

compensation since April 9, 2008, the date the Order was entered – a total of approximately

$316,923.17.  Even that overstates Mr. Rensin's gain from consumers; it assumes that every

consumer who paid a cent to BlueHippo during the entire period did so because of BlueHippo's

alleged misrepresentations.[2]

Verity came on the heels of the Supreme Court's opinion in Great-West, in which the

Supreme Court stated as follows:

> [N]ot all relief falling under the rubric of restitution is available in
> equity.  In the days of the divided bench, restitution was available
> in certain cases at law, and in certain others in equity. . . . In cases
> in which the plaintiff could *not* assert title or right to possession of
> particular property, but in which nevertheless he might be able to
> show just grounds for recovering money to pay for some benefit
> the defendant had received from him, the plaintiff had a right to
> restitution *at law* through an action derived from the common law
> writ of assumpsit. . . .
>
> In contrast, a plaintiff could seek restitution *in equity*, ordinarily in
> the form of a constructive trust or an equitable lien, where money
> or property identified as belonging in good conscience to the
> plaintiff could clearly be traced to particular funds or property in
> the defendant's possession.  A court of equity could then order a
> defendant to transfer title . . . or to give a security interest . . . to a
> plaintiff who was, in the eyes of equity, the true owner.

534 U.S. at 212-13 (internal citations and quotations omitted) (emphasis in original).

Of course, Verity was an action for violation of the FTC Act – precisely like the

underlying action here – rather than a contempt proceeding.  But the analysis in Verity applies

---

[2]       Several other jurisdictions have adopted different rules than the one laid out in *Verity*.  *See FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) ("We are unpersuaded by the defendants' assertion that they should not be liable for the full amount of Atlas' sales because Atlas paid them only a percentage as a royalty.  Equity may require a defendant to restore his victims to the status quo where the loss suffered is greater than the defendant's unjust enrichment.  Moreover, because the FTC Act is designed to protect consumers from economic injuries, courts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits."); *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1083 n.5 (N.D. Ca. 2009) (recognizing that Ninth Circuit's opinion in *Stefanchik* "appears to conflict with" *Verity*, and noting that *Stefanchik* binds district courts in California); *see also FTC v. Kennedy*, 574 F. Supp. 2d 714, 724 (S.D. Tex. 2008) (rejecting argument that *Verity* requires court to limit relief to "amount that [defendant] personally received as a result of his fraudulent conduct" because of Fifth Circuit precedent indicating otherwise).  In this Circuit, of course, *Verity* is binding precedent.

with equal force to a contempt proceeding where the action in which the injunction was issued was a direct action for alleged violations of the FTC Act.  That is especially true in this case, where the factual allegations on which the alleged contempt is based are *in pari materia* with the claims in the underlying proceeding, and the claims that would have been made against Mr. Rensin in a direct-FTC Act action.[3]  The Order the FTC claims BlueHippo violated prohibits violation of the FTC Act, as well as other FTC-enforced statutes, and the FTC claims that BlueHippo violated the Order by making false and material misrepresentations and omissions. Thus, the difference between a contempt proceeding and a direct action is in this case a distinction without a difference.

To distinguish between a direct action and a contempt proceeding in this context would lead to an especially perverse result in numerous respects.  First, if the FTC brought an enforcement action against Mr. Rensin based on the allegations it makes in this contempt proceeding, even if it prevailed on the merits, *Verity* squarely holds that the FTC's remedy against Mr. Rensin would be limited to the amount of his gain from consumers.  To permit the FTC to recover millions of dollars in a contempt proceeding based on allegations that, if successfully pursued on the merits, would permit at most a miniscule fraction of that amount, has no conceivable justification.  That is especially true here, where Mr. Rensin is not a party to the underlying action and has never been found to have violated the FTC Act.  And, of course, the fact that the FTC agreed to omit Mr. Rensin in order to settle the underlying action magnifies the perversity.

