UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

[corrected]

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>　　　　　Plaintiff,<br><br>　　　v.<br><br>BLUEHIPPO FUNDING, LLC,<br><br>　　　and<br><br>BLUEHIPPO CAPITAL, LLC,<br>　　　　　Defendants. | Civil No. 08 CV 1819 (PAC) |

**PLAINTIFF'S REPLY TO JOSEPH RENSIN'S OPPOSITION
TO PLAINTIFF'S MOTION FOR CONTEMPT**

**TABLE OF CONTENTS**

I.    **BLUEHIPPO AND RENSIN HAVE VIOLATED THE ORDER.** . . . . . . . . . . . . . . . 1

II.   **RENSIN IS IN CONTEMPT OF THE ORDER.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  **RENSIN AND BLUEHIPPO ARE JOINTLY AND SEVERALLY LIABLE FOR COMPENSATORY DAMAGES EQUAL TO THE GROSS RECEIPTS OF BLUEHIPPO RELATED TO THEIR CONTUMACIOUS ACTIVITIES.** . . . . . . . . 7

IV.  **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In his opposition, Joseph Rensin ("Rensin") argues that: (1) his companies, BlueHippo Funding, LLC and BlueHippo Capital, LLC (collectively "BlueHippo"), are not in contempt of the Court's April 9, 2008 Stipulated Final Judgment and Order for a Permanent Injunction ("Order"); (2) Rensin is not liable for contempt under Fed.R.Civ.P. 65(d) ("Rule 65(d)"); and (3) even if he is in contempt, his liability is limited to payments he received from BlueHippo since entry of the Order. As set forth in detail below, each of Rensin's arguments fails because they are neither supported by the facts nor the law.

I.  **BLUEHIPPO AND RENSIN HAVE VIOLATED THE ORDER.**

As discussed in greater detail in the FTC's initial memorandum supporting its contempt motion and its Reply to BlueHippo's Opposition, the practices of BlueHippo and Rensin violated this Court's Order. Specifically, BlueHippo and Rensin (collectively "Contempt Defendants"), through aggressive radio, television, and website advertising, and during telemarketing pitches, misrepresent that they are in the business of financing computers for credit-challenged consumers. However, in the year following entry of the Order, Contempt Defendants failed to finance a single computer for the more than 24,000 customers who signed up during the period with enough time to qualify for a computer. *See* FTC 47 at ¶ 9.[1] In fact, Contempt Defendants only began to provide financed computers to some of these customers after the FTC brought its

---

[1] This inquiry properly focuses on only those consumers who signed-up with BlueHippo after entry of the Order (Contempt Defendants' actions prior to the Order are obviously irrelevant in a contempt proceeding) and who had sufficient time to make all payments necessary to qualify for financing by March 11, 2009, entitling them to receive a computer from BlueHippo on or before April 8, 2009 (the day before the FTC's first contempt filing). *See* FTC Reply to BH Opp. at 5. Moreover, although in its opening brief the FTC argued that BlueHippo financed *at most* a single computer for these customers in the year following entry of the Order, Contempt Defendants now admit that computer was provided to a customer who paid BlueHippo in full and, therefore, was *not financed. See* BH Opp. at 17.

All exhibits not referenced in the FTC's Order to Show Cause Motion are being submitted as Consolidated Exhibits to the FTC Replies to Contempt Defendants' Oppositions.

first contempt action in this matter more than one year after entry of the Order.

Moreover, tens of thousands of consumers partially paid for computers, but received nothing in return. BlueHippo promised all these consumers that, while it would not refund their money after seven days, they could cancel their purchase at any time and receive a store credit in the amount they paid. These credits, according to BlueHippo, could then be used to purchase items directly from the company's online store. Defendants, however, do not dispute that they failed to tell consumers that BlueHippo would not allow them to use these unrefunded payments to pay for undisclosed shipping and handling fees or taxes. *See* BH Opp. at 26 ("BlueHippo did not disclose *details* of its Online Store policy in the scripts.") (emphasis original). To cover these hidden costs, consumers had to send even more money to the Contempt Defendants. Not surprisingly, few consumers did so.[2] Hiding these costs, and the fact that purchases from the BlueHippo store could only be made one at a time, left BlueHippo in the "enviable" position of collecting millions of dollars from consumers while providing nothing in return.[3] Rensin directly participated in all these contumacious activities as an actively involved CEO, director, and sole member and owner of BlueHippo. *Infra* at 4-5.

