IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

[corrected]

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>Plaintiff,<br><br>vs.<br><br>**BLUEHIPPO FUNDING, LLC**<br><br>and<br><br>**BLUEHIPPO CAPITAL, LLC,**<br><br>Defendants. | Civil Action No. 08-CV-1819 (PAC) |

**SUPPLEMENTAL DECLARATION OF JOSEPH K. RENSIN
PURSUANT TO 28 U.S.C. § 1746**

Joseph K. Rensin, being duly sworn, deposes and states as follows:

1. My name is Joseph K. Rensin. I am over eighteen years of age. The following facts are true and correct based upon my personal knowledge.

A. **Boost Credit**

2. From its inception through the beginning of 2008, BlueHippo Funding, LLC ("BlueHippo Funding;" together with BlueHippo Capital, LLC, "BlueHippo") operated under the "BlueHippo" brand. It ran television, radio, internet and print ads under that name throughout that period. By 2008, a consensus developed in the marketing group at BlueHippo that the market had been so saturated by the company's ads that the use of a new, fresh brand in the company's advertising would likely attract the attention of more potential

customers than the continued use of the BlueHippo name. This "refreshing" practice is common in the direct response industry; most of our competitors have used multiple brands.

3. The marketing department, Chief Operating Officer Jeff Ford and I, with input from a large number of others, decided to make a change, and we chose the name "Boost Credit." The company's practice in the past, based on counsel's advice concerning corporate structuring, had been to form separate subsidiaries of BlueHippo Funding for different aspects of its operations. For example, in 2006, when the company implemented its new business model involving the use of an installment credit plan for customers who qualified, it formed BlueHippo Capital, LLC ("BlueHippo Capital"), a wholly owned subsidiary, to enter into the installment credit agreements. In the same way, BoostCredit, LLC ("Boost"), a Delaware LLC and a wholly owned subsidiary of BlueHippo Funding, was formed in early 2008.

4. The marketing department began to develop advertisements using the new brand, Boost Credit. Production of a Boost Credit television ad took more than a year, but in the Summer of 2009 the ad was finally completed, and we began selling under the Boost Credit brand. (I have reviewed the excerpt from the deposition transcript of COO Jeff Ford, and he describes these events as well; *see* FTC Ex. 50 at 20-22).

5. The use of the new Boost Credit brand required a new Automated Clearing House Processing Agreement (the "ACH Agreement") with our payment processor, CheckGateway. BoostCredit.com, LLC ("BoostCredit.com"), a Delaware LLC and a wholly owned subsidiary of BlueHippo Funding, LLC, was formed to serve as the counterparty to the ACH agreement.

6. Until the FTC filed its Reply in this action, I was unaware that the ACH Agreement between BoostCredit.com and CheckGateway incorrectly listed me as the owner of BoostCredit.com. (FTC Ex. 59). The signature on the ACH Agreement is mine, and the title (Chairman and CEO) and date below my signature are also my writing. The other writing on the form, including the ownership information, is clearly not my handwriting. I signed a blank or partially completed agreement and asked an employee to fill it out, a practice that I have occasionally used for convenience (but should avoid for obvious reasons). The remaining information was filled in after I signed the agreement.

7. The Boost Credit brand was used strictly for marketing reasons. As I testified at my deposition, because Boost is a BlueHippo Funding subsidiary, the company has always treated the activities of all subsidiaries of BlueHippo Funding as activities of BlueHippo Funding, subject to all obligations of BlueHippo Funding, including the Consent Order in this case.

8. The entities that filed bankruptcy on November 22, 2009, included BoostCredit, LLC. When a December 2 ruling by the bankruptcy court made it clear that BlueHippo would not be able to reorganize and emerge from bankruptcy, BlueHippo and all affiliates, *including BoostCredit and BoostCredit.com*, stopped accepting orders from customers. When BlueHippo moved to convert its bankruptcy case from Chapter 11 to Chapter 7 of the Bankruptcy Code on December 9, it moved to convert the cases of all its affiliates, including BoostCredit.

9. When I read the FTC's Reply Memorandum, I was surprised to read the allegation that BoostCredit.com was not a party to the bankruptcy proceeding. Upon inquiry, I learned that counsel had inadvertently omitted BoostCredit.com from the bankruptcy filing. Its sibling, BoostCredit, was included, and my understanding was that the

3

bankruptcy petition included all subsidiaries of BlueHippo. I have instructed counsel to correct the omission and file a petition under Chapter 7 of the Bankruptcy Code immediately.

