# UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,
            Plaintiff,

v.

BLUEHIPPO FUNDING, LLC,

      and

BLUEHIPPO CAPITAL, LLC,
            Defendants.

Civil No. 08 CV 1819 (PAC)

Date of Hearings:
February 9, 2010 and
February 11, 2010.

**PLAINTIFF'S SUMMARY OF KEY HEARING ISSUES
IN SUPPORT OF ITS CONTEMPT MOTION**[1]

---

[1] The Court asked the parties to submit a ten-page summary of the evidence presented during the two-day contempt hearing. Tr. at 302-303. The FTC seeks leave of one additional page to address issues of fact related to Mr. Rensin's joint and several liability in light of counsel's representation that Mr. Rensin intends to assert his Fifth Amendment privilege against self-incrimination if called to testify. *See, infra*, at 1, 7.

At the conclusion of the two-day evidentiary hearing on the Federal Trade Commission's (FTC or Commission) Contempt Motion, the Court asked for a ten-page summary of the evidence presented to the Court on February 9 and February 11, 2010. Accordingly, the FTC submits this summary of four key issues addressed during the course of the hearing: 1) Contempt Defendants' failure to disclose material terms and conditions of their store credit "refund" policy; 2) Contempt Defendants' material misrepresentations that BlueHippo was in the business of financing computers in the year following entry of the Order; 3) Contempt Defendants' failure to provide computers even to those who met their financing criteria, which highlights that they were not in the business of financing computers; and 4) Contempt Defendants' material misrepresentations relating to whether consumers who placed store credit orders would receive merchandise.

In addition, during the hearing, counsel revealed that Mr. Rensin would not testify but, instead, would assert his Fifth Amendment privilege against self-incrimination in response to questions. Tr. at 272-274. As indicated in the FTC's February 18, 2010 letter to the Court, the FTC seeks adverse inferences as a result of Mr. Rensin's refusal to testify. *See Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 226 (2d Cir. 1999), *abrogated on unrelated grounds* ("[A]n inference will be drawn against a party to a civil suit that invokes the Fifth Amendment privilege against self-incrimination.") (*citing Baxter v. Palmigiano*, 425 U.S. 308, 318-20 (1976) ("The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.")). However, because Mr. Rensin will not be testifying, the FTC also summarizes the ample record, including Mr. Rensin's admissions in his deposition, demonstrating Mr. Rensin's joint and several liability.

1

**I.      Contempt Defendants Violate the Permanent Injunction By Failing to Disclose Material Conditions of Their Store Credit "Refund" Policy.**

**1.**     Section I.B of the Order requires that Contempt Defendants disclose "clearly and conspicuously . . . all material terms and conditions of any refund, cancellation, exchange or repurchase policy . . . prior to receiving any payment from customers." FTC 20.

**2.**     Through their advertising of BlueHippo, Contempt Defendants targeted a vulnerable population of consumers, those with "bad credit, past bankruptcies or unpaid bills." FTC 29-37.

**3.**     When these vulnerable consumers called BlueHippo to order computers, BlueHippo told them that it did not give cash refunds after seven days. *See* FTC 39-40. Rather, consumers were told that Contempt Defendants only offer refunds in the form of a "store credit" that could be used to purchase merchandise through BlueHippo's online store. *See id.*; *see also* FTC 41.

**4.**     Thus, after seven days, consumers who did not wish to pay the $2,000 that BlueHippo charged, on average, for a computer, *see* FTC Br. at 8, fn. 10, received nothing for the money they paid unless they could use their store credit to purchase merchandise from BlueHippo's online store. FTC 22F at 5.

**5.**     However, Contempt Defendants failed to disclose three material conditions of this store credit "refund" policy. Specifically, Contempt Defendants failed to disclose that: (1) store credit could not be used to cover shipping, handling, and taxes associated with purchases from the online store; (2) consumers must send in additional money to cover such charges, in advance, via a money order; and (3) consumers could only order one item at a time from the online store at a time. *Compare* FTC 39-40 with FTC 22F.

**6.**     As a matter of law, these conditions, which involve charges for the store credit products beyond their advertised prices, are material. *See FTC v. Crescent Publ. Group*, 129 F. Supp. 2d 311,

321 (S.D.N.Y. 2000) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.'")(citing *In re Thompson Medical Co.*, 104 F.T.C. 648, 816 (1984), *aff'd,* 791 F.2d 189 (D.C. Cir.1986)).[2] The legally mandated materiality of these undisclosed terms concerning additional charges for goods is particularly compelling in this situation where BlueHippo's advertising targeted people with "bad credit, past bankruptcies or unpaid bills," *see* FTC 29-37; FTC 27 C-F, and BlueHippo's business overwhelmingly resulted in consumers paying hundreds of dollars for no merchandise.

