**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                   Plaintiff,

      v.

BLUEHIPPO FUNDING, LLC,

        and

BLUEHIPPO CAPITAL, LLC,

               Defendants.

Civil No. 08-cv-1819 (PAC)

**PLAINTIFF FEDERAL TRADE COMMISSION'S BRIEF REGARDING**
**APPLICABILITY OF THE PRESUMPTION OF RELIANCE**

# TABLE OF CONTENTS

I.   Background ...........................................................................................................................2

    A.   Events Leading To Entry Of 2008 Consent Order ......................................................2

    B.   The District Court's Contempt Findings Regarding Contempt Defendants' Failure To Disclose Material Terms Of Their Refund Policy .........................................................3

II.  The Court Has Already Determined That The Undisclosed Refund Policy Conditions Are Material Omissions Of A Kind Usually Relied Upon By Prudent Persons. ........................................5

    A.   The Court Has Already Found That The Omitted Terms And Conditions Are Of A Kind Relied Upon By Reasonably Prudent Persons .........................................................6

    B.   The Court Already Found, As Fact, That The Omitted Refund Policy Terms Were Material .............................................................................................................................8

    C.   BlueHippo's Alleged Failure To Consistently Apply Its Store Credit Policy Is Irrelevant And Has Already Been Rejected By This Court And The Second Circuit. ...............11

    D.   BlueHippo's Own Telemarketing Scripts Disprove Rensin's Unsupported Speculation That Consumers Do Not Care About The Terms Of Refund Policies. .......................15

III. Rensin's Ability To Introduce New Evidence Related To Offsets Is Circumscribed By Second Circuit Precedent. ............................................................................................................17

IV.  Conclusion .........................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) ..................... 19

*Bakalar v. Vavra*, 851 F. Supp. 2d 489 (S.D.N.Y. 2011) ............................................. 22

*County of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112 (2d Cir. 1997) .................... 10

*Fed. Trade Comm'n v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1997) ............................ 20

*Fed. Trade Comm'n v. BlueHippo Funding, LLC*, 762 F.3d 238 (2d Cir. 2014) ................ passim

*Fed. Trade Comm'n v. Bronson Partners, LLC*,
674 F. Supp. 2d 373 (D. Conn. 2009), *aff'd* 654 F.3d 359 (2d Cir. 2011). ........................... 20

*Fed. Trade Comm'n v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011) ..................... 17, 21

*Fed. Trade Comm'n v. Febre*, 1996 WL 396117 (N.D. Ill. July 3, 1996),
*adopted by* 1996 WL 556957 (N.D. Ill. Sept. 27, 1996),
*aff'd by* 128 F.3d 530 (7th Cir. 1997) ..................................................................... 7

*Fed. Trade Comm'n v. Five Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ............ 17

*Fed. Trade Comm'n v. Freecom Communications, Inc.*,
401 F.3d 1192 (10th Cir. 2005) ............................................................................. 7

*Fed. Trade Comm'n v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004) (en banc) ........................... 19

*Fed. Trade Comm'n v. Sec. Rare Coin & Bullion Corp.,* 931 F.2d 1312 (8th Cir. 1991) ........ 7, 20

*Fed. Trade Comm'n v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ........................ 8

*Fed. Trade Comm'n v. Trudeau*, 579 F.3d 754 (7th Cir. 2009) ................................................. 21

*Fed. Trade Comm'n v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006) ......................................... 22

*In re Thompson Medical Co.*,
104 F.T.C. 648 (F.T.C. 1984), *aff'd* 721 F.2d 189 (D.C. Cir. 1986) ............................... 7, 8, 9

*ITC v. Punchgini, Inc.*, 482 F.3d 135 (2d Cir. 2007) .................................................................. 19

*Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063 (4th Cir. 1988) .................................. 9

*Kraft, Inc. v. Fed. Trade Comm'n*, 970 F.2d 311 (7th Cir. 1992) .................................................. 7

*McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000) ................................................. 12, 19, 20

*ResQNet.com, Inc. v. Lansa, Inc.*, 828 F. Supp. 2d 688 (S.D.N.Y. 2011) ................................... 10

*United States v. Ben Zvi*, 242 F.3d 89 (2d Cir. 2001) ............................................................ 10, 11

*United States v. City of New York*, 717 F.3d 72 (2d Cir. 2013) ................................................... 9

Rensin's argument that the presumption of reliance should not apply in the case depends on a fundamental misapprehension of the nature of the case. He treats the case as though it were about Contempt Defendants' saddling consumers with previously undisclosed fees when they attempted to avail themselves of BlueHippo's refund policy. It is not.

Rather, as the Second Circuit recognized, this case is about Contempt Defendants' failure to disclose to financially-vulnerable consumers that onerous, undisclosed terms of their refund policy would make it difficult, if not impossible, for consumers to obtain anything of value from BlueHippo. That failure deprived consumers of the opportunity to avoid doing business with Contempt Defendants before losing a single dollar. And it is this harm that the FTC seeks to remedy through this action.

This Court has already found that Contempt Defendants violated the order through these material omissions. And the Second Circuit has squarely rejected Rensin's argument that the FTC must prove injury on a consumer-by-consumer basis. *See Fed. Trade Comm'n v. BlueHippo Funding*, *LLC*, 762 F.3d 238, 244 (2d Cir. 2014). Instead, the Second Circuit found that consumer reliance may be presumed, and injury proven, if three conditions have been met: 1) the defendant made material misrepresentations or omissions that were of a kind usually relied upon by reasonable prudent persons; 2) the misrepresentations or omissions were widely disseminated; and 3) consumers actually purchased defendants' products. *See id.* (internal citations and quotation marks omitted). In determining contempt, this Court has already made all of the findings necessary to meet the standard for applying the presumption and finding that Contempt Defendants' $14,062,627.51 in gross revenues are the appropriate compensatory baseline.

Rensin contests only the first of these elements – that the omissions were material. *See* ECF 95 at 4-5. As discussed below, Rensin disputes materiality on four grounds. Each of his arguments is premised on misstatements of law, fact, or both, and none has merit. Moreover, Rensin's arguments would require this Court to ignore, or overturn, both its previous findings and Second Circuit's holdings in this case.