Second, to permit recovery for contempt that is greater – here, orders of magnitude greater – than the FTC could obtain for the same conduct in a direct action would lead to a

---

[3]    Of course, as has been mentioned, no claims were *ever made* against Mr. Rensin in a direct-FTC Act action.

20

grotesque procedural anomaly.  If the FTC had pursued a direct action against Mr. Rensin instead of this contempt proceeding, he would have had all the rights and abilities of a litigant in a substantive merits action.  In fashioning relief in a direct action, the FTC must "first show that its calculations reasonably approximated the amount of defendant's unjust gains."  *Verity*, 443 F.3d at 67 (internal citations and quotations omitted).  It has clearly failed to do so here.

Third, application of *Verity* to this proceeding is compelled by another long-settled rule of law: punitive relief is not permitted in a civil contempt proceeding.  *See, e.g.*, *Bagwell*, 512 U.S. at 826-30; *Universal City Studios, Inc.*, 705 F.2d at 96-97.  Permitting recovery in a contempt action that vastly exceeds the recovery available in a direct action for the same alleged violations of the same statute would plainly punish the alleged contemnor.  When an injunction commands compliance with the law, imposing any sanction for contempt that exceeds the recovery available in an action for the violation is punitive on its face.

At most, Mr. Rensin should be held responsible for that portion of consumer loss that made its way into his pocket, *i.e.*, those funds that can "'clearly be traced' to money or property 'identified as belonging in good conscience to the plaintiff.'"  *Verity*, 443 F.3d at 66-67 (quoting *Great-West*, 534 U.S. at 213).  As the Second Circuit has stated, *Great-West* must be "read . . . as broadly as it is written."  *Pereira v. Farace*, 413 F.3d 330, 340 (2d Cir. 2005); *see also DePace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 561 (E.D.N.Y. 2003) (describing the equitable restitution rule in *Great-West* as one that disallows claims "seek[ing] to impose 'personal liability' on a defendant"); *DePace*, 257 F. Supp. 2d at 561 ("In essence, *Great-West* dictates that plaintiffs' claims for compensatory payments equal to the difference between the benefits they received and those they were promised is not a viable remedy" available under equitable restitution.).

The holding of *Verity*, as well as the compelling equities here, thus require that, even if Mr. Rensin is held in contempt and found personally liable (and he should not be), this Court should fashion very limited relief.  Mr. Rensin has received relatively small sums of money from BlueHippo during the relevant period:  specifically, $316,923.17.  *See* Ex. B.  That is the *total sum of money Mr. Rensin received related to BlueHippo* during the relevant period, and thus the most that could possibly be related to BlueHippo consumers, on whose behalf the FTC here seeks recovery.  Because Mr. Rensin received little, if anything, that by any measure can be traced to the conduct complained of here, he should not be held liable for the enormous scope of relief pursued by the FTC.

## V.    CONCLUSION

Under circumstances such as these, where there exists more than a "fair ground of doubt as to the wrongfulness of [Mr. Rensin's] conduct," this Court should not deploy the "potent weapon" of contempt.  *King*, 65 F.3d at 1058 (internal citations omitted).  Alternatively, if this Court were to hold Mr. Rensin in contempt and personally liable, it should exercise its powers and limit the relief available against him in light of the fact that Mr. Rensin received very little, if any, of the monies from BlueHippo related to the consumers in question here.

For the foregoing reasons, Mr. Rensin respectfully asks this Court to deny the Contempt Motion.


Dated:  December 7, 2009

                    _/s/_____
                    Martin S. Himeles, Jr. (MH-8871)
                    mhimeles@zuckerman.com
                    ZUCKERMAN SPAEDER LLP
                    100 E. Pratt Street, Suite 2440
                    Baltimore, MD  21202

(410) 949-1144 (telephone)
(410) 659-0436 (facsimile)

Shawn P. Naunton (SN-0397)
snaunton@zuckerman.com
ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY  10036
(646) 746-8655 (telephone)
(212) 704-4256 (facsimile)