## II.   RENSIN IS IN CONTEMPT OF THE ORDER.

Rensin admits that he is bound by the Order pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, *see* Rensin Opp. at 2, but argues that the FTC has failed to satisfy its burden of demonstrating he is personally liable. His argument, however, rests upon the incorrect legal

---

[2] Most of the consumers who even tried to use store credit (4,634 out of 8,088) balked at these additional fees, and therefore, received nothing for their payments. *See* FTC 21 at ¶ 41.

[3] In total, by July 24, 2009, consumers who placed orders with BlueHippo after April 10, 2008, and received nothing, had paid BlueHippo over $14 million. *See* FTC 47 at ¶ 5.

standard and blatant misstatement of the facts.

Rensin contends that to be held liable the FTC must satisfy the standard for holding an individual personally liable for monetary restitution under the FTC Act. Rensin Opp. at 8.[4] In fact, "[i]n order for a court to hold a nonparty respondent in contempt of a court order [pursuant to Rule 65(d)], the respondent must either abet the [party named in the order], or must be legally identified with him." *People of the State of New York v. Operation Rescue*, 80 F.3d 64, 70 (2d Cir. 1996). Moreover, Rensin incorrectly cites *Jolly v. Pittore*, 170 B.R. 793, 796-98 (S.D.N.Y. 1994) for the proposition that an individual is liable only if he "acted with a deliberate purpose to disobey and frustrate the order of th[e] court." In fact, *Jolly* explicitly holds that, in a civil contempt proceeding, the court "need not find such willful conduct as would justify the imposition of criminal sanctions. All that is necessary for the [c]ourt to find is that the actions of the defendants and [the nonparty contempt defendant] were in violation of this [c]ourt's order and that their actions caused the damage which is to be remedied by the order to be entered herein." *Jolly*, 170 B.R. at 797.[5]

Rensin compounds these legal mistakes by misstating his role in BlueHippo.

---

[4] Although this is not the correct standard, Rensin would still be liable even if the Court were to apply it. Under the FTC Act, individuals are liable for monetary relief if "the individual had 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 535 (S.D.N.Y. 2000) (citations omitted). As set forth below, Rensin's complete control and hands-on management provided him with actual knowledge, or – at a minimum, reckless indifference to the truth – of BlueHippo's contumacious practices, including the misrepresentations about financing and BlueHippo's failure to disclose the onerous conditions of its store credit refund policy. In addition to his daily control and oversight of all aspects of the operations, Rensin also gained knowledge of Contempt Defendants' misrepresentations through the high volume of consumer complaints (BlueHippo produced to the FTC more than 18,000 pages of documents relating to such complaints). See FTC 22J, FTC 22M, and FTC 48 at ¶ 4.

[5] The court found the defendants and Bronitsky (a non-party) in contempt and held them jointly and severally liable. *Jolly,* 170 B.R. at 798.

Specifically, he argues that he is not liable for any violations of the Order by BlueHippo because, as an officer who delegated authority to his subordinates, he did not have knowledge of, or participate directly in, any contumacious practices. In support of this contention, Rensin claims that he had only "broad managerial responsibilities rather than detailed involvement in day-to-day marketing and sales." Rensin Opp. at 11. The evidence, however, including Rensin's own sworn testimony, demonstrates that this is simply not true. In his role as CEO, founder, owner, and sole member of BlueHippo from its inception, *see* FTC 49 at 11-12, 17 (11/24/09 Rensin Dep. Tr.), Rensin actively participated in BlueHippo's contumacious practices by directing, controlling, and participating in all aspects of BlueHippo's business practices.