10. Neither BlueHippo, BoostCredit, BoostCredit.com, nor any other entity with which I have any connection is now selling or advertising the sale of computers or consumer electronics. The computer and telecommunications equipment used by these companies has been shut down, the employees who operated the business have been terminated, and none of these companies continue to operate. I have no intention ever to resume selling computers to consumers.

**B.   Dell**

11. During the period from April 10, 2008 until the present (and for several years before), I was *not* the primary contact point for Dell. Nor did I negotiate the original contract in 2003, or the subsequent pricing between BlueHippo and Dell. I have never visited Dell for any reason. Dell has sent representatives to our offices on several occasions, but I personally involved myself in dealings with Dell only when there were problems that my staff was unable to solve, or unable to solve as quickly as required.

12. Different members of my management team were involved in negotiating the Dell contract. Bruce Mattare, our then-Chief Operating Officer (now owner of another company in the same business) negotiated the original contract, and the most recent pricing was discussed between our operations staff and our Dell representatives. It was my practice to review and sign significant contracts, and I signed the Dell contract.

13. A number of people at BlueHippo managed different aspects of the relationship with Dell. Orders were placed through a computer interface between Dell and BlueHippo, and the IT Department was responsible for interacting with Dell's IT department to set up

4

the interface and manage it on an ongoing basis. Financial aspects of the relationship were managed by our CFO and accounting team. The Customer Service Department was in regular contact with Dell's customer service personnel, addressing the recurrent problems Dell had processing and filling orders BlueHippo placed on behalf of customers.

14. As I explained in my initial Declaration, my standing instructions to my management team were to bring to my attention operational and other problems that were significant or that they could not resolve. When such matters were brought to my attention, I gave direction to management concerning their resolution, and occasionally, if the problem was sufficiently significant to require my personal attention, I involved myself in resolving it. I described in paragraph 30 of my Declaration one such problem pertaining to Dell.

15. The email correspondence submitted by the FTC (FTC Ex. 51) reflects that in June, 2008, Dell was having problems servicing BlueHippo in a way that was causing significant difficulties in the company's ability to obtain computers on a timely basis. In order to facilitate the resolution of these problems, I personally involved myself in resolving these problems.

16. One of the problems of which I had learned from my staff was Dell's frequent changes in part numbers, which were included in the Quotes we received from Dell. As I understood it, BlueHippo was required to specify part and Quote numbers each time we placed an order with Dell, but Dell frequently updated its product line, as a result of which part numbers changed and Quote numbers expired. We often did not receive notification of these changes and expirations. As a result, our orders specified Quote numbers that were no longer current, and the orders were rejected. Our IT and Operations department devoted substantial effort to resolving these problems, but they recurred, and they delayed shipment

of computers to our customers. The problem prevented BlueHippo's orders from being processed properly by Dell, and consequently I believed my involvement was necessary.

17. I communicated with our Dell Representative, Brent Thomas, and his boss, Gary Stephens, concerning these and other problems we were experiencing with Dell at the time, and I addressed them in my email to Gary Stephens on June 25, 2008 at 9:08 p.m. (FTC Ex. 51 at p. 3 of 137). I indicated in my email, "we haven't placed an order with [Dell] in a while, nor can we until [the problems are corrected], they keep getting rejected." (*Id.*).

18. A short time later, in my 10:03 p.m. email, I addressed Dell's failure to notify BlueHippo when its quotes expired (a "big recurring problem"), and its failure to notify BlueHippo when computers were returned to Dell because the customer's addresses were no longer good. (*Id.* at p. 2 of 137).

19. The significance of these problems, and the difficulty resolving them – the factors which led to my involvement – are reflected in this email exchange. Dell's difficulties were preventing us from supplying our customers with computers in a timely fashion. That was why I took the unusual step of telling Dell that "I would appreciate if I were the point person until we get our relationship back on track. I imagine it can get fixed quickly, but there were a bunch of open items when you left and I think everyone of them remains open." (Id.). After this e-mail was received by Dell, the matter gained more attention and was promptly resolved. My involvement as the "point person" was for the purpose of re-starting the relationship and solving these issues. Dell attempted to address the problems, and when I believed they were on the way to being corrected, I ended my personal involvement. Unfortunately, however, I continued to hear that our customer service

and IT departments were encountering these problems periodically even after the acute problems that caused me to involve myself.

I declare under penalty of perjury that the foregoing is true and correct.

_12/15/09_  
Date

_____  
Joseph K. Rensin