**7.** Dr. Erez Yoeli, the FTC's expert in the fields of applied economics and data analysis, Tr. at 28, 36, testified as to the number of consumers affected by these material failures to disclose. Dr. Yoeli testified that between April 10, 2008 and July 24, 2009, consumers placed 62,673 computer orders with BlueHippo. Tr. at 172, 198.

**8.** Dr. Yoeli further testified that, by July 24, 2009, the last date for which BlueHippo provided data, consumers did not receive either a computer or store credit merchandise for 55,892 of those orders. Tr. at 172-173.

**9.** Dr. Yoeli testified that, in total, consumers paid Contempt Defendants $14,062,627.51. Tr. at 205.

**10.** Contempt Defendants' expert, Neil Demchick, testified that he performed a similar analysis and obtained results that were "substantially the same" as Dr. Yoeli's results. Tr. at 255.

---

[2] At the hearing, counsel for Mr. Rensin, for the first time, suggested that these undisclosed terms were not material because not all consumers who placed online store orders were ultimately charged shipping, handling, and taxes. *See* Tr. at 14. However, Mr. Rensin adduced no evidence demonstrating that BlueHippo did not assess such charges to consumers who placed orders through the online store. *See* FTC 22F (describing store credit refund policy); *see also* FTC 48 D-H (consumer complaints relating to BlueHippo's requirement that taxes, shipping and handling be paid separately). Moreover, there is no dispute that BlueHippo's refund policy expressly required such charges.

## II. Contempt Defendants Violated The Permanent Injunction Through Numerous Misrepresentations Of Material Fact.

**Contempt Defendants' Misrepresentation That BlueHippo Was In The Business of Financing Computers.**

**11.** Contempt Defendants misrepresented BlueHippo as a company that "finances thousands of computers to people with past credit problems." *See* FTC 29-37. However, the evidence demonstrates that, in the year following entry of the Order, BlueHippo was not in the business of financing computers.

**12.** Dr. Yoeli testified that, after April 10, 2008, consumers placed 24,108 orders that could have qualified to receive a financed computer on or before April 8, 2009.[3] Tr. at 45-47.

**13.** Dr. Yoeli further testified that, by April 8, 2009, however, BlueHippo provided only one computer to fulfill any of those 24,108 orders before the consumer paid in full. Tr. at 47-49. That single consumer only paid $200-$300 towards a computer for which BlueHippo charged approximately $2,000 and did not meet either of BlueHippo's financing criteria. Tr. at 48-49.[4]

**14.** Dr. Yoeli testified that, by July 24, 2009, 20,760 out of the 24,108 orders that could have qualified to receive a financed computer by April 8, 2009 received nothing from BlueHippo. Tr. at 65. Dr. Yoeli testified that these 20,760 consumers paid a total of $6,682,469.82. *Id.*

**15.** Again, Contempt Defendants' expert, Mr. Demchick, performed an analysis similar to Dr.

---

[3] April 8, 2009 is the day before the FTC brought its first Contempt Action against BlueHippo for failing to produce data and reports relating to, among other things, its financing practices.

[4] Thus, as Contempt Defendants conceded in their Opposition, BlueHippo never provided financing for this consumer. BlueHippo Opp. at 17**.**

Yoeli's and arrived at "essentially the same" results. Tr. at 253-54.[5]

**Contempt Defendants' Misrepresentations That Consumers Who Met BlueHippo's Qualification Criteria Would Receive A Financed Computer.**

16. The fact that Contempt Defendants are not in the business of financing computers is highlighted by the consumers who did not receive a computer even if they met BlueHippo's financing criteria (*i.e.,* made at least 13 consecutive payments and returned a completed financing installment contract).

17. Dr. Yoeli testified that, in the year following entry of the Order, 2,025 orders fulfilled BlueHippo's financing qualification criteria and did not default within 4 weeks. Tr. at 51-53. Contrary to BlueHippo's representation to consumers that they would receive a financed computer within 3-4 weeks of meeting the criteria, *see* FTC 39-40 (telemarketing scripts); FTC 41-42 (layaway agreement and financing installment contract); *see also* Tr. at 49-51, Dr. Yoeli further testified that by April 8, 2009, none of those consumers had received a financed computer. Tr. at 53-54.