As explained below, once the presumption applies, the burden shifts to Rensin to prove that individual consumers did not rely on the omissions, and any other evidence is irrelevant to the Court's computation of damages. Therefore, if the Court finds that further discovery is necessary, it must be strictly limited in light of Rensin's proclivity to muddy the record with irrelevant and incorrect arguments. Such limits are particularly important because Rensin has already indicated that he will once again rely on erroneous premises of law in an effort to undo the Second Circuit's key holding: the FTC need not prove injury on a consumer-by-consumer basis.

## I. BACKGROUND

### A. Events Leading To Entry Of 2008 Consent Order

On April 10, 2008, this Court entered the consent order ("Order") that is the subject of these contempt proceedings. The Order resolved allegations that BlueHippo violated the FTC Act in a number of ways. One of the central allegations was BlueHippo's failure to disclose that it would not provide refunds to those who entered its financing programs *before* receiving money from consumers. *See* FTC 23 ¶¶ 17-18, 23-25 (Complaint for Injunctive and Other Equitable Relief). Specifically, BlueHippo's failure to disclose its policy of not giving refunds prior to debiting the consumers' accounts deprived them of "***the opportunity to make a timely and informed decision about whether or not to risk the potential loss of up to several hundred dollars in advance payments***." FTC 23 ¶ 18. (emphasis added).

Accordingly, the Order directly addressed that alleged conduct and required BlueHippo to fully disclose the material terms of its refund policies ***prior to*** receiving money from the consumers who entered into one of its various financing programs. Specifically, Section I of the Order provides:

> [I]n connection with the advertising, marketing, offering for sale, or sale of Covered Products[1] in commerce . . . Defendants . . . are hereby permanently restrained and enjoined from: . . .
>
> B.      Making any representation regarding any refund, cancellation, exchange or repurchase policy without disclosing clearly and conspicuously, ***prior to receiving any payment from customers***, all material terms and conditions of any refund, cancellation, exchange or repurchase policy, or if there is a policy of not making any refunds, cancellations, exchanges, or repurchases whatsoever, a statement informing the customer of such policy, prior to receiving any payment from customers.

ECF 2 at 3-4 (emphasis added).

**B.      The District Court's Contempt Findings Regarding Contempt Defendants' Failure To Disclose Material Terms Of Their Refund Policy**

This Court found Contempt Defendants marketed computers and other electronics to credit-challenged consumers through national print, radio, and television ads that promised to finance those products to "everyone – regardless of their credit." ECF 76 at 1. When consumers enrolled in the financing programs,[2] Contempt Defendants told them that, after seven days, cash refunds were not available, but that they could obtain store credit, which could be used to obtain other merchandise. *See id.* at 2. As part of their telemarketing sales pitch, Contempt Defendants emphasized that their refund policy made it easy for consumers to receive something of value,

---

[1] "Covered Products" is defined as "any consumer electronics product and any other product for which Defendants require four or more periodic payments before shipping the product." ECF 2 at 3.

[2] BlueHippo offered consumers enrollment in two programs: 1) the "Layaway Plan," in which the consumer made an initial payment and then weekly or biweekly payments until the full purchase price was satisfied; and 2) an "Installment Credit Financing Plan," in which consumers who made their initial payment plus 13 additional, consecutive payments and entered into an Installment Credit Agreement and would receive a computer before satisfying the full purchase price. ECF 76 at 1-2.

even if they were unable to meet the company's financing terms, stating:

> Now [f]irst you can cancel your order at any time prior to shipment – and while we don't give cash refunds – we will give you store credit that you can use on over 3 dozen desktops, laptops, monitors, TVs and more at BlueHippo.com. ***So you see – we've really tried to make this decision easy for you today***.

FTC 39 at 14 (telemarketing script) (emphasis added); FTC 40 at 14 ("[W]e will give you store credit that you can use on over a thousand desktops, laptops, monitors, TVs, and more at BlueHippo.com."); *see also* FTC 41 at 5 (BlueHippo Layaway Agreement stating, "I can cancel my order at any time prior to shipment – and while BlueHippo doesn't give cash refunds – they will give me store credit that I can use if I like towards desktops, laptops, monitors, software, TVs and more at BlueHippo.com.")

However, as the Court found, Contempt Defendants failed to disclose all material terms of this store credit policy.  ECF 76 at 8-9.  Specifically, citing BlueHippo's sworn response to the FTC's request for a compliance report detailing its store credit refund policy, the Court found that Contempt Defendants failed to tell consumers that store credit could not be used to cover taxes, shipping and handling, and that consumers would have to pay additional money to satisfy those costs.  *Id.* at 8 (citing to FTC 22F at 6).  They also failed to tell consumers that store credit could only be used to purchase one item at a time, so consumers might have to pay shipping, handling, and taxes on any additional orders.  *Id.*[3]

Throughout the contempt action, Rensin argued strenuously that the omitted store credit policy conditions were not material to consumers on the grounds that not all consumers were

---

[3]  As discussed *infra* at 13-14, this sworn response was confirmed by Rensin at his deposition in this matter.

charged those fees. ECF 72 at 6 (Rensin post trial brief) (recounting evidence and argument).[4] In holding Rensin and BlueHippo in contempt, the Court expressly rejected this argument, holding: "Since the cost of shipping, handling, and taxes increases the overall cost of merchandise, *these costs are material* and BlueHippo should have clearly and conspicuously disclosed this information to consumers." ECF 76 at 8-9 (emphasis added). Moreover, these omissions were particularly material to consumers who were likely to pay large amounts of money without receiving anything in return. As the Second Circuit noted, Contempt Defendants did not challenge the Court's finding that they were in contempt of the Consent Order as a result of these material omissions. *See BlueHippo Funding*, 762 F.3d at 246 ("BlueHippo, as the district court found and *the defendants do not dispute*, violated the Consent Order.") (emphasis added).

In total, between April 10, 2008, and July 24, 2009, consumers who were deprived of these material disclosures placed 62,673 orders for computers from Contempt Defendants. *See* ECF 76 at 4. For 55,892 of those orders, consumers paid Contempt Defendants a total of $14,062,627.51, *but received nothing in return*. *See id.*

## II. THE COURT HAS ALREADY DETERMINED THAT THE UNDISCLOSED REFUND POLICY CONDITIONS ARE MATERIAL OMISSIONS OF A KIND USUALLY RELIED UPON BY PRUDENT PERSONS.