Specifically, Rensin admits that he led the company. *Id.* at 35. He testified that as CEO all department heads reported to him, and that he would see them multiple times each day. *Id.* at 13-14. He also admits that he oversaw the management team and was "in charge." *Id.* at 34-35. He reviewed telemarketing scripts, *id.* at 64-65, and had a say in setting refund policies, *id.* at 94. Rensin further admits that he was involved in all decisions about the change in business models and that any such change would not have happened without his agreement. *Id.* at 41-42. Moreover, Chief Operating Officer John (Jeff) Ford testified that he reports to Rensin on at least a weekly basis, FTC 50 at 12-13 (11/24/09 Ford Dep. Tr.), that Rensin participates in regular meetings (weekly through July 2009, and then every two to three weeks) with the director of marketing, media managers, call center manager, and the director of operations. *Id* at 14, 16. Ford also testified that he and Rensin regularly met with individual media managers, and reviewed the weekly advertisement purchases. *Id.* at 17-18. Tellingly, Ford testified that Rensin was involved in reviewing scripts and advertisements until early Summer 2009. *Id.* at 26-27,

50-51.[6]

      Given these facts, Rensin is clearly in contempt of this Court's Order. As the owner, sole member, and president intimately involved in the day-to-day operations of BlueHippo, there is no question that he is legally identified with the company. *See Spectacular Venture, L.P v. World Star Int'l, Inc.*, 927 F. Supp. 683, 684-85 (S.D.N.Y. 1996) (holding non-party individual who was the president and principal of a corporate contemnor in contempt pursuant to Rule 65(d). Moreover, he unquestionably abetted BlueHippo's contempt. He controlled all aspects of the company, reviewing the sales scripts and advertising, as well as orchestrating the fulfillment of computers. He, therefore, knew, and in fact approved of, the advertising which marketed BlueHippo as a financing company. Moreover, as the contact point for Dell, he was uniquely situated to know that his company was financing few, if any, computers. Additionally, as a hands-on president, Rensin knew (or, at a minimum, recklessly avoided knowing) that his company's contracts and marketing failed to disclose that the hundreds, or thousands, of dollars paid by most consumers who never received anything in return could not be used for taxes and additional fees at the company store.

      Even if the Court were to accept Rensin's counter-factual argument that he was not actively involved in the company, "[p]assivity in the face of court order is no defense to contempt. A person 'who is responsible for ensuring that a corporation complies with a court

---

[6] Rensin was also heavily involved in the fulfillment side of the business. He personally visited Dell to negotiate BlueHippo's contract with them, and signed the contract. FTC 49 at 113; FTC 51 (Dell00110-15). Rensin emailed Gary Stephens, his contact at Dell, that with respect to the 2008 quarterly ordering projections, he did not want Dell personnel to "reach out to any of my staff . . . it seems like a smarter idea if we speak directly. . .. I would appreciate it if I were the point person until we get our relationship back on track." FTC 51 at Dell00111. Dell ultimately sued BlueHippo for $4.5 million for failure to pay for the computers it ordered from Dell. FTC 61.

order cannot escape liability merely by removing himself from the day-to-day operations of the corporation and washing his hands of responsibility.'" *Rudd v. Advance Bedding Corporation*, 1996 U.S. Dist. LEXIS 22542, *7 (E.D.N.Y. Jan. 30,1996) (citations omitted) (attached).[7]

Finally, Rensin argues at length, without citing to any law, that he cannot be bound by the Order under Rule 65(d) because the FTC considered naming him in the original action but declined to do so. This argument is meritless. For a variety of reasons that are completely irrelevant here, the FTC entered into a settlement with BlueHippo that did not include Rensin. In fact, had the FTC known that Rensin would turn around and immediately violate the Order, it may well have taken a very different course. However, the Order does not abrogate the FTC's right, pursuant to Rule 65(d), to seek contempt sanctions against non-parties who have actual knowledge of the Order and are engaged in contumacious conduct in active concert or participation with the parties. Indeed, the injunctive provisions of the Order explicitly state that they bind officers.