---

[5] At the hearing, Mr. Demchick, Mr. Rensin's expert, opined that between April 10, 2008 and March 31, 2009, BlueHippo financed 885 computers. Tr. at 231. However, this testimony is not probative of whether BlueHippo was in the business of financing computers. First, all but one of these 885 computers were ordered prior to the Order, (Tr. at 231-232), and are, thus, legally irrelevant to this contempt action concerning BlueHippo's post-Order representations to consumers. Second, the criteria employed by Mr. Demchick to determine whether a computer was "financed" bore no relation to BlueHippo's own definition of financing. At his deposition, Mr. Rensin conceded that when BlueHippo used the term "finance[d]" in its advertisements, the term meant "the retail installment sales agreement financing." FTC 63 at 59-60 (Rensin deposition designations). However, Mr. Demchick testified that in determining how many computers BlueHippo financed, he did not attempt to determine whether the orders met BlueHippo's financing criteria. Tr. at 257-258. Third, of the 885 orders, Mr. Demchick admitted that BlueHippo placed orders for all but three between April 10, 2008 and August 10, 2008, Tr. at 263. Thus, even Mr. Demchick's flawed analysis shows that BlueHippo provided virtually no computers to consumers who had not paid in full for the last eight months of the relevant one-year period after entry of the Order.

**18.** The FTC began aggressively pursuing information from BlueHippo on April 8, 2009. Dr. Yoeli observed that BlueHippo ultimately ordered computers for nearly 1,300 of these 2,025 orders after that date, with the vast majority of those orders not placed until June 2009. Tr. at 55-56.

**19.** Even after this litigation-driven spike in computer orders, Dr. Yoeli testified that, as of July 24, 2009, 677 of those consumers had not received any computer, Tr. at 55, let alone a financed computer.

### Contempt Defendants' Misrepresentations Relating To When A Consumer Would Receive A Financed Computer.

**20.** BlueHippo told consumers that, if they met the financing qualification criteria, they would receive computers within 3-4 weeks. FTC 39-42. However, the evidence demonstrates that this, too, was a misrepresentation.

**21.** Dr. Yoeli testified that, after the June 2009 ordering spike, BlueHippo ultimately ordered approximately 1,300 computers for the 2,025 orders that qualified for financing under BlueHippo's criteria. Tr. at 55-56.

**22.** However, as Dr. Yoeli explained, BlueHippo did not order a single one of these 1,300 computers within 4 weeks of qualification. Tr. at 44, 55-57. Dr. Yoeli further testified that, on average, it took "just over 26 weeks for BlueHippo . . . to order a computer on behalf of a customer from the date that the customer had qualified." Tr. at 56. In at least one instance, Dr. Yoeli testified, "there was a delay of almost a year, 352 days." Tr. at 56.

### Contempt Defendants' Misrepresentations That Consumers Who Placed Orders For Store Credit Merchandise Would Receive The Merchandise.

**23.** Consumers who cancelled their computer orders with BlueHippo purportedly received a store credit that could be used to purchase merchandise through BlueHippo's online store. *See* FTC 22F at 5.

**24.**     As BlueHippo's narrative explanation of the store credit ordering process makes clear, at the point of a consumer's online store purchase, he or she is told what conditions must be met in order for the consumer to receive store credit merchandise. BlueHippo told consumers that after they applied their credit and paid any remaining balance, including the charges for shipping, handling and taxes, BlueHippo would order their store credit merchandise. FTC 22F at 5-7.

**25.**     Dr. Yoeli testified that between April 10, 2008 and July 24, 2009, 3,454 store credit orders had a zero balance indicating that the consumer did not owe any further funds. Tr. at 57-59; FTC 22F at 6-7.

**26.**     Dr. Yoeli explained that although 3,454 orders had a zero balance, BlueHippo only fulfilled 750 of those orders, leaving 2,704 orders unfulfilled. Tr. at 59, 145.

**III.     Mr. Rensin Is Jointly And Severally Liable For BlueHippo's Contemptuous Conduct.**

Mr. Rensin is asserting his Fifth Amendment right against self-incrimination. The FTC seeks adverse inferences against Mr. Rensin stemming from his invocation. Even absent such inferences, however, Mr. Rensin's deposition and other evidence overwhelmingly demonstrate that he is jointly and severally liable with BlueHippo because Mr. Rensin is "legally identifiable" with BlueHippo. *See People of the State of NY v. Operation Rescue,* 80 F.3d 64, 70 (2d. Cir. 1996) ("[i]n order for a court to hold a nonparty respondent in contempt of a court order [pursuant to Rule 65(d)], the respondent must **either** abet the [party named in the order], **or** must be legally identified with him") (emphasis added); *accord Vuitton Et Fils S.A. v. Carousel Handbags*, 592 F. 2d 126, 130 (2d Cir. 1979). Although the FTC need only establish that Mr. Rensin is legally identifiable with Defendants, *see Spectacular Venture, L.P v. World Star Int'l, Inc.*, 927 F. Supp. 683, 684-85 (S.D.N.Y. 1996) (holding individual who was the president and principal of a corporate contemner in contempt pursuant to Rule 65(d)), as set forth below, the evidence also demonstrates that Mr.