Rensin does not dispute that the FTC has satisfied the second and third elements of the Second Circuit's test for the presumption of reliance. ECF 95 at 4-5. Rather, he contests the first prong – materiality – on four grounds. First, Rensin claims that the Second Circuit has changed the law of materiality such that the Court's previous findings no longer apply. *See* ECF

---

[4] Specifically, Rensin argued: "The FTC's claim of materiality rests on its assumptions that shipping and taxes were charged on *all* online store merchandise, and that because customers were required to make additional payments for shipping and taxes to use their store credits, they would be deterred from placing orders. In fact, the evidence established the contrary. Shipping and tax charges were not required for all merchandise, nor did they deter customers from placing orders." ECF 72 at 6.

95 at 1, 8, 16-18.  Second, he argues that the Court never found that the omissions were material, but merely presumed it.  *Id.* at 2-3, 18.  Third, Rensin argues that BlueHippo's apparent failure to consistently apply its refund policy somehow excuses its failure to disclose the policy's material terms.  *Id.* at 4, 6-7, 10-13.  Finally, he claims that refund policies do not impact consumers' purchasing decisions because, in the past, consumers ordered from BlueHippo when it offered no refunds.  *Id.* at 15.  These arguments are untethered to both law and fact and are irrelevant to the fact that the presumption of reliance applies.

### A. The Court Has Already Found That The Omitted Terms And Conditions Are Of A Kind Relied Upon By Reasonably Prudent Persons.

Rensin argues that the Second Circuit's requirement that the FTC show the material omissions were "of a kind usually relied upon by reasonable prudent persons" creates "a different standard for materiality in determining whether there is a presumption of reliance than the Court applied in reaching its contempt determination."  ECF 95 at 17.  Rensin suggests that this means the Court cannot use the same facts that establish materiality to also find that the omissions satisfy this additional requirement.  Rensin cites no law for this proposition.  *See* ECF 95 at 1, 8, 16-18.  Nor could he, as the well-established law of materiality makes clear the determination that a claim is material (*i.e.,* likely to affect a person's choice of products or services) necessarily determines that the claim is one upon which a reasonable person would usually rely.[5]

---

[5] Notably, Rensin never defines precisely what evidence he believes would be required under this so-called new standard.  To the contrary, throughout his argument he vacillates wildly between various formulations.  For example, in one instance, he claims that the FTC "must establish that 'reasonable prudent persons' usually would not have ordered a computer from BlueHippo had they been informed at the outset of certain details concerning BlueHippo's store credit policy."  ECF 95 at 1 (emphasis omitted); *see also id.* at 14.  In another, he claims that the FTC must show "whether and with what frequency BlueHippo charged for shipping and handling and for taxes."  *Id.* at 6.  In yet another, Rensin claims that the FTC "had to offer not just evidence of a payment policy, but evidence that a payment policy mattered to consumers because charges that were subject to the policy were in fact imposed, and with sufficient regularity to cause consumer reliance."  *Id.* at 8.  Regardless of the formulation he posits, Rensin tellingly admits that "whether consumers 'usually rely' upon a representation or omission ***depends upon***

(continued…)

Specifically, courts have found that claims concerning "central characteristics of a product or service, such as those relating to its purpose, safety, efficacy, or **cost**" are material precisely because "**reasonable consumers** would consider the information in the claims important." *In re Thompson Medical Co.*, 104 F.T.C. 648, 816-17 (F.T.C. 1984), *aff'd* 721 F.2d 189 (D.C. Cir. 1986) (emphasis added); *see also Fed. Trade Comm'n v. Freecom Communications, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005) (finding that misrepresentations that "strike at the heart of a consumer's purchasing decision" are likely to mislead ordinary consumers); *Kraft, Inc. v. Fed. Trade Comm'n*, 970 F.2d 311, 322-23 (7th Cir. 1992); *Fed. Trade Comm'n v. Febre*, 1996 WL 396117, at *2-*3 (N.D. Ill. July 3, 1996), *adopted by* 1996 WL 556957, at *2 (N.D. Ill. Sept. 27, 1996), *aff'd by* 128 F.3d 530 (7th Cir. 1997) (rejecting argument that FTC must use extrinsic evidence to prove "that a reasonably prudent person would rely on the allegedly deceptive advertisements").[6] Thus, the language that the omission is "of a kind usually relied upon by reasonable prudent persons" does nothing to alter the law of materiality. Indeed, Rensin concedes as much when he admits that the Second Circuit's opinion "could be read . . . to modify and explain the former phrase [*i.e.*, material omission] with the latter in this context." ECF 95 at 22-23.

And here, the Court's finding that the omitted store credit policy terms were material

---

consumers' state of mind." *Id.* at 14 (emphasis added). But the Second Circuit rejected this argument when it ruled that the presumption of reliance applies in FTC contempt actions precisely because requiring proof of subjective reliance "would be an onerous task with the potential to frustrate the purpose of the FTC's statutory mandate." *See BlueHippo Funding*, 762 F.3d at 244 (citing *Fed. Trade Comm'n v. Sec. Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1316 (8th Cir. 1991)); *see also Sec. Rare Coin & Bullion Corp.*, 931 F.2d at 1316 (calling the task of proving subjective reliance "impossible").

[6]  Notably, in *Febre*, the court rejected the very argument that Rensin makes here, *i.e.*, the FTC must use extrinsic evidence to prove "that a reasonably prudent person would rely on the allegedly deceptive advertisements." 1996 WL 396117, at *2. Like this case, *Febre* involved claims that involved a central characteristic of the service being sold – there, the earnings potential associated with a work-at-home business opportunity. *See id*. *Febre* also specifically notes that the FTC need not offer extrinsic evidence to demonstrate that "the failure to disclose material facts that could affect consumers' decisions, i.e., **the conditions for obtaining refunds**" was likely to mislead a reasonable consumer. *Id.*, at *4 (emphasis added).

because they were cost terms necessarily determines that reasonably prudent consumers would typically rely on them (*i.e.,* consider them important), and no further evidence is required.  *See Thompson Medical*, 104 F.T.C. at 816-17; *Fed. Trade Comm'n v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) ("A representation or omission is material if it is of the kind usually relied on by a reasonably prudent person").  Thus, Rensin is plainly incorrect when he claims "[t]his Court has not previously made the determination that the Court of Appeals instructed it to make on remand, and even if it had, the Court of Appeals decision requires it to reconsider the decision under the new test."  ECF 95 at 23.  To the contrary, the Court made the correct determination under the correct standard.[7]

> ### B.    The Court Already Found, As Fact, That The Omitted Refund Policy Terms Were Material.