In a similar vein, Rensin claims that, because the Order does not contain a specific requirement that BlueHippo change its extant business practices, he had "every reason to believe that the company's business model and practices as of the date the Order was entered were fully complaint with the law. . .." Rensin Opp. at 11. Again, this argument is not supported by any

---

[7] Rensin tries to paint himself and his company as good corporate citizens, but ignores the fact that BlueHippo has been sued by numerous state Attorneys General, including Tennessee, *see* FTC 52-53, Ohio, *see* FTC 54-55, and Washington, *see* FTC 56-57, alleging, among other things, that BlueHippo engages in deceptive practices. Moreover, BlueHippo has entered into at least one voluntary agreement not to advertise or sell to consumers in a certain state after the Attorney General in that state brought concerns relating to BlueHippo's business practices to light. *See, e.g.,* FTC 58.

law or facts. The FTC's Complaint alleged, *inter alia*, that BlueHippo was making certain material misrepresentations in violation of the FTC Act. However, the Order was not limited to prohibiting those material misrepresentations, but enjoined all material misrepresentations (in addition to violations of certain laws and regulations). At no point did the Commission or its staff review and approve BlueHippo's business model and practices.[8] Rather, it expected that BlueHippo would take the necessary steps to comply with the Order as it was entered.[9] Where, as here, the Order provisions are clear, the Courts do not look beyond the four corners of the Order. *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) ("[T]he 'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.'") (citations omitted).

### III.  RENSIN AND BLUEHIPPO ARE JOINTLY AND SEVERALLY LIABLE FOR COMPENSATORY DAMAGES EQUAL TO THE GROSS RECEIPTS OF BLUEHIPPO RELATED TO THEIR CONTUMACIOUS ACTIVITIES.

Finally, Rensin relies on *FTC v. Verity Intern., Ltd.*, 443 F.3d 48 (2d Cir. 2006), to argue that his liability should be limited to the salary he drew from BlueHippo. Rensin Opp. at 17. This position is legally unsustainable for two reasons.

First, the *Verity* decision has no applicability in contempt. A brief review of the *Verity* holding and its genesis makes this clear. The *Verity* court held that because the FTC's suit pursuant to Section 13(b) of the FTC Act sounded in equity, the Commission was seeking

---

[8] For example, although the White Paper discusses BlueHippo's store credit refund policy in numerous places, nowhere does it disclose that consumers must pay additional monies to BlueHippo to cover taxes, shipping and handling, let alone that those terms are not disclosed to consumers until they try to use the store credit. *See* BH Opp., Ex. 4 at 12-14.

[9] Indeed, had the staff realized the extent of BlueHippo's deceptive practices, failures to disclose material store credit terms, and its continued extension of credit on terms that violated EFTA, it likely would have recommended litigation rather than settlement.

recovery under the doctrine of equitable restitution. *Id.* at 67. The court then, relying wholly on the Supreme Court's characterization of equitable restitution in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002), held equitable restitution allowed recovery of all consumer loss paid directly to the defendants, but excluded those funds that consumers paid directly to a nonparty middleman. *Id*. at 68. Significantly, the *Great-West* court arrived at this characterization by conducting an historical analysis of the equitable doctrine of restitution. *Id.* at 213-14. This history, however, is irrelevant to the separate, non-equitable remedy of compensation in a contempt proceeding.

The Court's contempt authority does not sound in equity and its power to compensate BlueHippo's victims does not derive from the doctrine of equitable restitution. As recognized by the Supreme Court, federal courts have possessed the "inherent" power to enforce their orders through contempt since "[t]he moment the courts of the United States were called into existence." *Ex Parte Robinson*, 86 U.S. 505, 510 (1874).

Because the Court's authority to provide relief in contempt cases is inherent, it is not dependent on the equitable or legal relief that may have been available in any underlying statutory action. Instead, the Court utilizes its inherent authority by providing the relief necessary to effect complete compensation to those aggrieved by the contempt. *See, e.g., Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) (compensatory nature of the relief sought is a hallmark separating civil from criminal contempt) (citing *United States v. United Mine Workers*, 330 U.S. 258, 303-304 (1947)).