7

Rensin abetted BlueHippo in its contumacious conduct.

**Rensin Is Bound by the Order**

**27.**     The plain language of the Permanent Injunction covers BlueHippo's officers, agents, servants, limited liability corporations and all other persons or entities in active concert or participation with any of them who receive actual notice of the Permanent Injunction. *See e.g.,* FTC 20 at ¶¶ I and IV.

**28.**     Mr. Rensin received actual notice of the Order. FTC 43A (acknowledgment of receipt of Order); FTC 63 (Rensin Deposition) at 129. Mr. Rensin has conceded that he is bound by the Permanent Injunction, by virtue of his role as an officer of BlueHippo. Tr. at 276.

**Rensin is Legally Identifiable With Defendants – Ownership and Leadership Role**

**29.**     Mr. Rensin has solely owned Defendant BlueHippo Funding, LLC since 2003 through at least November 24, 2009. FTC 63 at 11-12, 17, 49, 153.

**30.**     Mr. Rensin's LLC, BlueHippo Funding, owns Defendant BlueHippo Capital, LLC. FTC 22T; FTC 63 at 17, 80.

**31.**     Mr. Rensin has served as Chair of BlueHippo's Board of Directors since 2003 through at least November 24, 2009. FTC 63 at 11-12.

**32.**     Mr. Rensin served as BlueHippo's Chief Executive Officer (CEO) from 2003 until July 20, 2009. FTC 22G at 3; FTC 63 at 12. As CEO, Mr. Rensin led the company and was in charge of the company. FTC 63 at 35.

**Rensin Abetted BlueHippo's Order Violations**

**Rensin Oversaw Company Operations**

**33.**     As the person in charge of BlueHippo, Mr. Rensin had final say over company policy and set the direction of the company. FTC 65 at 90 (corporate representatives deposition). Mr. Rensin

8

was also responsible for formulating BlueHippo's business strategies, which included the decision to sell computers. FTC 22G at 3; FTC 63 at 35-37. Mr. Rensin also played a decision-making role when BlueHippo adjusted its business model. FTC 63 at 40-42.

**34.** As CEO, Mr. Rensin oversaw BlueHippo's Department heads. Each Department head reported directly to Mr. Rensin. FTC 63 at 13, 34. These Department heads included the Chief Operating Officer, the General Counsel, the Chief Technology Officer, the Chief Strategy Officer, and the Chief Financial Officer.

**35.** Mr. Rensin's oversight of his Chief Operating Officer, Mr. Ford, included oversight over the Sales, Marketing and Customer Service Departments. FTC 63 at 32. Mr. Ford was in charge of Marketing at BlueHippo since May 2008. FTC 64 at 9 (Ford deposition designations).

### Rensin's Involvement With Marketing

**36.** Mr. Rensin attended weekly meetings with Mr. Ford to discuss marketing. FTC 64 at 12-13. During these meetings, Mr. Rensin reviewed customer response to BlueHippo's ads in different media. FTC 64 at 13-18. Prior to stepping down as CEO, Mr. Rensin also approved the amounts spent for marketing and ad placement. FTC 64 at 51. Mr. Rensin remained involved in recommendations regarding advertising until the summer of 2009. FTC 64 at 12-15.

**37.** BlueHippo's telemarketing scripts were circulated to Mr. Rensin for his input. FTC 63 at 64-65. Mr. Rensin reviewed the telemarketing scripts. Def. A ¶ 25; *see also* FTC 64 at 50.

**38.** Mr. Rensin saw all of BlueHippo's television ads and offered his opinion on them. FTC 63 at 62. Mr. Rensin gave his input on certain ads and the content of BlueHippo's web site. FTC 64 at 26-27; FTC 63 at 172. Mr. Rensin also reviewed BlueHippo's ads for accuracy. Def. A at ¶ 26.

### Rensin's Involvement with Ordering Computers

**39.** Mr. Rensin was knowledgeable about BlueHippo's ordering system. FTC 63 at 96-98, 108-113. The Chair of the Technology/IT Department, Mr. Wienholt, reported directly to Mr. Rensin. FTC 63 at 13, 97-98.