Rensin now claims that, despite finding that Contempt Defendants violated the 2008 Order, the Court made no finding that the omitted cost terms were material – it simply assumed it based on a legal presumption.  *See* ECF 95 at 2-3; *id.* at 18 ("[T]his Court merely found that the omissions related to cost, and then followed another district court's *suggestion* that information related to cost is presumed material.") (emphasis added).  Nothing could be further from the truth.

Indeed, the Court found specifically – by clear and convincing evidence – not just that the omitted store credit policy terms were presumed material, but that they were, as a matter of fact, material, stating:

> Information concerning cost, however, is presumed material.  FTC v. Crescent Publ'g Group, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001).  Since the cost of shipping, handing, and taxes increases the overall cost of the merchandise, *these costs are material* and BlueHippo should have clearly and conspicuously

---

[7] For this reason, Rensin's claim that an "intervening change of controlling law" justifies departure from the "law of the case" doctrine, *see* ECF 95 at 25, is unavailing.

disclosed this information to consumers . . . . Accordingly, the Court finds BlueHippo in civil contempt for violating the Consent Order by ***failing to disclose material terms*** relating to its Store Credit Policy.

ECF 76 at 8-9 (emphasis added).[8] This finding, of course, was critical to this Court's

determination of contempt liability because the Order does not prohibit the omission of any term

of the refund policy. Rather, only ***material*** omissions are prohibited. ECF 2 at 3-4.[9] Moreover,

in making this finding, the Court expressly rejected Contempt Defendants' argument that "any

terms of its Store Credit Policy that [they] did not disclose were immaterial." *See* ECF 76 at 8.

Critically, and notwithstanding Rensin's efforts to diminish it as "dicta," *see* ECF 95 at

13 n.5, the Second Circuit clearly and specifically affirmed the Court's materiality

determination, holding: "This information, if it had been revealed to consumers before they

purchased computers from BlueHippo, in all likelihood would have influenced their purchasing

---

[8] It is black-letter law that "[w]hen a plaintiff successfully creates a presumption, he not only satisfies his burden of going forward but also shifts that burden to the defendant . . . . If the defendant fails to introduce sufficient evidence to rebut the presumption, the plaintiff might prevail on the strength of the presumption." *Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063, 1066 (4th Cir. 1988); *see also United States v. City of New York*, 717 F.3d 72 (2d Cir. 2013) ("[T]he presumption arising from an unrebutted prima faciae case entitles the plaintiff to prevail on the issue of liability and proceed directly to the issue of appropriate relief").

[9] Rensin now attempts to distinguish the Court's reliance on *Crescent Publishing* because "the materiality of cost information turns on the facts of individual cases and the facts were egregious in *Crescent Publishing*." ECF 95 at 21. Once again, Rensin cites no law for this so-called "egregiousness" standard, nor could he. As demonstrated by the cases above, cost terms, because they are central to commercial transactions, are presumptively material. *See In re Thompson Medical*, 104 F.T.C. at 816-17. Indeed, Rensin argued in connection with the FTC's appeal that this matter was not an appropriate case for the presumption to apply under any circumstances because the refund policy was a "comparatively minor" aspect of BlueHippo's business that did not involve "false statements about the nature or quality of the product for sale." *See* ECF 56 at 23, 29, 48-50, *Fed. Trade Comm'n v. BlueHippo Funding,* Case No. 11-374 (2d Cir. 2011). This argument was soundly rejected by the Second Circuit when it specifically affirmed the materiality of the omitted cost terms. *See* 762 F.3d at 246.

decisions," *BlueHippo Funding*, 762 F.3d at 246.[10]

As the Second Circuit specifically noted, Contempt Defendants did not appeal the Court's holding that these omissions were material. *See BlueHippo Funding*, 762 F.3d at 246.[11] Having foregone the opportunity to challenge this determination, Rensin cannot now claim that the FTC failed to demonstrate the materiality of those omissions. *See United States v. Ben Zvi*, 242 F.3d 89, 96 (2d Cir. 2001); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 828 F. Supp. 2d 688, 696 (S.D.N.Y. 2011). To permit him to do so is plainly inconsistent with the Second Circuit's mandate, which vacates only "that portion of the district court's contempt order that has calculated damages" but leaves the Court's contempt liability determination intact. *See BlueHippo Funding*, 762 F.3d at 246; *see also* ECF 86. Moreover, doing so would lead to the very harm that the Second Circuit intended to prevent through the "prior decision rule," namely:

> [I]t would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost.

*Ben Zvi*, 242 F.3d at 96 (quoting *County of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d

---

[10] To escape the effect of this finding, Rensin resorts to misstatements of the Second Circuit's decision in two respects. First, he states: "the appellate court's observations were based on its factual recitation, which did not comport with the record. The Court believed that the BlueHippo practice, *before entering into the Consent Order,* was not to disclose that taxes and shipping and handling in the online store had to be paid in cash rather than with store credits, and consumers therefore had to send in additional funds to receive online store merchandise." ECF 95 at 13 n.5 (emphasis original). However, the Second Circuit did no such thing. Indeed, its affirmation of the materiality of the omitted terms and conditions follows its recitation of the *undisputed facts* concerning Contempt Defendants' Order violations found by the District Court. *See BlueHippo Funding*, 762 F.3d at 245-46. Second, Rensin claims that "the Court of Appeals was under the mistaken impression that the FTC had established that the only way consumers could obtain online store merchandise was by paying additional funds for taxes and for shipping and handling." ECF 95 at 13 n.5. Once again, this is at odds with the Second Circuit's clear discussion of the district court's undisputed findings of fact regarding the terms and conditions of the store credit refund policy. *See BlueHippo Funding*, 762 F.3d at 246 ("The district court noted that at the time of these purchases BlueHippo informed these consumers that if they chose not to have their purchases refunded within seven days of placing their order, they could cancel their order later and obtain usable store credit. In making these representations, *the district court further observed BlueHippo had conveniently omitted several material caveats accompanying their store credit policy*, namely, that store credit could be used for one online store order at a time and could not be applied towards shipping and handling fees or taxes.") (emphasis added).