Accordingly, the Supreme Court has held that damages are proper for civil contempt violations even where the underlying statute authorizes only injunctive, equitable relief. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) (in public enforcement suit, district

court had authority to award compensatory damages for violation of the injunction, regardless of the equitable relief authorized by the statute).[10]  Specifically, the Supreme Court held:

> We have no doubts concerning the power of the District Court to order respondents, in order to purge themselves of contempt, to pay the damages caused by their violations of the decree.  We can lay to one side the question whether the Administrator, when suing to restrain violations of the Act, is entitled to a decree of restitution for unpaid wages.  *Cf. Porter v. Warner Holding Co.*, 328 U.S. 395 (1946).  We are dealing here with the power of a court to grant the relief that is necessary to effect compliance with its decree.  ***The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief.***

*Id.* at 193 (emphasis added); *see also American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) (upholding contempt remedy requiring union to pay $45 million in damages to airline for violating court order to halt a sick-out, holding that it was irrelevant that monetary relief was not available pursuant to the injunctive provision of underlying statute).[11]

Therefore, this court's remedial authority derives from its inherent contempt power, and the only question is what remedy provides "full remedial relief" for the harm caused by Rensin's contempt.  *See McComb*, 336 U.S. at 193.  The proper measure of relief is not Rensin's gain, but the consumer harm caused by his contempt.

Second, even if the *Verity* decision were applicable in contempt, Rensin would still be jointly and severally liable with BlueHippo for total consumer loss.  *Verity* held that equitable restitution does not include monies taken by ". . . some middleman ***not a party to the lawsuit***

---

[10]  The Administrator sought relief under 29 U.S.C. § 217 of the Fair Labor Standards Act, which authorizes courts to "restrain violations" of the statute.  *See Fleming v. Jacksonville Paper Co.*, 128 F.2d 395, 399 (5th Cir. 1942) (underlying case).  This provision is equitable.  *See*, *e.g.*, *Hodgson v. American Can Co.*, 440 F.2d 916, 920 (8th Cir. 1971); *Shultz v. Parke*, 413 F.2d 1364, 1368 (5th Cir. 1969); *Clifton D. Mayhew, Inc. v. Wirtz*, 413 F.2d 658, 663 (4th Cir. 1969).

[11]  Notably, the court also did not focus on any financial benefit the union obtained through its contempt.  *Id.* at 585.

9

[who] takes some of the consumer's money before it reaches a defendant's hands." *Verity*, 443 F.3d at 68 (emphasis added). In the instant case, Rensin argues that the middleman is the company he owns and runs, BlueHippo, and, therefore, he should only be liable for the funds that ultimately came to him, his own salary. BlueHippo, however, is neither a middleman, nor a nonparty. Rather, as a named party in the underlying action and a contempt defendant in this action, BlueHippo is obviously a party.

Moreover, another Second Circuit district court recently addressed the *Verity* decision, finding "here, where there is no middleman, the proper measure of restitution is the full amount of consumer funds paid to the defendants." *FTC v. Bronson Partners, LLC et al.*, Civil Action No. 3:04-cv-1866-SRU at 5 (D. Conn. Dec. 4, 2009) (attached). In that case, the court held a 50% owner and manager of a company jointly and severally liable with his company for the full amount of restitution. *Id*. at 26 (citing *FTC v. Bronson Partners, LLC,* 564 F. Supp. 2d 119, 136 (D. Conn. 2008)).[12] In this matter, Rensin, the 100% owner and president of BlueHippo, is also not a middleman, and thus, jointly and severally liable.

## IV. CONCLUSION

For all of the foregoing reasons, as well as those set forth in the FTC's initial memorandum of law and its reply to BlueHippo's opposition, Rensin is in contempt of the Order and is jointly and severally liable with BlueHippo for compensation to consumers for their losses which are tied to Contempt Defendants' contumacious activities.

---

[12] Notably, the *Verity* court itself did not upset the district court's ruling that Verity's corporate officers, who were named as individual defendants, were jointly and severally liable. *Verity*, 443 F.3d at 56 and 68 (instructing the district court, on remand, to determine what portion of payments to AT&T "was in fact received by the defendants-appellants [including the individuals] and is therefore subject to an order of restitution").

Dated: December 11, 2009                    Respectfully submitted,

/s/ Laureen Kapin
Laureen Kapin
Amanda C. Basta
Federal Trade Commission
601 New Jersey Avenue, NW
Suite 2122
Washington, DC 20580
Telephone: (202) 326-3237
Facsimile: (202) 326-2558
lkapin@ftc.gov
abasta@ftc.gov
Attorneys for the Federal Trade Commission