**40.** BlueHippo did not track whether the computers that had been ordered had actually been delivered to its customers. FTC 63 at 110-111; FTC 22D at 2.

**41.** The Permanent Injunction required BlueHippo not to misrepresent when consumers would receive their products from BlueHippo. FTC 20 at 4.

**42.** Nevertheless, BlueHippo's Technology Department, under Mr. Rensin's oversight, did not create or retain delivery records that could show when customers actually received their computers from BlueHippo. FTC 63 at 110-111.

**43.** BlueHippo contracted with various vendors to supply computers to its customers. FTC 63 at 108-109. Dell was the largest supplier during 2008-2009 supplying close to 90% of BlueHippo's computers. *Id.* at 108, 110, 113. Mr. Rensin signed the contract between BlueHippo and Dell. Mr. Rensin also dealt directly with Dell personnel and acted as BlueHippo's point person when issues arose between Dell and BlueHippo in the summer of 2008. FTC 51 (e-mail between Rensin and Dell Regional Sales Manager). These issues included ordering forecasts for the second and third quarter of 2008. *Id.*

### BlueHippo's Surge of Computer Orders After the FTC's Contempt Action

**44.** The following year, in June and July of 2009, after the FTC filed its first contempt action, BlueHippo placed a large number of computer orders with Dell. Mr. Rensin described these orders as "a larger than normal quantity" for BlueHippo; "a larger number, substantially;" "a meaningfully larger number;" and "a very meaningful number" of computers from Dell. FTC 63 at 119-120, 126.

**45.** In October of 2009, Dell sued BlueHippo for over $4 million alleging that BlueHippo hadn't paid for computers it ordered from Dell. FTC 61 at 3.

### Rensin's Involvement in BlueHippo's Refund Policy

**46.** Rensin had a say in setting BlueHippo's store credit refund policy. FTC 63 at 94-95.

**47.** Rensin was aware that BlueHippo's telemarketing scripts failed to disclose that customers could not apply their credit to taxes, shipping or handling. FTC 63 at 88-91; FTC 22F at 6; FTC 39, 40 (telemarketing scripts).

### Thousands of Customers Complained to BlueHippo when Rensin was In Charge

**48.** BlueHippo received thousands of complaints from its customers between April 10, 2008 and May 2009. FTC 22M and FTC 22J (transmitting consumer complaints).

**49.** Although Rensin alleges that he had "standing instructions to his management team" to bring significant problems to his attention, Def. A, ¶ 26, he claims that no one brought these thousands of complaints to his attention, FTC 63 at 148.

### Rensin's Control of Edison Worldwide

**50.** In November of 2009, BlueHippo filed for bankruptcy. FTC 72 at ¶ 17. John Delta, BlueHippo's Chief Financial Officer, reported that BlueHippo invoiced sales of over $54 million within the last two years. FTC 72 at 4, ¶ 7.

**51.** Mr. Rensin owns Edison Worldwide ("Edison"). FTC 22T; FTC 63 at 20. Since entry of the Order, BlueHippo has had no employees. FTC 63 at 20-21. Edison supplied all of the personnel to perform services for BlueHippo pursuant to a contract between Edison and BlueHippo. *Id.*

**52.** Edison has not filed for Bankruptcy. FTC 72 at 4, ¶ 6 at n.2.

**53.** Edison is the entity that pays Mr. Rensin and provides employees for BlueHippo. FTC 63 at 152.

Dated: February 18, 2010                    Respectfully submitted,


                                            /s/ Laureen Kapin
                                            Laureen Kapin
                                            Amanda C. Basta
                                            Federal Trade Commission
                                            601 New Jersey Avenue, NW
                                            Suite 2122
                                            Washington, DC 20580
                                            Telephone: (202) 326-3237
                                            Facsimile: (202) 326-2558
                                            lkapin@ftc.gov
                                            abasta@ftc.gov
                                            Attorneys for the Federal Trade Commission

# Certificate of Service

I, Amanda C. Basta, hereby certify that on February 18, 2010, I caused a true and correct copy of Plaintiff's Summary Of Key Hearing Issues In Support Of Its Contempt Motion to be served on the following counsel via ECF:

    Martin S. Himeles, Jr., Esq., mhimeles@zuckerman.com
    Elizabeth Taylor, Esq., etaylor@zuckerman.com
    A. Paul Pineau, Esq., ppineau@zuckerman.com
    Zuckerman Spaeder LLP,
    100 East Pratt Street, Suite 2440
    Baltimore, Maryland, 21202

    (Counsel for Contempt Defendant Joseph K. Rensin)

    /s/ Amanda C. Basta
    Amanda C. Basta