[11] Rensin claims that, if this were the Second Circuit's holding, it would not have remanded the case for further proceedings. That claim is baseless because, as the Court recognized at the March 24 status conference, when the Second Circuit announces a new rule, its practice is to remand to the lower court to apply it in the first instance.

1112, 1117 (2d Cir. 1997)).

**C.** **BlueHippo's Alleged Failure To Consistently Apply Its Store Credit Policy Is Irrelevant And Has Already Been Rejected By This Court And The Second Circuit.**

Contrary to both the facts and applicable law, Rensin argues that, because BlueHippo may not have consistently complied with its own refund policy, Contempt Defendants' failure to disclose the potential for additional charges was not material. ECF 95 at 4, 6-7, 10-13. This argument is nothing more than an at-times-verbatim rehash of the arguments that this Court rejected in holding Contempt Defendants' liable for their Order violations. *Compare* ECF 95 at 4, 6-7, 10-13, 21-23 *with* ECF 72 at 6-8 *and* Trial Tr. at 380-382, 386-387. In making these arguments, Rensin predominantly relies on the same evidence that the Court already rejected, information elicited through the cross-examination of the FTC's expert. *Compare* ECF 95 at 4, 6-7, 10-13 *with* ECF 72 6-8 and Trial Tr. at 382-387 (recounting Yoeli testimony). Rensin made these same arguments and relied on the same evidence in opposing the FTC's appeal. *See* ECF 56 at 14-17, 32-33, *Fed. Trade Comm'n v. BlueHippo Funding*, Case No. 11-374 (2d Cir. 2011).

Once again, the Second Circuit's affirmance of materiality is dispositive of this issue. Although Rensin did not appeal the materiality *per se*, he vigorously argued that a lack of materiality prevented the Second Circuit from adopting the presumption of reliance in this case, relying on the same arguments and evidence he advances now. *See id.* The Second Circuit disagreed, holding both that the omitted terms were material and that this case was a proper one in which to apply the presumption. *BlueHippo Funding,* 762 F.3d at 245-46. Thus, because materiality was "explicitly or implicitly decided by the appellate court," the mandate rule bars Rensin from relitigating it. *See Ben Zvi*, 242 F.3d at 95.

Moreover, Rensin has offered no reason at all why the Court should reverse its findings regarding materiality based on evidence it has already plainly rejected. Nor could he, as doing so

would require the Court to ignore both the plain language of the Order and the Second Circuit's specific findings regarding the time and nature of the consumer injury and its findings regarding materiality.

As the Second Circuit recognized, Section I of the Order defines both the time of the injury to consumers and the nature of that injury. Critically, it requires that BlueHippo disclose to consumers the material conditions of its refund policies ***before accepting payment*** for consumer electronics products. ECF 2 at I.B. It therefore defines the ***time*** of contempt injury – the moment consumers pay money to Contempt Defendants without receiving the required disclosures. *See BlueHippo Funding*, 762 F.3d at 244 ("The injury to a consumer occurs ***at the instant of a seller's misrepresentations, which taint the consumer's subsequent purchasing decisions***.") (emphasis added). Moreover, it also defines the precise ***nature*** of the injury – the monies paid by each and every consumer for those consumer electronics products after they were deprived of the material disclosure. *Id.* at 245 ("[W]hen an injury by misrepresentation or omission ***precedes a purchase***, ***the full amount paid by the injured consumer must serve*** as the baseline for calculating damages because 'the seller's misrepresentations tainted the consumer's purchasing decisions.'") (quoting *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000)) (emphasis added). Accepting Rensin's position that events occurring after the violation are relevant to whether the presumption applies would require the Court to, in practical effect, reverse the Second Circuit's holdings regarding the timing and nature of consumer injury.[12]

---

[12] Rensin's continuing effort to point to BlueHippo's conduct ***after*** the injury to consumers occurs is, therefore, irrelevant. It would be different if the FTC were seeking to recover the additional taxes, shipping and handling costs paid by consumers. Under those circumstances, it would obviously be relevant whether BlueHippo actually imposed such charges. But the argument that BlueHippo may have, on occasion, disregarded its own policy provides no basis to excuse the harm inflicted on consumers when Contempt Defendants failed to inform them of the possibility of such charges.

Unable to avoid the legal infirmity of his argument, Rensin resorts to blatant misstatements of fact, suggesting that the Court erred when it found that BlueHippo's policy was that store credit could not be used to pay for taxes, shipping, and handling.  Rensin argues that "the policy itself simply did not say what the FTC has always contended."  ECF 95 at 4.  Specifically, he claims:

> The BlueHippo policy was described in a single sentence in a two-page description of the online store contained in a letter from a lawyer for BlueHippo to the FTC … [and] does not state or imply that such charges must be paid on every online store item, or how frequently, if at all,  taxes or shipping and handling are charged.

ECF 95 at 6.  However, the evidence of the policy's content comes directly from Contempt Defendants' sworn admissions.  Indeed, BlueHippo provided the policy, through its attorney, in response to a demand for an Order-required compliance report describing:

> "Defendants' policies regarding redeeming store credits and any limitations on using store credits to pay for products or costs associated with such products, including taxes, shipping and handling."

FTC 22F at 4.  In response, BlueHippo detailed its policy, including the fact that store credit could not be used for taxes, shipping, and handling.  *See id.* at 6.  It did not detail any exceptions to the policy, and BlueHippo's then-General Counsel, Andrew Campbell, attested under penalty of perjury that BlueHippo's responses to the FTC's compliance demands were "truthful and accurate."  *See* FTC 22H.

Moreover, Rensin' sworn deposition testimony affirms that the BlueHippo store credit policy was exactly as described in the company's compliance report.   Specifically, Rensin confirmed that "it's BlueHippo's policy to require that customers pay for taxes, shipping, and handling in advance by a money order to BlueHippo before they're entitled to receive products ordered by store credit," stating that it was "an effective way to take payment."  FTC 63 at 25 (Rensin Dep. at 90).  He further admitted that such payment was required "even if the customer

ordered a product that cost, say, $200 less than the amount of credit they had available to spend."
*Id.* (Rensin Dep. at 90-91). Notably, Rensin identified no exceptions to the policy that permitted
shipping and handling charges to be waived under certain circumstances. *See id.* Nor did he
claim that BlueHippo's store refund policy was anything other than what the company described
in its sworn compliance demand response. *See id.*

Indeed, even now, Rensin cannot point to specific exceptions to the policy, resorting to
rank speculation that BlueHippo's policy "*might mean* that it charged for shipping and handling
for some items but not for others; that it discontinued such charges without updating the policy;
that it never imposed the charges but issued the policy in case its practice changed." ECF 95 at 8
(emphasis added). Rensin's speculation is, of course at odds with the evidence, which
demonstrates that BlueHippo did actually charge consumers for taxes, shipping, and handling
consistent with this policy. *See* FTC 48D-H.[13]

However, even if BlueHippo had applied its policy inconsistently, that does not alter the

---

[13] Specifically, these complaints all involve consumers who investigated redeeming their store credits for
merchandise but were deterred from completing the online store purchase when informed that they would have to
pay additional sums to receive their products. *See* FTC 48D (consumer complaint dated 4/21/2009: "*My new order
cost $333.?? They have $467.?? And still want me to pay $46.09 for shipping and handling.* Why? *They don't use
in store credit to pay shipping & handling.* They want me to send it through the mail before they will send me my
product . . . . People who order through Blue Hippo [sic] are getting ripped off! *If you decide not to order from
them & they have your money, they keep it until you order something & then you have to send more money in
order to get your order shipped!*") (emphasis added); FTC 48E (consumer complaint dated 1/26/2009: "I called and
told them to cancel my account…. [T]hey said I couldn't get my money back but I could use it for store credit. Well
now, *if I order, they are telling me that I need to pay for the shipping and taxes by money order first and they will
send whatever I buy. I shouldn't have to, after I have almost a thousand dollar credit with them.*") (emphasis
added); FTC 48F (consumer complaint dated 5/20/2009: "You claim that I have sufficient store credit to purchase a
television, however *you still want extra money for tax and shipping when I have enough credit to cover these
costs as well.*") (emphasis added); FTC 48G (consumer complaint dated 3/18/2009: "When I cancelled the order I
was informed that I would not be able to rec[ei]ve a refund but would have to use my initial 100 dollar deposit as an
internet store credit on blue hippo's [sic] website. *When I ordered the product I wanted off the website the total
for the product was 50.72 plus 18.47 for S + H charges. However, Blue Hippo required me to send the shipping
and handling fee in sep[a]rately and by money order only even though I had a 100 dollar credit which is more
than enough to cover the total charges.*") (emphasis added); FTC 48H (consumer complaint dated 6/15/2009: "I
finally decided to cancel my contract and request my money back and he said we cannot refund your money but we
will give you an in[-]store credit and *I said what is your policy to use in[-]store credit and he said that you can
only order 1 item at a time and you have to pay your shipping and handling up front . . . They have 963.76 of my
money and I refuse to send anymore [sic] of my money to them.*") (emphasis added).

fact that it failed to properly disclose the policy's terms and conditions, depriving consumers of the opportunity to avoid the transaction if they did not like those terms. *See BlueHippo Funding*, 762 F.3d at 244 (noting that "the presumption of consumer reliance . . . attaches to **potential consumers** at the instant of the initial misrepresentation") (collecting cases) (emphasis added). The opportunity to avoid the transaction is particularly important, here, where Contempt Defendants targeted their sales pitch to financially-vulnerable consumers who in all likelihood would not complete the financing program. *See* ECF 76 at 4 (of the 24,108 orders that could have qualified for financing on or before April 8, 2009, only 2,025 actually did).[14] For those consumers, the only way they could obtain anything of value in return for their scarce funds would be to avail themselves of the store credit refund policy.

## D. BlueHippo's Own Telemarketing Scripts Disprove Rensin's Unsupported Speculation That Consumers Do Not Care About The Terms Of Refund Policies.

Finally, Rensin claims that the fact that 43,568 consumers who ordered but never received computers from BlueHippo purchased those computers prior to March 1, 2006 – at a time when its policy was to provide no refunds – demonstrates that consumers "usually did not rely on the details of the refund policy." *See* ECF 95 at 15. Three key facts completely undermine Rensin's contention.

First, even if Rensin's claim that BlueHippo fully disclosed the "no refund" policy were true, it does not prove that even consumers in the underlying case did not care about the refund

---

[14] Indeed, at trial, Rensin made the likelihood that a consumer would not ever qualify to receive a computer a centerpiece of his defense to the FTC's allegation that the BlueHippo lied when it claimed to be in the "business of financing computers". *See* Trial Tr. at 12. That is a far cry from his current line of speculation: that BlueHippo's consumers were "highly motivated to obtain computers [and] would have been exceedingly unlikely to change their purchasing decisions on the possibility, which appeared remote at the time they placed their orders, that they might have to pay taxes or shipping and handling." ECF 95 at 15-16.

policy.[15]  Specifically, there could have been tens of thousands of consumers who, once informed that they could not obtain refunds, chose not to purchase computers from BlueHippo. Rensin's argument depends on an ***assumption devoid of any support in the record whatsoever***: That ***every*** consumer who received the disclosure that refunds were not available purchased anyway.[16]

Second, Rensin's argument is completely defeated by BlueHippo's prominent touting of the refund policy in an effort to induce financially-vulnerable consumers to enter into one of its financing programs.  Indeed, after reassuring consumers that they could cancel their computer order at any time and for any reason, Contempt Defendants' telemarketers promised consumers that they could use their store credit to obtain items from the online store, virtually guaranteeing that consumers could get something in exchange for their money.  After telling consumers how simple it was to use their store credit, Contempt Defendants' telemarketers aggressively encouraged consumers to complete the enrollment process, stating:  "***So you see – we've really tried to make this decision easy for you today***."  FTC 39 at 14 (telemarketing script) (emphasis added).  The telemarketers, of course, were talking about the consumers' decision to enter BlueHippo's computer financing program – and used the features of the store credit refund policy as a tool to present the decision as risk-free, while concealing that it could very well entail

---

[15]  Moreover, there is no proof that the conditions of the "no-refund" policy were ever disclosed to the consumers. Rensin cites to Exhibit N, the White Paper submitted by BlueHippo to the FTC in connection with the consent negotiations leading to entry of the Order as "evidence" that BlueHippo fully disclosed the terms of that policy.  *See* ECF 95 at 15.  However, the White Paper is simply the argument of counsel and does not prove that BlueHippo actually disclosed the refund policy terms.  And, Rensin's contention that the terms were properly disclosed is belied by the fact the 43,568 consumers Rensin cites were precisely those consumers who were not informed that their payments were not refundable even if they received nothing from BlueHippo.  It was those very consumers who comprised the victim pool that was compensated with the $3.5 million BlueHippo paid to settle the case.  *See* ECF 2 §§VI and VII; ECF 95 at 15 n.6.

[16]  Rensin tries to argue that the burden is on the FTC to show the contrary – that consumers who learned of the refund policy did not enter into BlueHippo's programs.  ECF 95 at 1.  But that is just another way of saying that the FTC must prove injury on an individual basis and the Second Circuit has made clear that is an impermissible result.

additional costs to the consumer. Common sense alone dictates that financially-vulnerable consumers would be particularly susceptible to this type of sales pitch – a fact highlighted by Contempt Defendants' assurances that even if consumers could not complete the financing programs they would be able to receive **something** in return for their hard-earned dollars. *See Fed. Trade Comm'n v. Five Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 533 (S.D.N.Y. 2000).

Finally, the Second Circuit, analyzing the ***actual policy at issue***, and not one that Contempt Defendants abandoned years earlier, held that these specific undisclosed terms and conditions were, in fact, material to consumer's purchasing decisions. *BlueHippo Funding*, 762 F.3d at 246 ("BlueHippo had conveniently omitted several material caveats accompanying their store credit policy . . . This information, if it had been revealed to consumers before they purchased computers from BlueHippo, in all likelihood would have influenced their purchasing decisions."). Whether or not consumers might consider some other terms of some other policy material is simply irrelevant.

## III. RENSIN'S ABILITY TO INTRODUCE NEW EVIDENCE RELATED TO OFFSETS IS CIRCUMSCRIBED BY SECOND CIRCUIT PRECEDENT.

Because all three elements required for the presumption of consumer reliance are satisfied, the presumption of reliance must be applied and Contempt Defendants' gross revenues of $14,062,627.51 are the compensatory baseline. *See BlueHippo Funding*, 762 F.3d at 245-46. Pursuant to Second Circuit precedent, the burden now shifts to Rensin to "demonstrat[e] that baseline consumer loss should be offset." *Id*. at 246.

However, evidence sufficient to rebut the presumption is not unbounded. Specifically, Rensin is only permitted to demonstrate "that *individual* transactions were atypical and resulted in a lower-than-expected gain to the wrongdoer." *See Fed. Trade Comm'n v. Bronson Partners, LLC*, 654 F.3d 359, 369 (2d Cir. 2011) (emphasis original). In other words, for each consumer

for which he claims offset, Rensin must show that the consumer's injury was less than the full amount that he or she paid to BlueHippo. *See id.* (rejecting application of 25.25 percent offset to account for 25.25 percent chargeback rate because the chargebacks pertained to all products sold by company not just the two products at issue). Thus, Rensin cannot rely on evidence relating to hypothetical consumers or a universe of consumers who were not subjected to the deceptive omissions. Only evidence pertaining specifically to each of the 55,000 individuals injured by Contempt Defendants' omissions is relevant.

Moreover, Rensin cannot evade his burden by attempting to shift it back to the FTC. Specifically, in his motion for panel rehearing before the Second Circuit, and again in his response to the FTC's motion for a pre-motion conference, Rensin stated that he intends to argue that if presents *any* evidence that consumers did not actually rely on the misrepresentations, the burden shifts back to the FTC to prove individualized harm for all 55,892 consumers. *See* ECF 105 at 14-15, *Fed. Trade Comm'n v. BlueHippo Funding, LLC*, 11-0374-cv (2d Cir. Sept. 25, 2014); *see also* ECF 90 at 3. Rensin's position is without merit.

As an initial matter, the Second Circuit's opinion does not expressly permit Rensin to present evidence relating to the presumption itself. *See* ECF 105 at 14-15, *Fed. Trade Comm'n v. BlueHippo Funding, LLC*, 11-0374-cv (2d Cir. Sept. 25, 2014) (Motion for Panel Rehearing) ("The Court should clarify that petitioner has the opportunity to present evidence that would contravene the presumed fact – in this case, reliance – and ***not merely evidence that would show offsets to the calculation of gross receipts***.") (emphasis added); *see also BlueHippo Funding*, 762 F.3d at 242-43, 246.[17]

---

[17] Notably, the Second Circuit denied Rensin's petition for rehearing on this point without expanding the categories of evidence Rensin may present on remand. ECF 111, *Fed. Trade Comm'n v. BlueHippo Funding, LLC*, 11-0374-cv (2d Cir. Nov. 17, 2014).

Critically, Rensin's argument misapprehends the nature of the presumption.  The presumption is not that *all* consumers in the aggregate relied on the misrepresentation, but rather that *each individual consumer* relied on the misrepresentation and was injured as a result.  As the Second Circuit found:  "[t]he injury to *a consumer* occurs at the instant of a seller's misrepresentations, which taint *the consumer's* subsequent purchasing decisions." *BlueHippo Funding*, 762 F.3d at 244 (collecting cases); *see also id.* at 245 ("[W]hen an injury by misrepresentation or omission precedes a purchase, the full amount paid by *the injured consumer* must serve as the baseline for calculating damages because the 'seller's misrepresentations tainted *the customer's* purchasing decisions.'") (quoting *McGregor*, 206 F.3d at 1388) (emphasis added).

The presumption then allows the court to aggregate total consumer harm by looking to defendants' gross receipts.  *Id.*  To the extent that evidence shows that an individual consumer did not rely on the misrepresentation to his or her detriment, the presumption is rebutted, but only as to that individual consumer, not to the thousands of others who were subject to the same misrepresentation and presumed to rely on it.  *See ITC v. Punchgini, Inc.*, 482 F.3d 135, 148 (2d Cir. 2007) (a presumption disappears only "upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact") (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992)).

Accordingly, even in instances where courts have permitted defendants to adduce evidence that individual consumers did not rely on the misrepresentations to their detriment, they have not shifted the burden of proving each injured consumer's individual reliance back to the FTC, as Rensin urges.  Rather, they have uniformly treated that evidence as individual offsets to gross revenues.  *See, e.g.*, *Fed. Trade Comm'n v. Kuykendall*, 371 F.3d 745, 766-67 (10th Cir.

2004) (en banc) ("The defendants may then put forth evidence showing offset is required because *certain consumers* . . . were satisfied with their purchases.") (emphasis added); *Fed. Trade Comm'n v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1997) ("Contrary to defendants' claims, *the FTC need not provide that every consumer was injured*. The existence of some satisfied consumers does not constitute a defense under the FTCA. *The magistrate correctly acknowledged the existence of satisfied customers in computing the amount of defendants' liability*. . . .") (emphasis added); *Fed. Trade Comm'n v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 386 (D. Conn. 2009) (noting that, where presumption of reliance applies, evidence that "repeat customers *did not rely on the deceptive advertising*" would entitle defendants to an "*offset* against the restitutionary baseline" for sales made to *those customers*) (emphasis added), *aff'd* 654 F.3d 359 (2d Cir. 2011).

Third, shifting the burden back to the FTC based on evidence that some individual consumers did not rely on the Defendants' misrepresentations would recreate the very problem the Second Circuit tried to solve – namely, "the inherent difficulty of demonstrating individual harm" thwarts the FTC's ability to protect the victims of widespread deception. *BlueHippo Funding*, 762 F.3d at 244. The Second Circuit expressly rejected Rensin's argument that the FTC should be required to prove injury on an individualized basis, stating:

> To require proof of each individual consumer's reliance on a defendant's misrepresentations would be an onerous task with the potential to frustrate the purpose of the FTC's statutory mandate.

*Id.* (citing *Sec. Rare Coin & Bullion Corp.*, 931 F.2d at 1316 and *McGregor*, 206 F.3d at 1388); *see also McGregor*, 206 F.3d at 1388 ("[T]he FTC need not prove subjective reliance by each customer, as '[i]t would be virtually impossible for the FTC to offer such proof, and to require it

would thwart and frustrate the public purposes of FTC action.'").[18]

Accordingly, clear guidance from the Court that Rensin is required to present evidence pertaining to individual consumers is critical given that, as demonstrated above, Rensin's strategy on remand appears to be to litter the record with legally-unsupportable arguments bolstered by misstatements of fact. *See, e.g., supra* at 10 nn.9-10, 11-15. Accordingly, the FTC requests that prior to setting a schedule for damages proceedings, the Court to: 1) decide whether the presentation of evidence regarding consumers who did not rely on the omissions operates as an offset to revenues relating to that consumer, as controlling precedent dictates, or, to destroy the presumption, as Rensin contends, and 2) require Rensin to come forward with a proffer of the evidence that he intends to present during the damages phase of these proceedings.

Given that Rensin has had more than five years since the commencement of this contempt action and over five-and-a-half months since the Second Circuit's opinion vacating the prior damages determination, he has had an ample opportunity to develop such evidence. Accordingly, Rensin should be required to come forth within thirty (30) days of that determination with a brief setting forth what, if any, amounts should be offset from the gross revenues figure and the evidence that supports his calculations.[19] These steps are necessary to prevent "prejudice [to the plaintiff], increase the already-substantial litigation costs, and further

---

[18] Rensin's complaint that following the Second Circuit's rulings that the presumption applies to individual, not aggregate consumers "would require defendant to call tens of thousands of witnesses at trial, most of whom would be rebutting 'damages' of a few hundred dollars or less," *see* ECF 90 at 3, is unavailing for two reasons. First, as discussed above, the Second Circuit has already determined that requiring the FTC to provide such proof would thwart its law enforcement mission. *BlueHippo Funding*, 762 F.3d at 244. Second, it is well-established in the Second Circuit that after the burden of rebutting the FTC's damages calculation shifts to the defendant, "the risk of uncertainty 'fall[s] on the wrongdoer whose illegal conduct created the uncertainty.'" *Bronson Partners*, 654 F.3d at 368 (quoting *Fed. Trade Comm'n v. Verity Int'l, Ltd.*, 443 F.3d 48, 69 (2d Cir. 2006)); *see also Fed. Trade Comm'n v. Trudeau*, 579 F.3d 754, 773 (7th Cir. 2009). That it may be difficult for Contempt Defendants to rebut the FTC's damages calculation does not provide a basis to ignore longstanding, controlling precedent.

[19] At that point, the FTC would have an opportunity to object to the newly-developed evidence produced by Rensin and, if necessary, seek discovery to rebut the newly-developed evidence.

delay resolution of this litigation, now almost six years old." *See Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493-94 (S.D.N.Y. 2011) (prohibiting further discovery in case where issues were known to parties at time of trial).[20]

## IV.    CONCLUSION

For the foregoing reasons, the FTC respectfully requests that the Court:  1) enter a finding that the presumption of reliance applies; 2) enter a finding that $14,062,627.51 is the appropriate compensatory baseline; and 3) require Rensin to file a brief within thirty (30) days setting forth any evidence and argument pertaining to offsets to the compensatory baseline.

Dated:  April 16, 2015

Respectfully submitted,

/s/ Amanda C. Basta
AMANDA C. BASTA
abasta@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Mailstop CC-9528
Washington, D.C.  20580
Tel.:    (202) 326-2340
Fax:    (202) 326-3197

Attorney for Plaintiff Federal Trade Commission

---

[20] Indeed, to the extent that Rensin intends to present evidence that is irrelevant (*e.g.,* evidence relating to consumers generally as opposed to the specific consumers harmed by Contempt Defendants' Order violations), the FTC would likely seek *in limine* rulings before being required to undertake discovery to rebut such evidence.

**Certificate of Service**

I, Amanda C. Basta, hereby certify that on April 16, 2015, I caused a true and correct copy of Plaintiff Federal Trade Commission's Brief Regarding Applicability of the Presumption of Reliance to be served on the following counsel via ECF:

Martin S. Himeles, Jr., Esq., mhimeles@zuckerman.com
John J. Connolly, Esq., jconnolly@zuckerman.com
Zuckerman Spaeder LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland, 21202
(Counsel for Contempt Defendant Joseph K. Rensin)

/s/ Amanda C. Basta
AMANDA C. BASTA